**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Scott Detrich, | No. CV-03-229-TUC-DCB |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| | **ORDER** |
| Dora Schriro, et al., | |
| Respondents. | |

     Petitioner David Scott Detrich ("Petitioner") is a state prisoner who filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution.  In an Order dated September 23, 2005, the Court denied Petitioner's Motion for Discovery and Motion for Evidentiary Hearing and Expansion of the Record (dkts. 82, 81.)[1] as to all claims except Claims A(5) (in part) and B, and found that these claims were exhausted and properly before the Court for review on the merits (<u>see</u> dkt. 93 at 9, 13.)  The Court heard oral argument regarding the motions as to these claims on December 5, 2005.

## <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

     On November 2, 1990, Petitioner was convicted by a jury of kidnapping, sexual abuse and first degree murder.  The factual predicate for these convictions was that Petitioner and his co-defendant Alan Charlton picked up the victim, Elizabeth Souter, on the side of the

---

[1] "Dkt." refers to the documents in this Court's case file.

road on November 4, 1989.[2]  After obtaining some cocaine and going to the victim's house, Petitioner accused her of providing him bad drugs.  Three witnesses testified that Petitioner held a knife to her throat; he also said they were going to have sex and threatened to kill her. The two men took the victim to the car at knife point.

Charlton drove, Petitioner sat in the middle, and the victim sat up against the passenger door.  Charlton testified that he saw Petitioner humping the victim and asking her if she liked it.  Charlton subsequently looked and saw that the victim's throat was slit. Charlton indicated that Petitioner then hit her and asked her three times from whom she got the drugs.  The victim gurgled in response each time.  Charlton attested he never saw any stabbing, but he was poked in the arm with the knife three or four times. The pathologist established that the victim was stabbed forty times and her throat was slit.  Petitioner dragged the victim's body into the desert in a remote area.  Charlton testified that the passenger side of the car was covered in blood, he washed it out and rinsed out the seat cover and threw it away.  (RT 12/15/94 at 34.)[3]

A friend and co-worker of Petitioner and Charlton's, William Carbonell, testified that the two men showed up at his house at 4:00 a.m.  Carbonell testified that both Charlton and Petitioner were covered in blood, but Petitioner had more blood on him and Charlton had it only on his right side.  (RT 12/14/94  at 165, 178.)  Petitioner confessed to Carbonell that he had killed a girl by slitting her throat, after forcing her into the car at knife point.  He stated that he killed the victim because the drugs she had purchased were bad.  Petitioner did not return to work after the murder and was arrested in New Mexico approximately two weeks later.  (RT 12/15/94 at 94, 118-19.)

---

[2]  Except where otherwise indicated, this factual summary is taken from the Arizona Supreme Court opinion upholding Petitioner's conviction and sentence.  See State v. Detrich, 188 Ariz. 57, 60-61, 932 P.2d 1328, 1331-32 (1997) ("Detrich II").

[3]  "RT" refers to reporter's transcript from Petitioner's state court trials.  The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on January 21, 2005.  (Dkt. 91.)

1        Charlton pled guilty to kidnapping and agreed to testify in exchange for a dismissal

2    of the murder charge; he was sentenced to ten and one-half years in prison.  Phillip Shell, an

3    inmate housed for some period with Charlton at the jail, testified that Charlton told him he

4    had committed the murder but hoped to testify for the state against Petitioner and blame him.

5    (RT 11/1/90 at 56.)  Shell testified that Charlton told him that the three of them were in his

6    car parked behind a bar, that Petitioner was kissing the victim and Charlton was angry at

7    Petitioner for kissing a black woman, and that Charlton stabbed her.  (Id. at 56-57, 58.)

8    Charlton's wife, from whom he was separated, testified that Charlton hated blacks.  (RT

9    12/15/94 at 143-44.)  Shell testified that the victim went crazy and Charlton slit her throat,

10   and Petitioner left the car.  (RT 11/1/90 at 57, 71.)  Then Charlton told him that he passed

11   out in the back seat, but found Petitioner again in the morning.  (Id. at 57.)  Shell later met

12   Detrich in the jail, and Detrich told him he was being blamed for something he did not do.

13   (Id. at 59, 78.)  Petitioner told him that he was in a bar all that night, but he knew someone

14   had been killed and that it happened in a parking lot.  (Id. at 78.)  Charlton testified that he

15   did not discuss the details of his case with Shell, and that Shell tried to talk to all the inmates

16   about their cases.  (RT 12/15/94 at 75, 84.)

17       Pima County Superior Court Judge Michael D. Alfred sentenced Petitioner to death

18   for the murder and to a term of years for the other counts.  The Arizona Supreme Court

19   affirmed the sexual abuse conviction but reversed Petitioner's convictions for kidnapping and

20   first degree murder.  State v. Detrich, 178 Ariz. 380, 873 P.2d 1302 (1994) ("Detrich I").

21   Petitioner was re-tried and, on December 20, 1994, was again convicted by a jury of

22   kidnapping and first degree murder.  After finding one aggravating factor, Pima County

23   Superior Court Judge Richard D. Nichols sentenced Petitioner to death for the murder and

24   to a term of years for kidnapping.   On appeal, the Arizona Supreme Court affirmed

25   Petitioner's convictions and sentences.  Detrich II, 188 Ariz. 57, 932 P.2d 1328.

26

27

28

## LEGAL STANDARD FOR EVIDENTIARY HEARING,
## EXPANSION OF THE RECORD AND DISCOVERY

### Evidentiary Hearing

The decision whether to grant an evidentiary hearing when there are material facts in dispute is generally at the discretion of the district court judge.  See Townsend v. Sain, 372 U.S. 293, 312, 318 (1963), overruled in part by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), and limited by § 2254(e)(2); Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required).  However, a judge's discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA.  See Williams v. Taylor, 529 U.S. 420 (2000).

Section 2254 provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).  Subsection (e)(2) precludes an evidentiary hearing in federal court only if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 432.  "The purpose of the fault component of 'failed' is to ensure the prisoner undertakes his own diligent search for evidence."  Id. at 435.

If this Court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, then the Court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions.  If, however, the petitioner

has not failed to develop the factual basis of his claim in state court, the Court will then proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in Townsend. 372 U.S. 293; see Baja, 187 F.3d at 1078 (quoting Cardwell, 152 F.3d at 337). A federal district court *must* hold an evidentiary hearing in a § 2254 case when the facts are in dispute if (1) the petitioner "alleges facts which, if proved, would entitle him to relief," and (2) the state court has not "after a full hearing reliably found the relevant facts." Townsend, 372 U.S. at 312-13. In any other case in which the facts are in dispute and diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Id. at 318 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing").

**Expansion of the Record**

Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims. Rule 7 provides:

> The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record.

Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; see also Blackledge v. Allison, 431 U.S. 63, 81-82 (1977).

Section 2254(e)(2), as amended by the AEDPA, limits a petitioner's ability to present new evidence through a Rule 7 motion to expand the record in the same manner as it does with regard to evidentiary hearings. See Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners

1    seeking relief based on new evidence, even when they do not seek an evidentiary hearing)

2    (citing <u>Holland v. Jackson</u>, 124 S. Ct. 2736, 2737 (2004) (per curiam)).  Thus, when a

3    petitioner seeks to introduce, through a Rule 7 motion, new affidavits and other documents

4    never presented in state court for the purpose of establishing the factual predicate of a claim,

5    he must show both diligence in developing the factual basis in state court and relevancy of

6    the evidence to his claim.

7              **Discovery**

8              Rule 6(a) of the Rules Governing Section 2254 Cases ("Habeas Rules") provides that

9    "[a] judge may, for *good cause*, authorize a party to conduct discovery under the Federal

10   Rules of Civil Procedure, and may limit the extent of discovery."  Rule 6(a), 28 U.S.C. foll.

11   § 2254 (emphasis added).  Whether a petitioner has established "good cause" for discovery

12   requires a habeas court to determine the essential elements of the petitioner's substantive

13   claim and evaluate whether "specific allegations before the court show reason to believe that

14   the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

15   entitled to relief."  <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09 (1997) (quoting <u>Harris v.

16   Nelson</u>, 394 U.S. 286, 300 (1969)).

17            **LEGAL STANDARD FOR RELIEF UNDER THE AEDPA**

18            For properly preserved claims "adjudicated on the merits" by a state court, the

19   AEDPA enacted a more rigorous standard for habeas relief.  <u>See</u> <u>Miller-El v. Cockrell</u>, 537

20   U.S. 322, 337 (2003); <u>Lambert v. Blodgett</u>, 393 F.3d 943, 965 (9th Cir. 2004) ("Inspired by

21   principles of comity, finality and federalism, AEDPA establishes a highly deferential

22   standard for reviewing state court determinations").

23            Pursuant to the AEDPA, Petitioner is not entitled to relief on any claim adjudicated

24   on the merits in state court unless that adjudication:

25   (1) resulted in a decision that was contrary to, or involved an unreasonable
     application of, clearly established Federal law, as determined by the Supreme
26   Court of the United States; or

27   (2) resulted in a decision that was based on an unreasonable determination of
     the facts in light of the evidence presented in the State court proceeding.
28

1  28 U.S.C. § 2254(d).  Further, section 2254(e)(1) provides:

2      In a proceeding instituted by an application for a writ of habeas corpus by a
   person in custody pursuant to the judgment of a State court, a determination
3  of a factual issue made by a State court shall be presumed to be correct.  The
   applicant shall have the burden of rebutting the presumption of correctness by
4  clear and convincing evidence.

5  28 U.S.C. § 2254(e)(1).

6  **§ 2254(d)(1)**

7      To assess a habeas claim under subsection (d)(1), the Court must first identify the

8  "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas

9  review.  "Clearly established" federal law includes the holdings of the Supreme Court at the

10  time the petitioner's state court conviction became final.  See Williams v. Taylor, 529 U.S.

11  362, 365 (2000).  Habeas relief cannot be granted if the Supreme Court has not "broken

12  sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower

13  federal courts have decided the issue.  See id. at 381.  A state court decision is "contrary to"

14  clearly established federal law if it fails to apply the correct controlling Supreme Court

15  authority, or if it applied the correct authority to a case involving facts materially

16  indistinguishable from those in a controlling Supreme Court case, but nonetheless reached

17  a different result.  Id. at 413; see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Brewer

18  v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

19      A state court decision amounts to an "unreasonable application" under § 2254(d)(1)

20  if the state court correctly identifies the governing "clearly established" legal principle from

21  the Supreme Court's decisions, but then makes an objectively unreasonable application of

22  that principle to the facts of the petitioner's case.  See Andrade, 538 U.S. at 75.  An

23  "objectively unreasonable" application of federal law involves more than an incorrect or even

24  clearly erroneous application of federal law.  See Williams, 529 U.S. at 410-11 ("[A] federal

25  habeas court may not issue the writ simply because that court concludes in its independent

26  judgment that the relevant state-court decision applied clearly established federal law

27  erroneously or incorrectly.  Rather, that application must also be unreasonable.")  The

28  AEDPA mandates deferential review of a state court's application of clearly established

1  Supreme Court precedent.  See Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citing Lindh
2  v. Murphy, 521 U.S. 320, 333 n.7 (1997)).

3      In considering a challenge under either the "contrary to" or "unreasonable
4  application"  prong of subsection (d)(1), state court factual determinations are presumed
5  correct pursuant to § 2254(e)(1) and can be rebutted only by clear and convincing evidence.
6  See Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004), cert. denied 125 S. Ct. 809
7  (2004).

8      **§ 2254(d)(2)**

9      To obtain habeas relief under subsection (d)(2), the state court factual determination
10  at issue must be "objectively unreasonable" in light of the evidence presented in the state
11  court proceeding.  Miller-El, 537 U.S. at 340; Davis v. Woodford, 384 F.3d 628, 637-38 (9th
12  Cir. 2004).  As explained by the Ninth Circuit, the "unreasonable determination" clause:

13      applies most readily to situations where petitioner challenges the state court's
        findings based entirely on the state record.  Such a challenge may be based on
14      the claim that the finding is unsupported by sufficient evidence, see, e.g.,
        Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 2538-39, 156 L.Ed.2d 471
15      (2003); Ward v. Sternes, 334 F.3d 696, 704-08 (7th Cir. 2003), that the
        process employed by the state court is defective, see, e.g., Nunes v. Mueller,
16      350 F.3d 1045, 1055-56 (9th Cir. 2003); Valdez v. Cockrell, 274 F.3d 941,
        961-68 (5th Cir. 2001)(Dennis, J., dissenting), or that no finding was made by
17      the state court at all, see, e.g., Weaver v. Thompson, 197 F.3d 359, 363 (9th
        Cir. 1999); cf. Wiggins, 123 S. Ct. at 2539-41.
18
19  Taylor, 366 F.3d at 999; cf. Norton v. Spencer, 351 F.3d 1, 7 (1st Cir. 2003) (describing
    grounds to find state court factual determinations unreasonable under (d)(2)).
20
21      When a petitioner challenges a state court's factual findings under subsection (d)(2),
22  a federal court must be satisfied that an appellate court could not reasonably affirm the
23  finding.  Taylor, 366 F.3d at 1000. "Once the state court's fact-finding process survives this
    intrinsic review . . . the state court's findings are dressed in a presumption of correctness,
24
    which then helps steel them against any challenge based on extrinsic evidence, i.e., evidence
25
26  presented for the first time in federal court."  Id.  The presumption of correctness may be
    overcome only by clear and convincing evidence, pursuant to § 2254(e)(1).  Id.; see Nunes
27
28  v. Mueller, 350 F.3d 1045, 1055-56 (9th Cir. 2003), cert. denied 125 S. Ct. 808 (2004).

1    **LEGAL STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL**

2    To prevail on a claim of ineffective assistance of counsel, a petitioner must show that

3    counsel's performance was deficient and that the deficient performance prejudiced his

4    defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The performance inquiry is

5    whether counsel's assistance was reasonable considering all the circumstances. Id. at 688-

6    89. "[A] court must indulge a strong presumption that counsel's conduct falls within the

7    wide range of reasonable professional assistance; that is, the defendant must overcome the

8    presumption that, under the circumstances, the challenged action 'might be considered sound

9    trial strategy.'" Id. Regarding prejudice, a petitioner "must show that there is a reasonable

10   probability that, but for counsel's unprofessional errors, the result of the proceeding would

11   have been different." Id. at 694. A reasonable probability is a probability sufficient to

12   undermine confidence in the outcome." Id.

13   Counsel has a duty to conduct a reasonable investigation or to make a reasonable

14   decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 690. The

15   failure to adequately investigate and present mitigating evidence can constitute deficient

16   performance. See Wiggins v. Smith, 539 U.S. 510 (2003). A reasonable mitigation

17   investigation involves not only the search for good character evidence but also evidence that

18   may demonstrate that the criminal act was attributable to a disadvantaged background or to

19   emotional and mental problems. See Boyde v. California, 494 U.S. 370, 382 (1990). Thus,

20   deficient performance has been found where trial counsel failed to investigate and present

21   substantial mitigating evidence regarding family background, borderline mental retardation

22   and exemplary behavior in prison when potential rebuttal evidence was minimal. See

23   Williams (Terry) v. Taylor, 529 U.S. 362 (2000). In addition, counsel who is on notice of

24   a serious mental health issue and does not complete a reasonable mitigation investigation or

25   provide a reasonable tactical justification performs deficiently. See Caro v. Woodford, 280

26   F.3d 1247, 1254 (9th Cir. 2002); Evans v. Lewis, 855 F.2d 631, 637 (9th Cir. 1988).

27   However, defense "counsel need not present all available mitigating circumstance evidence

28   in order for counsel's conduct to be deemed effective at the sentencing stage." Conklin v.

1   Schofield, 366 F.3d 1191,1204 (11th Cir. 2004); see Bell v. Cone, 535 U.S. 685, 697-700

2   (2002) (decision at sentencing not to recall or present certain witnesses not objectively

3   unreasonable).  To establish prejudice, the Supreme Court has emphasized that assessing

4   prejudice in the context of capital sentencing requires the reviewing court to "reweigh the

5   evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539

6   U.S. at 534; see also Mayfield v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001) (en banc).

7                                          **DISCUSSION**

8           In Claim A(5), Petitioner alleges he had ineffective assistance of counsel ("IAC")

9   because his counsel failed to test the forensic evidence and seek forensic experts.  If counsel

10  had not been deficient, Petitioner argues, there is a reasonable probability he would not have

11  been convicted and the sentencing judge would not have found the cruelty prong of the (F)(6)

12  aggravating factor.  (Dkt. 31 at 47-49.)   In Claim B, Petitioner alleges he had IAC at

13  sentencing because his counsel failed to adequately investigate and present evidence in

14  mitigation and rebuttal of aggravation.  (Id. at 53-69.)  Petitioner alleges that if counsel had

15  not been deficient there is a reasonable probability that Petitioner would not have been

16  sentenced to death because the court would not have found the heinous/depraved prong of

17  the (F)(6) factor and would have found additional and/or more weighty mitigating factors.

18  (Id. at 59-60, 63, 67.)

19          **(F)(6) Aggravating Factor**

20          As an initial matter, the Court will address the validity of the (F)(6) aggravating factor

21  found by the trial court and the Arizona Supreme Court because it is challenged in both

22  Claim A(5) and Claim B.  Upon independent review, the supreme court found both prongs

23  of the (F)(6) factor–that the crime was especially cruel, and it was heinous and depraved.

24          The Arizona Supreme Court made the following findings regarding the crime being

25  especially cruel:

26          To find cruelty, the state must prove beyond a reasonable doubt that the victim
            consciously suffered physical pain or mental distress. State v. Amaya-Ruiz,
27          166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990); Jimenez, 165 Ariz. at 453,
            799 P.2d at 794. In determining whether a murder was especially cruel, we
28          must view the entire murder scenario, not just the final act that killed the

victim. <u>Lavers</u>, 168 Ariz. at 393, 814 P.2d at 350. Having done so, we have determined that this murder was, without a doubt, especially cruel.

We find overwhelming evidence that the victim was conscious throughout much of the crime. Witnesses testified that the victim looked terrified as defendant dragged her to the car. The pathologist testified that the victim suffered numerous cutting wounds over her hands, which are consistent with defensive-type injuries one would sustain while trying to fend off an attacker. After her throat was slit, she attempted to answer defendant's questions, but was able only to gurgle in response. The defense contends that her gurgling may have been merely reflexive breathing. However, her gurgling was heard only after questions were posed to her.

We find that the victim suffered physical pain. She suffered forty cutting and stab wounds about her face, hands, chest, neck, abdomen, and thigh. This includes a deep cutting wound that stretched across the victim's neck from ear to ear, cutting through the voice box, the esophagus, and into the cerebral column. Furthermore, she suffered blunt force injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. She must have suffered excruciating pain before she died.

We also find that the victim suffered mental distress. Mental distress includes uncertainty as to one's ultimate fate. <u>State v. Lopez</u>, 175 Ariz. 407, 411, 857 P.2d 1261, 1265 (1993). Witnesses testified that defendant held a knife to the victim's neck, told her that he was going to kill her, and dragged her to the car. During this time, the victim had "terror" and "fear" in her eyes. Anyone in the victim's situation would have been uncertain as to his or her ultimate fate. Thus, this murder was especially cruel.

<u>Detrich II</u>, 188 Ariz. at 67-68, 932 P.2d at 1338-39.

The Arizona Supreme Court made the following findings regarding the murder being heinous and depraved:

This court has defined "heinous" as "hatefully or shockingly evil" and "depraved" as "marked by debasement, corruption, perversion or deterioration." <u>State v. Knapp</u>, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). Heinousness and depravity focus upon the "defendant's state of mind at the time of the offense, as reflected by his words and acts." <u>Fulminante</u>, 161 Ariz. at 255, 778 P.2d at 620 (citing <u>State v. Summerlin</u>, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983)).

This court has set forth specific factors which, when found, may be used to justify a trial court's finding that a murder was especially heinous or depraved. <u>State v. Gretzler</u>, 135 Ariz. 42, 51-52, 659 P.2d 1, 10-11 (1983). The factors are: (1) whether the killer relished the murder; (2) whether the killer inflicted gratuitous violence on the victim beyond that necessary to kill; (3) whether the killer needlessly mutilated the victim; (4) whether the crime was senseless; and (5) whether the victim was helpless. <u>Id.</u>; <u>Lopez</u>, 175 Ariz. at 412, 857 P.2d at 1266.

We find that the record supports the trial court's finding of heinous and depraved conduct. Defendant's statement to Charlton, "It's dead, but it's warm. Do you want a shot at it?" clearly shows that defendant relished the

murder. The trial court found that this statement showed an abhorrent lack of regard for human life, and we agree. Furthermore, we find that defendant engaged in gratuitous violence beyond that necessary to cause death. See State v. Jones, 185 Ariz. 471, 488, 917 P.2d 200, 217 (1996). Of the forty cutting and stab wounds, only three were potentially fatal. The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive.

We also find that the victim was helpless. Defendant held a knife to the victim's throat and forced her into the car. She was unarmed and partially clothed, with no means of escape. In the car, defendant was on top of her, abusing and stabbing her. The victim was unable to resist defendant's attack.

Finally, the murder was senseless. A murder is senseless when it is unnecessary to achieve the killer's goal. State v. Ross, 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994). Defendant's apparent goal was to be paid back for the money he wasted on the bad drugs. Killing the victim was unnecessary to accomplish this goal and in fact, ensured that he would neither be paid back, nor find out the identity of the drug dealer. In total, the record overwhelmingly supports a finding of heinous and depraved conduct.

Id. at 68, 932 P.2d at 1339.

First, Petitioner argues that forensic testing could rebut the cruelty finding because it was based on the victim making gurgling sounds after her throat was cut, and a pathologist could have established that any response by the victim was impossible. (Dkt. 31 at 48-49.) Additionally, Petitioner argues that a blood spatter expert would testify to the victim's "probable loss of consciousness secondary to blood loss and secondary to specific incisions in throat area" as relevant to the cruelty finding. (Dkt. 100 at 4.)

The PCR court found that counsel was not deficient in failing to retain an expert pathologist to rebut the testimony that the victim made "gurgling sounds," and there was no prejudice because the cruelty finding was sufficiently supported without that evidence and there was overwhelming evidence that Petitioner committed the murder even if Charlton's credibility had been damaged by an expert. (ROA-PCR 69 at 2.)[4] The finding that Petitioner attempted to speak after having her throat slit is only a partial basis for the cruelty finding, and the prong is sufficiently supported without it. Petitioner does not allege he can develop forensic evidence that would fully rebut the finding that the victim was conscious for much

---

[4] "ROA-PCR" refers to the two-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-02-0244-PC).

1    of the crime and suffered pain and mental distress, even if there were additional evidence

2    about when the victim lost consciousness.  The cruelty finding is sufficiently supported by

3    the eyewitness testimony that the victim was taken to the car at knife point while Petitioner

4    threatened her life, and evidence that she suffered over forty stab wounds, including

5    defensive wounds, as well as blunt force injuries.  At a minimum, Petitioner cannot establish

6    with the proposed forensic evidence that the PCR court's ruling–that counsel did not perform

7    deficiently and Petitioner was not prejudiced with respect to the cruelty finding–was an

8    objectively unreasonable application of Strickland to the facts.  See 28 U.S.C. § 2254(d)(1).

9        Second, Petitioner argues that counsel could have developed evidence that Petitioner

10   did not have the culpable mental state necessary for the heinous/depraved prong of the (F)(6)

11   aggravator.  (Dkts. 31 at 63, 81 at 19.)  Although the Arizona caselaw refers to a defendant's

12   "state of mind" at the time of the offense as the relevant issue for the heinous/depraved

13   prong, the determination is based on the perpetrator's "words and acts" not on a subjective

14   mental state.  See State v. Fulminate, 161 Ariz. 237, 255, 778 P.2d 602, 620 (1988).  More

15   specifically, there are five non-exclusive factors used by the courts to determine if a murder

16   was heinous or depraved:  relishing of the murder, the infliction of gratuitous violence,

17   mutilation of the victim's body, senselessness of the murder and the helplessness of the

18   victim.  Id. at 256, 778 P.2d at 621 (citing State v. Gretzler, 135 Ariz. 42, 52-53, 659 P.2d

19   1, 11-12 (1983)).  Thus, a defendant's brain function or mental health are not assessed in

20   applying the (F)(6) prong.  Rather, impaired capacity is appropriately categorized as

21   mitigation, including the statutory mitigating factors that a person's "capacity to appreciate

22   the wrongfulness of his conduct or to conform his conduct to the requirements of the law was

23   significantly impaired," or that the person "could not reasonably have foreseen that his

24   conduct . . . would cause, or would create a grave risk of causing, death to another person."

25   A.R.S. § 13-703(G) (1) & (4).  Any proven mitigation, including impaired capacity, is then

26   weighed against the proven aggravating factors.  The factors of relishing the murder based

27   on Petitioner's statement to his co-defendant, gratuitous violence based on the excessive

28   wounds and the helplessness of the victim and senselessness of the crime are sufficiently

1    supported by the record to uphold the heinous/depraved finding.

2          Petitioner also attempts to rebut the entirety of the (F)(6) factor based on an alleged

3    lack of participation in the murder. Specifically, Petitioner contends that if counsel had not

4    performed deficiently at sentencing, there is a reasonable probability that he could have

5    demonstrated that Petitioner was not the killer, and did not intend or foresee the victim's

6    suffering. At sentencing, the trial judge made a finding that Petitioner intended to and did

7    kill the victim. (RT 2/8/95 at 4.) That finding is not objectively unreasonable based on the

8    evidence presented to the trial court, as discussed in the above Background section;

9    therefore, this Court must defer to that finding unless Petitioner rebuts it by clear and

10   convincing evidence. See 28 U.S.C. § 2254(d)(2) & (e)(1). As addressed below, with

11   respect to both Claims A(5) and B, Petitioner has not alleged facts sufficient to meet that

12   standard and to overcome the trial court's finding that Petitioner committed the murder.

13         With respect to Claims A(5) and B, Petitioner has not demonstrated an ability to rebut

14   either prong of the (F)(6) aggravating factor. Even if one prong were rebutted, Arizona law

15   indicates that the finding of either especial cruelty or especial depravity alone will establish

16   the (F)(6) factor and that the validity, or lack thereof, of the other prong does not affect the

17   weight given to the circumstance. See, e.g., State v. Djerf, 191 Ariz. 583, 597, 959 P.2d

18   1274, 1288 (1998) ((F)(6) circumstance upheld based on cruelty alone without considering

19   validity of depravity finding); State v. Towery, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996)

20   (same); State v. Roscoe, 184 Ariz. 484, 500-01, 910 P.2d 635, 651-52 (1996) (upholding

21   (F)(6) factor based on cruelty after invalidating depravity finding); State v. Bolton, 182 Ariz.

22   290, 312, 896 P.2d 830, 852 (1995) ((F)(6) factor upheld based on cruelty alone without

23   considering depravity finding). Based on all of the above, the Court will deny development

24   of evidence intended to rebut the aggravating factor and will dismiss the portions of Claims

25   A(5) and B that challenge the (F)(6) factor. The Court will not address this portion of the

26   claims in the discussion below.

27   **Claim A(5)**

28         Petitioner alleges he had IAC at trial based on counsel's failure to investigate or test

1   the physical evidence and seek expert assistance regarding forensic evidence.  In particular,

2   he alleges that counsel failed to present any blood pattern evidence relating to the car, the

3   car seat covers and the blue jeans found in the car, or to seek the appointment of any forensic

4   experts to examine that evidence.  In its prior Order, the Court found that Petitioner

5   diligently attempted to develop this claim in state court, therefore, evidentiary development

6   is not statutorily barred (dkt. 93 at 38).  See 28 U.S.C. § 2254(e)(2).

7        Petitioner asserts that development of forensic evidence might demonstrate prejudice

8   in the following ways.  In the amended petition, Petitioner alleges that forensic evidence

9   could have revealed "the positioning of the individuals in the car, the pattern of bleeding, and

10  nature of Ms. Souter's wounds, all of which would have provided a direct conflict with

11  Charlton's version of events and, conversely, direct corroboration of Shell's version of

12  Charlton's confession."  (Dkt. 31 at 47-48.)  In the Traverse, Petitioner further asserts that

13  testing of the car seat covers "will reveal that Charlton's version that Mr. Detrich killed Ms.

14  Souter while Charlton was simultaneously driving the car and intermittently blacking out,

15  is a lie," and that testing is necessary to rebut testimony of prosecution witnesses Charlton

16  and Carbonell.  (Dkt. 75 at 56-57.)  Again at oral argument, Petitioner's counsel emphasized

17  that forensic testing would be used to discredit Charlton's testimony.

18       With respect to the guilt phase of the case, the PCR court ruled that counsel was not

19  deficient and Petitioner was not prejudiced by the lack of forensic examination.  (ROA-PCR

20  69 at 1.)  Specifically, the court found that examination of the physical evidence by experts

21  would not have yielded relevant or exculpatory information not available from other sources,

22  such as witnesses.  (Id.)

23       The entirety of Petitioner's argument rests on the possibility that forensic evidence

24  might rebut the testimony of Charlton and Carbonell.  The *possibility* of impeachment, even

25  of the key eyewitness and codefendant, does not amount to a "reasonable probability" of a

26  different outcome.  Even if the forensic evidence showed that Charlton's description of the

27  killing was not accurate, no evidence will provide conclusive information that Petitioner did

28  not commit the murder as determined by the trial court.  Additionally, Charlton was

- 15 -

subjected to substantive cross-examination at trial regarding his version of events, including whether Petitioner was "humping" the victim, the assertion that he was blacking out during the murder and his conversations with Phillip Shell, as well as the benefits he got under the plea agreement and his veracity in general. (RT 12/15/94 at 46-47, 48, 50-53, 54-56, 71-72.) Carbonell's testimony in relation to forensic evidence was quite limited, attesting only that both Charlton and Petitioner were covered in blood, but Petitioner had more blood on him and Charlton had it only on his right side. (RT 12/14/94 at 165, 178.) He also stated that Charlton told him he was driving and Petitioner had killed the victim. (Id. at 167.) Again, no forensic evidence, even if potentially contradictory to this story would demonstrate a "reasonable probability" that Petitioner would not have been found guilty.

After a thorough examination of the record in state court, and this Court and hearing oral argument on this claim, the Court finds that Petitioner has failed to demonstrate how the examination of forensic evidence could establish a reasonable probability that the outcome of trial would have been different. Further, Petitioner has not alleged any facts that could demonstrate that the state court's resolution of this claim was an objectively unreasonable application of Strickland. The Court will deny development of Claim A(5) and dismiss the claim on the merits.

**Claim B**

Petitioner alleges he had IAC at sentencing because his counsel failed to adequately investigate and present evidence in mitigation. In its prior Order, the Court found that Petitioner diligently attempted to develop this claim in state court, therefore, evidentiary development is not statutorily barred (dkt. 93 at 39). See 28 U.S.C. § 2254(e)(2). A federal district court *must* hold an evidentiary hearing in a § 2254 case when the facts are in dispute if (1) the petitioner "alleges facts which, if proved, would entitle him to relief," and (2) the state court has not "after a full hearing reliably found the relevant facts." Townsend, 372 U.S. at 312-13. In any other case in which the facts are in dispute and diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Id. at 318.

The Court finds that an evidentiary hearing is warranted with respect to this claim. Petitioner has alleged a colorable claim for relief and the state court did not allow significant development of this claim or hold a hearing.  With respect to the first prong of the Strickland analysis, counsel was aware of potential mitigating evidence regarding Petitioner's background based on the presentence report and the psychological evaluations presented to the court.  Further, counsel knew that this same information had been before the first judge that sentenced Petitioner to death, and the judge had found no mitigating factors based on that information.  Despite that knowledge, it appears that counsel conducted almost no investigation and very limited preparation for sentencing.  With regard to the Strickland prejudice prong, Petitioner has alleged significant mitigating information that was never presented to the sentencing court.  It is premature to assess the probability of success on the merits, because even Petitioner's counsel acknowledges they do not yet know the breadth of the mitigating evidence they may discover upon investigation.  However, the allegations are significant, and there is a possibility that Petitioner may be entitled to relief if he is allowed to fully develop and present evidence on this claim.  Therefore, the Court will grant Petitioner's motion for an evidentiary hearing on Claim B.  Petitioner's requests for expansion of the record will be denied without prejudice pending the evidentiary hearing.

Petitioner has proposed the development and presentation of evidence in mitigation on the issue of residual doubt.  As an initial matter, development on this issue appears to be an end-run around the Court's finding that Petitioner's claims of IAC at trial are procedurally barred, with the limited exception of parts of Claims A(2) and A(5).  (See Dkt. 93 at 15.) Doubt regarding Petitioner's guilt is necessarily developed as trial evidence, and trial counsel would generally argue residual doubt as a mitigating factor based on that evidence.  The exception might be some limited evidence not admissible at trial; however, Petitioner has not alleged any such evidence.  Rather, Petitioner seeks to reinvestigate the guilt phase of his case, which the Court has already denied to the extent sought in connection with his IAC at trial claims, and present any resulting evidence as mitigation.

Additionally, Petitioner has not alleged sufficient facts in relation to this claim to

1   rebut the trial court's finding that Petitioner was the killer.  Petitioner has proposed to

2   develop the following evidence regarding residual doubt:  (1) Darcie Bell would testify that

3   Petitioner was still intoxicated the morning after the crime and that Petitioner's clothes were

4   not covered in blood; (2) Darcie and Donald Bell would testify that police intimidated them

5   into not participating in the trial; (3) Phillip Shell submitted a declaration, and would testify,

6   that Charlton confessed to him, that Petitioner's counsel at the first trial appeared to be on

7   drugs, that Shell's original testimony was not compelling because he was emotionally

8   exhausted, intimidated and wearing jail clothing, and he was willing to testify in person at

9   the second trial; (4) transcript of 10/11/90 Shell interview in which he said Charlton

10   confessed to being the real killer; (5) transcript of 10/17/90 interview of Carbonell in which

11   he said that Charlton and Petitioner confessed to killing a girl; and (6) 11/11/89 interview of

12   Charlton in which he said they took the victim to the car, Petitioner raped her and asked

13   Charlton if he "wanted a shot at it," that Petitioner hit her and asked where she got the drugs

14   and she gurgled, and after she was dead Petitioner drug her body out of the car, and Charlton

15   asked the detectives if he was going to get any time out of it.

16        Most of this information is cumulative of that presented at trial.  The only significance

17   to the statements by Charlton and Carbonell is one of semantics regarding who did the actual

18   killing, whether it was joint or just Petitioner, and whether Charlton was going to get a deal

19   for providing information.  This information is not weighty.  Similarly, the only new

20   information provided by Shell is why his testimony was not compelling, however, the same

21   substantive testimony he would offer now was in fact admitted at trial.  Additionally, the fact

22   that Shell may have appeared tired and in jail clothing at the first trial was irrelevant at the

23   second trial because the testimony was read and he was not seen by the jury.  The only new

24   evidence not offered in any form at trial is that provided by Darcie and Donald Bell.  The

25   only significant evidence they offer to the question of whether Petitioner was the killer is

26   Darcie's declaration that Petitioner did not have a significant amount of blood on his clothes.

27   While this evidence could impeach the testimony of Carbonell and Charlton, it is not in itself

28   so weighty that it could rebut by clear and convincing evidence the trial court's finding that

1    Petitioner was the killer.  Thus, even if Petitioner proved all of the facts he alleges regarding

2    residual doubt it would not rebut the finding sufficiently to qualify as a mitigating factor.

3         As a final matter, Petitioner has not demonstrated diligence in state court in attempting

4    to develop this portion of the claim.  All of the proposed witnesses on this subject,  Shell,

5    Carbonell, Charlton, and the Bells, were available and/or testified at trial; thus, any failure

6    to present relevant evidence from these witnesses was not reasonable in light of the

7    information available at the time and must be attributed to a lack of diligence by Petitioner.

8    See Williams, 529 U.S. at 435.   In sum, the Court will deny the development and

9    presentation of evidence intended to demonstrate residual doubt.

10        Next, the Court will address some of the specific evidentiary development requests

11   regarding Claim B, and the procedure to govern the next stage of the proceedings.  Petitioner

12   has requested subpoenas for various institutions, organizations and/or agencies to obtain

13   records regarding Petitioner's background.  Petitioner has not demonstrated that informal

14   means, such as a release from Petitioner, will be insufficient to obtain the desired records at

15   this point.  Additionally, these institutions are located in numerous states and Petitioner

16   would need to follow appropriate procedures for out-of-state subpoenas.  The Court is not

17   inclined to grant the use of subpoenas based on the current showing; Petitioner can renew

18   his request if necessary at a later time.

19        Petitioner has requested only one formal deposition with respect to this claim, that of

20   a representative of the Pima County Indigent Defense Services.  The requested discovery is

21   sought to investigate their funding procedures and trial counsel's workload. This information

22   is not relevant to the claim, which requires only information regarding what counsel knew

23   and understood, and how he made his decisions and acted in Petitioner's case.  Neither the

24   funding policies from Defense Services nor records of counsel's workload will enable

25   Petitioner to demonstrate that he is entitled to relief on this claim.  Therefore, the Court will

26   deny evidentiary development on this issue.  As no other specific requests have been made,

27   and Petitioner has not made a showing that formal discovery is warranted, it will be denied

28   at this time.  Petitioner is granted leave to conduct informal discovery regarding this claim,

i.e., interviews and document requests to persons other than Respondents.

Petitioner has indicated a desire to develop evidence from Petitioner's trial counsel from his first trial, in order to demonstrate that counsel from his second trial, whose performance is in question, should not have relied on prior counsel's work.  Again, the relevant information is what counsel for the relevant trial knew when he made his decisions, not the facts as demonstrated by other witnesses such as prior counsel.  Because evidence from prior counsel will not assist Petitioner in demonstrating that he is entitled to relief, the Court will deny evidentiary development on this issue.

The Court anticipates that the evidentiary hearing will be held in Fall 2006, and initial intermediate deadlines are set forth below.  Although the Court is setting a deadline for completion of Petitioner's fact investigation, this deadline does not limit counsel from beginning other activities in preparation for the hearing during this time frame.  The Court will set the remainder of the deadlines, including a hearing date, at the first status conference in June.

Accordingly,

**IT IS HEREBY ORDERED** that the remaining portion of Claim A(5) is **DISMISSED WITH PREJUDICE** as meritless.

**IT IS FURTHER ORDERED** that the portion of Claim B alleging IAC for failure to challenge the aggravating factor is **DISMISSED WITH PREJUDICE** as meritless.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Evidentiary Hearing and Expansion of the Record (dkt. 81) and Motion for Discovery (dkt. 82) are **DENIED IN PART** as to Claim A(5), and **GRANTED IN PART** as to Claim B regarding mitigation, to the extent allowed in the body of this Order.

**IT IS FURTHER ORDERED** that Petitioner shall complete his fact investigation regarding mitigation on or before **May 31, 2006**.

**IT IS FURTHER ORDERED** that a joint scheduling conference to set the remainder of the schedule will be held on **June 12, 2006, at 1:30 p.m.** in Courtroom 6B, 6th Floor.

1   **IT IS FURTHER ORDERED** that if, pursuant to LRCiv 7.2(g), Petitioner or
2   Respondents file a Motion for Reconsideration of this Order, such motion shall be filed
3   within fifteen (15) days of the filing of this Order.

4   **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order
5   to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.
6   DATED this 18th day of January, 2006.

7

8

9

10                                                           David C. Bury
11                                                    United States District Judge

12

13

14

15

16

17

18   *copy: Clerk, Arizona Supreme Court by cjs*

19

20

21

22

23

24

25

26

27

28