**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| David Scott Detrich, | ) | No. CV-03-229-TUC-DCB |
| Petitioner, | ) | |
| | ) | DEATH PENALTY CASE |
| vs. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF DECISION** |
| Dora Schriro, et al., | ) | **AND ORDER** |
| Respondents. | ) | |
| | ) | |
| | ) | |

Petitioner David Scott Detrich is a state prisoner who filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. Seven claims remain pending, and the Court reviews them on the merits in this Order. For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief.

## FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of November 4, 1989, in Benson, Arizona, Petitioner and his co-defendant Alan Charlton each consumed twelve to twenty-four beers in approximately two hours.[1] After driving to Tucson and consuming more beer, they picked up the victim, Elizabeth Souter, on the side of the road. After obtaining some cocaine and going to the victim's house, Petitioner accused her of providing him bad drugs. Petitioner sat down with

---

[1] Except where otherwise indicated, this factual summary is taken from the Arizona Supreme Court opinion upholding Petitioner's convictions and sentence. *See State v. Detrich*, 188 Ariz. 57, 60-61, 932 P.2d 1328, 1331-32.

the victim and was bothering her while she tried to sleep; he told her she was going to pay for giving him bad drugs and that she was going to have sex with him.  (RT 12/14/94 at 30-33, 80-81.)  Petitioner held a knife to her throat and threatened to kill her.  The two men took the victim to the car at knife point.

Charlton drove, Petitioner sat in the middle, and the victim sat up against the passenger door.  Charlton testified that he saw Petitioner humping the victim and asking her if she liked it.  Charlton subsequently looked and saw that the victim's throat was slit.  Charlton indicated that Petitioner then hit the victim and asked her three times from whom she got the drugs.  The victim gurgled in response each time.  Charlton attested he never saw any stabbing, but he was poked in the arm with the knife three or four times.  The pathologist established that the victim was stabbed forty times and her throat was slit.  Charlton declined when Petitioner asked, "It's dead but it's warm.  Do you want a shot at it?"  Petitioner dragged the victim's body into a remote area of the desert.

A friend of Petitioner and Charlton's, William Carbonell, testified that the two men showed up at his house at 4:00 a.m.  Carbonell testified that Petitioner was covered in blood and that Charlton had blood on his right side.  Petitioner confessed to Carbonell that he had killed a girl by slitting her throat, after forcing her into the car at knife point.  He stated that he killed the victim because the drugs she had purchased were bad.  Petitioner was arrested in New Mexico approximately two weeks later.  Charlton pled guilty to kidnapping and agreed to testify in exchange for a dismissal of the murder charge; he was sentenced to ten and one-half years in prison.

On November 2, 1990, Petitioner was convicted by a jury of kidnapping, sexual abuse, and first degree murder.  Pima County Superior Court Judge Michael D. Alfred sentenced Petitioner to death for the murder and to a term of years for the other counts.  The Arizona Supreme Court affirmed the sexual abuse conviction but reversed Petitioner's convictions for kidnapping and first degree murder.  *State v. Detrich*, 178 Ariz. 380, 873 P.2d 1302 (1994) (*Detrich I*).  Petitioner was re-tried and, on December 20, 1994, was again convicted

by a jury of kidnapping and first degree murder.  After finding one aggravating factor, Pima County Superior Court Judge Richard D. Nichols sentenced Petitioner to death for the murder and to a term of years for kidnapping.  On appeal, the Arizona Supreme Court affirmed Petitioner's convictions and sentences.  *See State v. Detrich*, 188 Ariz. 57, 932 P.2d 1328 (1997) (*Detrich II*).

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on April 29, 2003. (Dkt. 1.)  Petitioner's Amended Petition, filed on April 15, 2004, raised eighteen claims, and the parties briefed the procedural status and merits of those claims.  (Dkts. 31, 61, 75.)  After Petitioner's motions for evidentiary development were fully briefed (Dkts. 81, 82, 83, 86, 87, 90), the Court denied development and dismissed eleven of the claims based on a procedural bar or the merits.  (Dkts. 93, 105.)  The Court granted an evidentiary hearing as to Claim B (Dkt. 105), which was held in April and May, 2007.

## LEGAL STANDARD FOR RELIEF UNDER THE AEDPA

The Antiterrorism and Effective Death Penalty Act (AEDPA) established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1  28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision

2  regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

3  *Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664

4  (9th Cir. 2005).

5         "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

6  of law that was clearly established at the time his state-court conviction became final."

7  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

8  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

9  the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

10  of the holdings of the Supreme Court at the time the petitioner's state court conviction

11  became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

12  *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

13  the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

14  advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

15  U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

16  2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent

17  may be "persuasive" in determining what law is clearly established and whether a state court

18  applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

19         The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

20  The Court has explained that a state court decision is "contrary to" the Supreme Court's

21  clearly established precedents if the decision applies a rule that contradicts the governing law

22  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

23  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

24  indistinguishable from a decision of the Supreme Court but reaches a different result.

25  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

26  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

27  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

28                                          - 4 -

facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.

### DISCUSSION OF CLAIM B

Petitioner alleges that his counsel failed to adequately investigate and present mitigation at sentencing. If counsel had conducted a sufficient investigation and presented additional evidence of Petitioner's childhood abuse and neglect, post-traumatic stress

1    disorder (PTSD), history of and genetic propensity for substance abuse, developmental and

2    neurological issues, familial love, and adaptation to prison, he alleges there is a reasonable

3    probability he would not have been sentenced to death.   The Court held a four-day

4    evidentiary hearing on Claim B (Dkts. 239, 241, 242, 246), and the parties filed post-hearing

5    briefs (Dkts. 258, 259).   In resolving this claim, the Court has reviewed and considered all

6    of the evidence presented in state court and in these proceedings, whether given by way of

7    in-person testimony or in written form.

8                      **Clearly Established Supreme Court Law**

9            To prevail on a claim of ineffective assistance of counsel (IAC), a petitioner must

10   show that counsel's performance was deficient and that the deficient performance prejudiced

11   his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   The performance inquiry

12   is whether counsel's assistance was reasonable considering all of the circumstances.   *Id.* at

13   688-89.   "[A] court must indulge a strong presumption that counsel's conduct falls within the

14   wide range of reasonable professional assistance; that is, the defendant must overcome the

15   presumption that, under the circumstances, the challenged action 'might be considered sound

16   trial strategy.'"   *Id.* at 689.

17           A petitioner must affirmatively prove prejudice. *Id.* at 693.   To demonstrate prejudice,

18   he "must show that there is a reasonable probability that, but for counsel's unprofessional

19   errors, the result of the proceeding would have been different.   A reasonable probability is

20   a probability sufficient to undermine confidence in the outcome."   *Id.* at 694.   The *Strickland*

21   Court explained that "[w]hen a defendant challenges a death sentence . . . the question is

22   whether there is a reasonable probability that, absent the errors, the sentencer . . . would have

23   concluded that the balance of aggravating and mitigating circumstances did not warrant

24   death."   466 U.S. at 695.   In *Wiggins v. Smith*, the Court further noted that "[i]n assessing

25   prejudice, we reweigh the evidence in aggravation against the totality of available mitigating

26   evidence."   539 U.S. 510, 534 (2003); *see also Mayfield v. Woodford*, 270 F.3d 915, 928 (9th

27   Cir. 2001) (en banc).   The "totality of the available evidence" includes "both that adduced

28                                        - 6 -

1   at trial, and the evidence adduced" in subsequent proceedings.  *Wiggins*, 539 U.S. at 536

2   (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

3       In order to assess and reweigh the aggravation and mitigation, this Court must

4   consider the relevant provisions of Arizona's death penalty statute at the time Petitioner was

5   sentenced:  mitigating circumstances are any factors "relevant in determining whether to

6   impose a sentence less than death, including any aspect of the defendant's character,

7   propensities or record and any of the circumstances of the offense"; mitigation evidence can

8   be presented regardless of admissibility and need only be proven by a preponderance; the

9   burden is on the defendant to prove mitigation; the court shall impose a sentence of death if

10  it finds at least one aggravating circumstance and "that there are no mitigating circumstances

11  sufficiently substantial to call for leniency."  A.R.S. § 13-703(C), (E), (G) (West 1994).

12      The Arizona courts assess whether mitigating factors are proven and consider "the

13  quality and strength of those factors."  *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849

14  (2006).  Mitigating evidence must be considered regardless of whether there is a "nexus"

15  between the mitigating factor and the crime, but the lack of a causal connection may be

16  considered in assessing the weight of the evidence.  *Id.*; *State v. Hampton*, 213 Ariz. 167,

17  185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not

18  sufficiently substantial to call for leniency, in part, because not tied to the offense).  When

19  the experts indicate that a defendant "knew right from wrong and could not establish a causal

20  nexus between the mitigating factors and [the] crime," the Arizona courts may afford

21  evidence of abusive childhood, personality disorders, and substance abuse limited value.

22  *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

23      **Background**

24      In sentencing Petitioner to death after his first trial, Judge Alfred found that the crime

25  was especially cruel, heinous, and depraved and that there were no mitigating circumstances.

26  Petitioner was appointed new counsel, Harold Higgins, for his retrial.

27

28                                          - 7 -

1        Counsel's Mitigation Presentation

2        After the second trial, Higgins submitted a sentencing memorandum which listed the

3   following mitigating factors:  (1) high level of intoxication at the time of the crime due to

4   alcohol and possibly cocaine, and a history of alcohol abuse encouraged by his parents;

5   (2) abusive background; (3) lack of prior convictions involving serious injury; (4) remorse;

6   and (5) minimal sentence received by co-defendant.  (Pet. Ex. 73 at 3.)[2]  Attached to the

7   memorandum was a statement by Diana Jo Stevens, Petitioner's sister.  Stevens's letter

8   focused on Petitioner's lifelong history of drug and alcohol use, beginning by age thirteen,

9   which was encouraged by his stepfather. (Pet. Ex. 73 at 4-6; Pet. Ex. 24.) Counsel submitted

10  a supplemental sentencing memorandum alleging Petitioner's abusive childhood as an

11  additional mitigating factor, again supported by a statement from Stevens.  (Pet. Ex. 75.)

12  Stevens described the constant and severe physical and verbal abuse Petitioner suffered from

13  the ages of eight to thirteen at the hands of his stepmother.  (Pet. Ex. 75 at 2-11; Pet. Ex. 25.)

14       Counsel did not present any live mitigation witnesses. (RT 2/6/95.) Based on the trial

15  testimony, the presentence report (PSR), a 1991 psychological evaluation requested by

16  original trial counsel, and information from Petitioner's sister, trial counsel argued that

17  Petitioner's capacity to appreciate the wrongfulness of his conduct was impaired by large

18  quantities of alcohol and possibly cocaine at the time of the crime; Petitioner had a

19

20       [2] "Pet. Ex." refers to Petitioner's exhibits submitted for the evidentiary hearing in this
    Court (Respondents did not submit a separate set of exhibits); the exhibit list is Dkt. 249.
21  "RT" refers to the reporter's transcripts from Petitioner's state court proceedings and federal
    habeas proceedings.  "ROA-I" refers to the three-volume record on appeal from trial and
22  sentencing prepared for Petitioner's first direct appeal to the Arizona Supreme Court (Case
    No. CR-91-0071-AP).  "ROA-II" refers to the two-volume record on appeal from retrial and
23  sentencing prepared for Petitioner's second direct appeal to the Arizona Supreme Court
    (Case No. 95-0085-AP).  "ROA-PCR Doc." refers to the docket of the two-volume record
24  on appeal from post-conviction proceedings prepared for Petitioner's petition for review to
25  the Arizona Supreme Court (Case No. CR-02-0244-PC).  The state court original reporter's
    transcripts and certified copies of the trial and post-conviction records were provided to this
26  Court by the Arizona Supreme Court on January 21, 2005.  (Dkt. 91.)

27

28                                        - 8 -

longstanding history of alcohol abuse starting at a very early age and encouraged by his parents; he suffered childhood physical and mental abuse; he had no prior convictions for violent crimes; he was remorseful; his co-defendant received a minimal sentence without a significant difference in criminal participation; and he had a role as a father to his son. (*Id.* at 34-38.)

<u>Presentence Report: December 1990 original report, February 1995 report addendum, 1985 and 1991 mental health evaluations</u>

The PSR recounted much of Petitioner's history: Petitioner was born with a cleft palate which was surgically corrected; he had an unstable childhood and was abused and neglected by his stepmother; there was a lengthy custody battle between his parents; his mother was a prescription drug abuser; he first used alcohol and began experimenting with drugs around age nine; he moved out around age fourteen; he went AWOL from the Army when his brother died; he had a turbulent marriage to his brother's widow, during which he had some criminal involvement and eventual placement in a state hospital for substance abuse; and he suffered from severe alcoholism and was a drug abuser. (Pet. Ex. 71.)

*1985 psychological & psychiatric reports*[3]

Psychologist Larry Zimmerman administered the Shipley Hartford, Sentence Completion, and the MMPI tests. Based on his clinical interview of Petitioner he recounted significant portions of Petitioner's history including his turbulent abusive childhood, his history of substance abuse, and that he attempted suicide shortly before his 1985 incarceration. Dr. Zimmerman assessed that Petitioner's intelligence was normal or average as was his conceptual problem-solving; however, he found Petitioner to be immature, irresponsible, impulsive, and at risk of acting with poor judgment or planning. (Pet. Ex. 60.) Psychiatrist Thomas Newberry also recounted some of Petitioner's background, including

---

[3] These evaluations were conducted at the Kansas State Reception and Diagnostic Center while Petitioner was incarcerated on a conviction for giving worthless checks; they were attached to the PSR.

his unstable childhood, the significant abuse and neglect to which he was subjected, his substance use beginning at an early age, and depression including a suicide attempt shortly before being incarcerated. The psychiatric report concluded that Petitioner's intelligence was above average and there was no evidence of psychotic processes; however, he found Petitioner to be occasionally impulsive, easily frustrated, and self-destructive. (Pet. Ex. 61.)

*1991 psychological evaluation*

Petitioner was referred by the probation department for evaluation by the court clinic, at the request of his original trial counsel. Psychologist Catherine Boyer administered the Rotter Incomplete Sentences Blank-Adult Form and the MMPI-2 tests. Dr. Boyer gathered and recounted significant background information about Petitioner including his erratic childhood; the severe physical abuse and neglect he suffered and domestic violence he witnessed; his long history of alcohol and drug use as well as familial substance abuse; the frequent alcoholic blackouts in his past and at the time of the crime; and a 1983 suicide attempt.[4] (Pet. Ex. 58.) Dr. Boyer found no evidence of significant psychiatric problems or major mental disorders. She assessed that Petitioner was emotionally impaired and displayed "oppositional tendencies, nonconformity, conflict with authority and antisocial attitudes, beliefs and/or behaviors." (Pet. Ex. 58 at 9.) She summarized her diagnostic impressions as: "Probable Antisocial Personality Disorder"; "Alcohol Abuse [and Polysubstance Abuse], currently in remission due to incarceration." (Pet. Ex. 58 at 10.)

Sentencing Pronouncement

Judge Nichols found several mitigating factors. (Pet. Ex. 70 at 7-9.) First, he found, under A.R.S. § 13-703(G)(1), that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform it to the law was significantly impaired, based on the testimony that Petitioner was drinking heavily and possibly using cocaine at the time of the crime. (*Id.* at

_____

[4] Petitioner indicated to Dr. Boyer that he had attempted suicide only one time, and she reported the date as 1983 (Pet. Ex. 58 at 3); however, the 1985 evaluations indicate a singular attempt in 1985 (Pet. Ex. 60 at 1; Pet. Ex. 61 at 5).

7-8.)  Second, he found the following non-statutory mitigation:  physically and mentally abusive background; remorse; and history of alcohol and drug abuse.  (*Id.* at 8-9.)  The judge determined that the mitigation did not outweigh the one aggravating factor – that the crime was especially cruel, heinous and depraved – under A.R.S. § 13-703(F)(6).  (*Id.* at 9.)

Appeal

The Arizona Supreme Court independently reviewed the record and upheld the (F)(6) aggravating factor.  Specifically, the court found that the murder was cruel because the victim suffered physical pain and mental distress, and that it was heinous/depraved because Petitioner relished the murder, he engaged in gratuitous violence, the victim was helpless, and the murder was senseless.  *Detrich II*, 188 Ariz. at 67-68, 932 P.2d at 1338-39.  The supreme court did not discuss independently each mitigating factor found by the sentencing court, but determined that when the mitigation was balanced against the circumstances of the singular aggravating factor – the evidence in support of which was substantial and horrific – it was not sufficient to warrant leniency.  *Id.* at 69, 932 P.2d at 1340.

Post-conviction Proceeding

Petitioner raised this IAC-at-sentencing claim in his petition for post-conviction relief (PCR), which he supported with several documents.  (ROA-PCR Doc. 13.)  James Williams, the investigator hired by Petitioner's attorney, attested in an affidavit that he did not conduct any investigation into mitigation or Petitioner's life history and family background.  (Pet. Ex. 4.)  Petitioner's mother, sister, and stepfather confirmed in written statements Petitioner's history of being abused and abusing alcohol and drugs, provided additional details, and added some new facts not specifically known before regarding Petitioner's separation from his mother as a newborn, the head injuries he suffered, and his personality changes due to the abuse he suffered.  (Pet. Exs. 27, 33, 39.)

Petitioner requested and received a  neuropsychological evaluation from Dr. Robert Briggs.  (Pet. Ex. 22.)  Dr. Briggs gathered information from PCR counsel, interviewed Petitioner, and reviewed statements by Petitioner's family members and a 1986 Larned State

1   Hospital psychological evaluation.  (*Id.* at 1.)  He administered the following tests:  Halstead-

2   Reitan Neuropsychological Battery (including the Halstead Neuropsychological Test Battery

3   for Adults, Trail Making Test, parts A and B, Reitan-Klove Lateral Dominance Examination,

4   Reitan-Indiana Aphasia Screening Examination, and Reitan-Klove Sensory-Perceptual

5   Examination); Memory Assessment Scales; WAIS; Wide Range Achievement Test – 3rd

6   edition; and MMPI-2.  (*Id.*)  Petitioner's IQ was in the high average range and his academic

7   abilities were within expectations based on his education and intelligence.  (*Id.* at 2.)  He

8   found that Petitioner tended to be hostile, very impulsive, blamed others for his difficulties,

9   and might be aggressive.    Further, he identified Petitioner as immature, alienated,

10  manipulative, self-indulgent, and narcissistic.  (*Id.* at 3.)  Dr. Briggs assessed Petitioner's

11  neuropsychological functioning as normal (with no pattern of cognitive dysfunction);

12  Petitioner had some impaired performances in testing which were not of major clinical

13  significance.  (*Id.* at 2, 6.) Dr. Briggs thought it was possible that Petitioner had an antisocial

14  or paranoid personality disorder.   He concluded there was likely an interaction between

15  Petitioner's emotional status, which the doctor thought had the greatest impact on his

16  functioning, and his mild neuropsychological deficits, causing greater impairment.  (*Id.* at

17  6.)  Finally, he concluded that Petitioner's decision-making when affected by alcohol was

18  instinctual and not based on reason.  (*Id.* at 6-7.)

19       The PCR court denied the claim, finding that:

20       Petitioner has not presented a colorable claim that trial counsel was ineffective
         at the sentencing stage of the proceedings for failing to have Dr. Briggs, a
21       neuropsychologist, testify on Petitioner's behalf, or to present additional
         evidence of Petitioner's abusive background.  After considering the initial
22       psychological report, the presentence report, a sentencing memorandum, and
         written statements from Petitioner's sister citing multiple examples of both
23       physical and mental abuse suffered by Petitioner as a child, this Court found
         statutory and non-statutory mitigating circumstances.  Dr. Briggs' report was
24       not significantly different from the report considered by this Court.  Indeed,
         Dr. Briggs found that Petitioner's general neuropsychological functioning was
25       normal and showed an absence of cognitive dysfunction.  Therefore, there is
         no reasonable probability that this testimony would have compelled this Court
26       to impose a sentence less than death.   Moreover, additional evidence of
         Petitioner's dysfunctional childhood would have been merely cumulative and
27       was not "newly discovered."  This claim is summarily dismissed.

28
                                        - 12 -

1  (ROA-PCR Doc. 69 at 3.)

2  **Performance Analysis**

3       The Court must assess whether counsel's investigation and presentation of mitigation

4  was reasonable under all the circumstances. *Strickland*, 466 U.S. at 688-89.

5       Facts

6       At the habeas evidentiary hearing, neither party presented any in-court evidence

7  regarding sentencing counsel's performance; however, Petitioner presented relevant

8  documents in lieu of live testimony.  James Glanville, Petitioner's attorney at his first trial

9  and sentencing, submitted a declaration stating that he did no investigation or presentation

10  of mitigation and did not obtain any expert assistance.  (Pet. Ex. 3.)  Harold Higgins,

11  Petitioner's counsel at his second sentencing, submitted a declaration stating that he was

12  aware Petitioner had been convicted and sentenced to death previously for the crime, and that

13  the judge had found no mitigating factors. (Pet. Ex. 1 at 1.) He knew that attorney Glanville

14  was rumored to have been a substance abuser around the time of Petitioner's first trial, and

15  he attests that Glanville's investigation file from the case was minimal.  (*Id.* at 2.)  Higgins

16  does not recall asking his investigator, James Williams, to investigate mitigation, outside of

17  possibly making a few unsuccessful calls to family members, nor does he think Williams was

18  qualified to do such investigation.  (*Id.* at 2; Pet. Ex. 5 at 12.)  Williams attests that he did not

19  investigate any possible psychological or psychiatric issues, nor any life history or family

20  background of Petitioner for purposes of mitigation.  (Pet. Ex. 4; Pet. Ex. 5 at 19.)  Higgins

21  did not hire a specialized mitigation investigator, did not request any mental health experts,

22  and does not recall talking to Petitioner's sister, Diana Jo Stevens.  Although he was aware

23  of Petitioner's cleft palate, he did not investigate whether it was related to any mental health

24  issues. (Pet. Ex. 1 at 2.) Higgins states that Petitioner's case was his second capital case and,

25  at that time, he had not attended any specialized trainings about the penalty phase of a capital

26  case; he asserts that he did not make a strategic decision not to investigate or present

27  available mitigation, and if he had known the information about Petitioner's background that

28

1    he has learned since he would have presented it. (*Id.* at 3.)  Finally, Higgins avows that his

2    billing records accurately reflect the time he spent on the case. (*Id.* at 1.)

3           Philip Maloney, the supervising attorney for the Pima County Office of Contract

4    Counsel, submitted a declaration based on his review of the billing records in Petitioner's

5    case. (Pet. Ex. 7.)  Higgins was paid $525, equivalent to approximately 10 hours of work,

6    for the penalty phase of Petitioner's case; investigator James Williams submitted his final bill

7    on January 11, 1995, and was paid a total of $1136.79, including expenses and costs. (*Id.*

8    at 1.)

9           Analysis

10          Counsel has a duty to conduct a reasonable investigation or to make a reasonable

11   decision that makes particular investigation unnecessary. *Strickland*, 466 U.S. at 690.  The

12   failure to adequately investigate and present mitigating evidence can constitute deficient

13   performance. *See Wiggins*, 539 U.S. at 522.  A reasonable mitigation investigation involves

14   not only the search for good character evidence but also evidence that may demonstrate that

15   the criminal act was "attributable to a disadvantaged background or to emotional and mental

16   problems." *See Boyde v. California*, 494 U.S. 370, 382 (1990).  Because the PCR court did

17   not address this prong of the *Strickland* analysis, the Court reviews this portion of the claim

18   *de novo*. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

19          Contrary to Respondents' argument, it was not reasonable for Higgins to rely

20   primarily on information presented in the first sentencing because in that proceeding the

21   judge did not find any specific mitigating factors and sentenced Petitioner to death.  Further,

22   Petitioner's original trial counsel did not file a written memorandum regarding mitigation

23   (ROA-I 237-54), nor did he present any evidence at the mitigation hearing, relying solely on

24   the trial record and the PSR to make his limited mitigation arguments (RT 2/4/91).  Thus, it

25   does not appear there was any investigation upon which subsequent counsel could have

26   relied.

27          Both Higgins and his investigator attested that the investigator did not conduct any

28                                               - 14 -

mitigation investigation (Pet. Ex. 4; Pet. Ex. 1 at 2), although they both recollect that the investigator made some unsuccessful efforts to contact members of Petitioner's family (Pet. Ex. 1 at 2; Pet. Ex. 5 at 12; Pet. Ex. 19). Counsel further attests that he did not conduct any mitigation investigation; however, it is clear from the record that someone had contact with Petitioner's sister, and counsel submitted evidence from her. Contact with Petitioner's sister and review of the PSR is the only investigation that appears to have been conducted in the ten hours spent preparing for sentencing. Higgins avowed that he did not make a strategic decision to not investigate or present any available mitigation. (Pet. Ex. 1 at 3.) Respondents have not argued there was a strategic reason for counsel to have foregone investigation and presentation of mitigation, and the Court is not aware of any such strategic basis.

Higgins was on notice that Petitioner was born with a cleft palate, had been severely abused as a child, had a history of alcohol and drug abuse beginning at a young age, had attempted suicide in the past, and was described by mental health professionals as impulsive and as a person who acts with poor judgment and in self-destructive ways. Yet, he did no further investigation. It was unreasonable for counsel to "abandon [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Counsel failed to contact additional family members for background and positive character trait information, investigate Petitioner's suicide attempts, discover that Petitioner was exposed to alcohol in utero, or obtain a neuropsychological evaluation.

Deficient performance is established where trial counsel failed to investigate and present substantial mitigating evidence regarding family background, mental health issues, and positive character traits when potential rebuttal evidence was minimal. *See Williams v. Taylor*, 529 U.S. at 395-96. In light of the evidence before the Court establishing counsel's failure to conduct any meaningful investigation, the Court finds that counsel's performance was unreasonable and that Petitioner has satisfied the performance prong of the *Strickland* analysis. *See Correll v. Ryan*, 465 F.3d 1006, 1011-12 (9th Cir. 2006) (finding that failure

1  to investigate and present classic mitigation evidence of which counsel was aware and to rely

2  on the presentence report was deficient); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir.

3  2001); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995) (finding counsel's

4  performance unreasonable when there was no tactical reason to not put on available

5  mitigation).

6  **Prejudice Analysis**

7  The Court now assesses whether there is a reasonable probability that, if counsel had

8  investigated and presented the available mitigation evidence, Petitioner would not have been

9  sentenced to death.  *See Strickland*, 466 U.S. at 693.

10  Childhood abuse

11  At the time of sentencing, Petitioner's counsel submitted a six-page letter from

12  Petitioner's sister discussing Petitioner's turbulent childhood and the abuse he suffered. (Pet.

13  Ex. 25.)  Stevens stated that their parents divorced when Petitioner was 6, and they moved

14  from Ohio to Kansas with their mother and saw little of their father.  Two years later, their

15  father refused to return the four children after a visit and they lived with him and their step-

16  mother for the next five years, although their father was rarely home.  In public, their

17  stepmother acted as if she was a great mother and would pretend to be their biological

18  mother.  At home, their stepmother let them know she hated them and did not want them

19  around.  She was constantly physically and verbally abusive:  slapping one or more of the

20  children across the face daily; spanking Petitioner with a belt when he wet the bed, requiring

21  him to wash the soiled sheets before school, and humiliating him in front of other kids;

22  preventing them from being alone with their dad; and constantly issuing threats that they

23  believed and feared.  Their stepmother pushed their older twelve-year-old brother down a set

24  of concrete stairs causing severe bruising, threatened them all with a gun if they told their dad

25  what had happened, and kept their brother inside for days until the bruises on his face faded.

26  One time as punishment she took Petitioner outside and tied him to a post with a rope around

27  his neck telling him he was no better than a dog.  Stevens emphasized that the abuse by their

28

1   stepmother was constant and they were reminded daily that she did not want them around.

2   After five years, their mother, using their letters and statements about the abuse, won custody

3   of the children.

4          After returning to his mother's custody, at the age of thirteen, Petitioner spent most

5   of his time with his stepfather, who encouraged him to drink beer and whiskey.  Petitioner

6   also began using marijuana and speed.  Petitioner's drinking, primarily with his stepfather,

7   increased over the next few years and included frequent all-night parties and guzzling

8   whiskey.  His mother and stepfather's marriage was turbulent, and Petitioner avoided the

9   house because his stepfather was physically and verbally abusive to his mother.

10         The PSR and attached mental health evaluations recounted Petitioner's unstable

11  childhood, that his parents divorced and his family moved a lot, he was abused and neglected

12  by his stepmother, there was a lengthy custody battle between his parents, he had a poor

13  relationship with his mother who was a prescription drug abuser, his alcohol and drug use

14  began at the age of ten, he had a history of constant drug use, and Petitioner was rarely home

15  after the age of fourteen (Pet. Exs. 71, 60, 61.) The 1991 psychological evaluation reiterated

16  much of the same background and noted an incident in which Petitioner's stepmother held

17  him down under the water in the bath.  Additionally,  Petitioner reported to Dr. Boyer in

18  1991 that his mother was an uninvolved, uncaring parent; that his stepfather was an alcoholic

19  who taught him to drink, saw other women, and was physically abusive to his mother; and

20  that Petitioner had little structure, supervision, or discipline when living with them. (Pet. Ex.

21  58.)

22         Some limited additional information about Petitioner's childhood was developed in

23  the PCR proceedings.  Petitioner's father was rarely home prior to divorcing Petitioner's

24  mother.  (Pet. Ex. 27 at 1; Pet. Ex. 39 at 1.)  Starting around the age of five, Petitioner's

25  brother would cause Petitioner to get in a lot of fistfights. (Pet. Ex. 27 at 1; Pet. Ex. 39 at 3.)

26  Petitioner received the worst and most frequent abuse from his stepmother due to his bed

27  wetting; she would call Petitioner "pissy" in front of other kids and hang his stained sheets

28

1   out the front window of the house.  (Pet. Ex. 27 at 1, 2.)  Their stepmother told them their

2   biological mother did not want them, and they were forbidden to mention her.  (*Id.* at 2.)

3   After the kids returned to their mother's house, Petitioner was a changed person, he was not

4   motivated, and he had problems in school and dropped out.  (*Id.* at 2; Pet. Ex. 39 at 3.)

5          The following information was developed during the federal habeas proceeding.

6   Petitioner's mother and father often fought; when Petitioner's parents got divorced, his father

7   unsuccessfully asked some of his wife's relatives to care for the children because he thought

8   his wife did not take care of the kids.  (Pet. Ex. 32 at 7-8; Pet. Ex. 42; Pet. Ex. 43 at 2.)

9   According to their father and a friend, but not reported by the children, Petitioner's mother's

10  house was filthy.  (Pet. Ex. 32 at 7; Pet. Ex. 31.)  Petitioner was traumatized by his parents'

11  divorce (Pet. Ex. 28 at 3) and thought it was due to the way his cleft palate made him look

12  (RT 4/16/07 at 47).  Other kids made fun of Petitioner because of his cleft palate and his bed-

13  wetting.  (Pet. Ex. 35 at 1; Pet. Ex. 36 at 2; RT 4/16/07 at 75-76.)  Petitioner did not have his

14  own friends and sometimes his siblings picked on him.  (Pet. Ex. 28 at 9.)

15         Petitioner's stepmother would dress him as a girl for Halloween or events.  (Pet. Ex.

16  37 at 2; RT 4/16/07 at 56.)  Sometimes their stepmother would not feed them, and if their

17  father was not home they would eat hot dogs or TV dinners while their stepmother ate steak.

18  (Pet. Ex. 37 at 6.)  In addition to being tied up in the yard, his stepmother tied Petitioner up

19  in the garage, behind the fence, and in the basement.  (Pet. Ex. 28 at 5; Pet. Ex. 37 at 4.) All

20  the children in the family had to do extensive chores and were constantly grounded.  (Pet. Ex.

21  28 at 6.)  On occasion their father would slap or beat them as punishment.  (*Id.* at 7-8.)

22  Petitioner had poor coping skills for dealing with the abuse.  (*Id.* at 4; RT 4/16/07 at 66-67.)

23  After the abuse by his stepmother began, Petitioner became withdrawn, quiet, and sad, and

24  stopped showing emotion.  (Pet. Ex. 28 at 9; Pet. Ex. 37 at 6; Pet. Ex. 40 at 5.)  Petitioner

25  slept poorly when he was younger, with his eyes open, and he would sleepwalk and have

26  nightmares. (Pet. Ex. 37 at 15; RT 4/16/07 at 64, 71.) Petitioner would wake afraid, thinking

27  he was hearing his stepmother's voice or that someone was downstairs.  (Pet. Ex. 28 at 2.)

28

1     Petitioner idolized his stepfather, the only father figure he ever had; however, his

2   stepfather sometimes became very angry at him.  (*Id.* at 14; Pet. Ex. 48 at 1.)   When

3   Petitioner returned to his mother's custody, she essentially abandoned him because she felt

4   left out of the relationship between Petitioner and his stepfather.  (Pet. Ex. 28 at 12, 14; Pet.

5   Ex. 34 at 3; Pet. Ex. 42; Pet. Ex. 43 at 2.)   In addition to her prescription drug addiction,

6   Petitioner's mother drank a lot.  (Pet. Ex. 28 at 15; Pet. Ex. 34 at 1; RT 4/16/07 at 104.)

7   When Petitioner was around the age of fourteen, he and his stepfather would watch each

8   other have sex with both girls and women, including an adult married friend of his stepfather.

9   (Pet. Ex. 28 at 14; Pet. Ex. 34 at 2; Pet. Ex. 37 at 11-12; Pet. Ex. 40 at 7; RT 4/16/07 at 103.)

10  Petitioner's stepfather promised him he would be able to take over the farm where they

11  worked, which was Petitioner's dream, but his stepfather lost the farm due to his drinking;

12  Petitioner was devastated by the loss of the farm and his ability to spend all day with his

13  stepfather.  (Pet. Ex. 28 at 11; RT 4/16/07 at 108; RT 4/17/07 at 162.)   In eleventh grade,

14  Petitioner moved to Michigan to live with his father and stepmother but after a year and a

15  half he returned to Kansas to live with his sister and brother-in-law.  (Pet. Ex. 28 at 16; Pet.

16  Ex. 32 at 11.)

17     With the exception of Petitioner's exposure to and participation in inappropriate

18  sexual activity with his stepfather, and the loss of a farming career, the information

19  developed since the time of sentencing is not substantively new.  The majority of the

20  information presented at the evidentiary hearing merely provides additional detail and

21  examples of the same type of evidence considered by the sentencing judge.  Counsel

22  specifically argued at sentencing that Petitioner's abusive background, including the parental

23  encouragement to drink at a young age, was a causal factor in the murder and should mitigate

24  Petitioner's punishment.  (RT 2/8/95 at 13.)   The limited added information is not of

25  significant weight in light of the substantial information about the constant and severe abuse

26  and neglect Petitioner experienced as a child of which the sentencing judge was well-

27  informed. *See Brown v. Ornoski*, ___ F.3d ___, No. 05-99008, 2007 WL 2713113 at *7 (9th

28

1    Cir. September 19, 2007) (finding that additional abuse evidence unlikely to alter outcome
2    where similar information was presented at sentencing). Further, Petitioner was thirty at the
3    time he committed the murder; thus, under Arizona law, his traumatic childhood may be of
4    less significant mitigating value. *See State v. Ellison*, 213 Ariz. 116, 144, 140 P.3d 899, 927
5    (2006) (finding childhood experiences of little mitigating value for murders committed at
6    thirty-three where there was no evidence defendant could not tell right from wrong);
7    *Hampton*, 213 Ariz. at 185, 140 P.3d at 968 (finding horrendous childhood less weighty, in
8    part, because defendant was thirty at the time of the crime).

9        <u>PTSD</u>

10       Petitioner's psychiatric expert, Dr. Amezcua-Patino, diagnosed Petitioner with Post
11   Traumatic Stress Disorder in remission. (Pet. Ex. 8 at 11, 18.) In his testimony, the doctor
12   stated that Petitioner suffered from symptoms of PTSD from age four or five to age nine.
13   (RT 4/17/07 at 74, 99-101.) Dr. Amezcua-Patino testified that Petitioner's primary coping
14   mechanism for the trauma, other than the use of alcohol, was withdrawal and avoidance of
15   conflict and the possibility of trauma. (*Id.* at 78-79, 87.) Similarly, Petitioner's
16   neuropsychological expert testified that Petitioner had suffered from PTSD at times in his
17   life. (RT 4/19/07 at 93, 108.) This evidence was presented for the first time in this federal
18   habeas proceeding; there was nothing in the state court record related to PTSD.

19       Although the State's psychiatrist, Dr. Scialli, determined that Petitioner did not have
20   symptoms consistent with PTSD (Pet. Ex. 84 at 7), his evaluation focused on Petitioner's
21   state of mind at the time of the crimes. (RT 4/17/07 at 11-13, 49.) Similarly, the state's
22   psychologist, Dr. Sullivan, found no current indication of PTSD based on his testing of
23   Petitioner (Pet. Ex. 80 at 5-6), but he could not opine on whether Petitioner had ever suffered
24   from PTSD because he evaluated only Petitioner's present functioning. (RT 5/8/07 at 53, 58,
25   51.)

26       Because there is no evidence to the contrary, the Court finds that Petitioner established
27   by a preponderance of the evidence that he suffered from symptoms of PTSD up to the age
28

1   of nine.   Despite a few limited references to symptoms later in life, Petitioner did not

2   demonstrate by a preponderance that he suffered from PTSD in adulthood nor, specifically,

3   at the time of the crime.

4          The diagnosed PTSD was a response to the childhood abuse Petitioner experienced

5   and may attest to the severity of the abuse; however, because the abuse and the PTSD were

6   coterminous, the PTSD itself does not carry mitigating weight beyond that given to the

7   childhood abuse.   As noted by Dr. Amezcua-Patino, "you cannot separate the acute reaction

8   to the trauma from the Post Traumatic Stress Disorder on somebody who is being pervasively

9   and consistently traumatized.   So what symptoms are from PTSD and what symptoms are

10  from the fear [of] being beat up on a regular basis is difficult to separate, but he probably had

11  both."   (RT 4/17/07 at 100.)   Although the trauma of the childhood abuse may have

12  continued to affect Petitioner later in life, Petitioner does not allege that PTSD continued to

13  affect him at times that he was not experiencing symptoms.   Similarly, Petitioner does not

14  assert that anything about the events the night of the murder would have triggered a trauma

15  reaction.   Further, his reaction to trauma as a child was identified as withdrawal and

16  avoidance, not aggression.   None of the experts suggested that PTSD had any impact on

17  Petitioner's actions or mental state at the time of the crime.   Thus, the Court considers

18  Petitioner's PTSD as additional evidence relevant to the mitigating factor of childhood abuse.

19  Because the trial court was aware of the severity of the abuse at the time of the sentencing,

20  the PTSD diagnosis relevant to the same time frame is not of significant new weight.

21          Substance abuse

22          Petitioner argues that he has a genetic propensity for substance addiction and has a

23  long history of addiction to alcohol and drugs.   Counsel did not specifically identify a genetic

24  propensity for addiction at the time of sentencing; however, the PSR and attached

25  psychological report noted that Petitioner's mother had an addiction to prescription drugs.

26  (Pet. Exs. 71, 60, 61.)   His mother's addiction also was noted in the 1991 psychological

27  evaluation, in which Dr. Boyer referred to familial and personal substance abuse during

28

1    Petitioner's developmental years.  (Pet. Ex. 58 at 6-7.)

2        In her letter filed prior to sentencing, Petitioner's sister reported that, by the age of

3    thirteen, Petitioner had begun drinking regularly and openly with his stepfather, who

4    encouraged it, and was using speed and marijuana.  Petitioner's stepfather was a heavy

5    drinker who began drinking in the morning and would stay out all night drinking with

6    Petitioner.  At the age of fifteen, Petitioner totaled his stepfather's truck while out drinking

7    with friends, went on a week-long drinking spree with his stepfather, and was capable of

8    guzzling a half-pint of whiskey at one time.  Petitioner had some criminal issues as an adult,

9    which his sister correlated with his episodic drinking.  He had a DUI at the age of eighteen,

10   got into trouble while in the army for a period of heavy drinking, started drinking after his

11   divorce and wrote some bad checks, and went through a chemical dependency program at

12   Larned State Hospital.  (Pet. Ex. 24.)

13       The PSR and attached reports, as well as the 1991 psychological evaluation stated that

14   Petitioner began using alcohol by age nine and had an extensive history of drinking and

15   severe alcoholism.  (Pet. Ex. 71 at 12; Pet. Ex. 61 at 4; Pet. Ex. 58 at 4.)  The 1991 evaluation

16   noted that Petitioner reported he often got into trouble when using alcohol and that he had

17   frequent alcoholic blackouts in his past and at the time of the crime.  (Pet. Ex. 58 at 5.)  The

18   reports noted that Petitioner's drug use started soon after he began drinking and that he had

19   an extensive history of drug use, including marijuana and speed.  (*Id.* at 4; Pet. Ex. 60 at 1;

20   Pet. Ex. 61 at 4; Pet. Ex. 71 at 12.)  There was also a reference to his placement as an adult

21   in a state hospital for substance abuse.  (Pet. Ex. 58 at 6; Pet. Ex. 71 at 12-13.)

22       Since the time of sentencing, Petitioner has developed the following additional

23   evidence.  Petitioner's paternal grandfather and great-uncle and his father's two half-brothers

24   were all significant drinkers or alcoholics.  (Pet. Ex. 32 at 1-2.)  Petitioner's father started

25   drinking at a young age, was always a heavy beer drinker, and became an alcoholic.  (Pet.

26   Ex. 28 at 1; Pet. Ex. 32 at 3-4; Pet. Ex. 42.)  Petitioner's mother also drank a lot.  (Pet.

27   Ex. 28 at 15; Pet. Ex. 34 at 1; Pet. Ex. 32 at 6; RT 4/16/07 at 101.)  Petitioner's first alcohol,

28

1   around the age of ten, occurred when he and his brother would sneak whiskey from their

2   father.  (Pet. Ex. 28 at 12-13; Pet. Ex. 37 at 9.)  Petitioner could drink almost unlimited

3   quantities as a teen, a case of beer or a fifth of bourbon.  (Pet. Ex. 35 at 2; RT 4/17/07 at 154,

4   159.) Petitioner's excessive drinking continued as an adult and when he drank it was always

5   to a state of drunkenness.  (Pet. Ex. 28 at 13; Pet. Ex. 30 at 1-2; Pet. Ex. 32 at 13; Pet. Ex. 35

6   at 4.)  Petitioner would pass out from drinking or would not remember what happened.  (Pet.

7   Ex. 37 at 10, 14-15; Pet. Ex. 48 at 1.)  Petitioner's teenage drug use included acid and his

8   mother's percodan and valium.  (Pet. Ex. 28 at 13, 15; Pet. Ex. 30 at 2; Pet. Ex. 35 at 2; RT

9   4/16/07 at 99-100.)  After Petitioner's brother died, he drank heavily and did a lot of drugs.

10  (Pet. Ex. 37 at 14.)  No expert disagrees that Petitioner has substance dependence in

11  remission.  Further, Dr. Froming testified that she reviewed Petitioner's family history of

12  substance abuse because it is something that can be genetically inherited and over which a

13  person is not likely to have significant control.  (RT 4/19/07 at 32.)  She noted that the risk

14  for alcohol dependence is three to four times higher for close relatives of people with alcohol

15  dependence; the risk is higher the more relatives affected, the closer the biological

16  relationships, and the severity of their problems.  (*Id.* at 34.)

17         Very little new information about Petitioner's substance abuse was developed in this

18  proceeding; rather, slightly more depth was added to the information already known.  The

19  only new information developed since sentencing is that related to the history of alcohol

20  abuse in Petitioner's family.  As stated by one of Petitioner's experts, the significance of the

21  family history is that Petitioner may have had little control over his substance abuse based

22  on his genetics.  Although Petitioner's genetic predisposition to alcoholism may be

23  sympathetic, it is not much more so than the fact that his family encouraged him to abuse

24  substances at a young age, a fact that was considered at sentencing.  Further, the sentencing

25  judge found that Petitioner had satisfied the (G)(1) statutory aggravator – that his capacity

26  at the time of the crime to appreciate the wrongfulness of his conduct or conform it to the law

27  was significantly impaired – based on his consumption of alcohol and possibly cocaine.

28

A.R.S. §13-703(G)(1).   Therefore, there is little additional significance to Petitioner's familial history of substance abuse (other than its contribution to his dysfunctional childhood, which is considered as part of the childhood abuse analysis).

<u>Developmental and Mental Health Issues</u>

The only information presented at sentencing about Petitioner's in utero development was the fact that he was born with a cleft palate, which had been surgically corrected.  Some developmental information, related to childhood abuse and substance abuse, is discussed above; the remaining relevant information presented at sentencing is discussed below.

Dr. Zimmerman's 1985 psychological evaluation concluded that Petitioner's intelligence fell in the lower part of the bright-normal range and his conceptual problem-solving was normal; he had a lot of underlying anger and felt alienated; he was immature, impulsive, exhibited poor judgment, and had a low tolerance for frustration; he blamed others for his problems; and under stress he may act-out in a poorly planned manner.  (Pet. Ex. 60.)  Also in 1985, Psychiatrist Thomas Newberry concluded that Petitioner had above average intelligence and no evidence of psychotic processes; he occasionally gave impulsive responses and was easily frustrated; he has poor self-esteem and views himself as a victim; and Petitioner repeatedly acted in self-destructive ways to ensure failure.  (Pet. Ex. 61.)

In her 1991 evaluation, Dr. Boyer concluded there was no evidence of significant psychiatric problems or major mental disorders; however, Petitioner was emotionally impaired, and he had an elevated scale reflecting "oppositional tendencies, nonformity, conflict with authority and antisocial attitudes, beliefs and/or behaviors."  (Pet. Ex. 58 at 3, 9.)  His profile suggested an antisocial personality disorder because, although he did not present as having a disregard for others, he was alienated and distrustful and projects blame on others.  (*Id.* at 9.)

In the PCR proceeding, Petitioner's mother provided some new factual information: Petitioner's cleft palate kept them separated for the first three to four days of his life, he was hospitalized for approximately the first twenty-two days after birth, he had three surgeries

by the age of three and stopped breathing for some period of time during his last surgery. (Pet. Ex. 39 at 1.) Dr. Briggs conducted the first neuropsychological testing of Petitioner during the PCR proceedings. Dr. Briggs determined that Petitioner's IQ was in the high average range and his academic abilities were within expectations. (Pet. Ex. 22 at 2.) He stated that Petitioner appeared "immature and alienated," manipulative, "self-indulgent," "narcissistic," "hostile, resentful, and irritable," "very impulsive," blamed others for his difficulties, and may be aggressive. (*Id.* at 3.) Dr. Briggs found no pattern of cognitive dysfunction, concluding that Petitioner's neuropsychological functioning was normal, which he regarded as an improved assessment relative to what it would have been closer to the time at which he suffered head traumas and engaged in substance abuse. The few impaired performances in testing were not of major clinical significance. (*Id.* at 2, 6.) Dr. Briggs found that psychological/emotional factors were the most significant component of Petitioner's functioning, including the possibility of a severe personality disorder. He concluded that Petitioner's level of impairment may be heightened by an interaction between his emotional status and his mild neuropsychological deficits. (*Id.* at 6.) Finally, he opined that Petitioner's decision-making when affected by alcohol was not reasoned and consequence-driven but instinctual, learned behavior outside of right and wrong. (*Id.* at 6-7.)

In preparation for the evidentiary hearing, Petitioner was examined by several new experts, whose evaluations relied in part on factual information about Petitioner's development that was uncovered during these federal habeas proceedings. Petitioner's mother drank when she was pregnant with him. (Pet. Ex. 32 at 6.) Petitioner was hard to feed as a child due to his cleft palate, and he was a very small, thin child. (Pet. Ex. 28 at 2.) As an infant, Petitioner would repeatedly bang his head on the side of the crib. (Pet. Ex. 43 at 1.) As a child, Petitioner had a concave chest, was knock-kneed and clumsy, was easily confused, and had a hard time learning to dress himself. (Pet. Ex. 37 at 1-2.) Petitioner did not begin speaking until age three and was very difficult to understand even in kindergarten. (Pet. Ex. 28 at 2.) As an adult, Petitioner's ability to communicate is poor; his attention often

wanders, or he speaks so rapidly or is so wordy that people cannot understand him.  (*Id.* at 21; Pet. Ex. 35 at 6; Pet. Ex. 37 at 16; Pet. Ex. 49 at 2.)  Petitioner was a follower as both a child and an adult.  (Pet. Ex. 28 at 2; Pet. Ex. 36 at 1; Pet. Ex. 37 at 17.)  When doing a task Petitioner would do it the same way every time even if it was not the best method.  (Pet. Ex. 37 at 17.)  According to family members, Petitioner lacked insight and the ability to plan, was impulsive, and could not grasp the consequences of his actions.  (Pet. Ex. 28 at 19-20; Pet. Ex. 32 at 12.)  Petitioner was unable to sustain the day-to-day of a stable environment and was overly sensitive to, and avoided, the minor aggravations that occur between people.  (Pet. Ex. 28 at 16.)

Petitioner sustained several head injuries as a youth:  when Petitioner was about four years old, he fell in a floor vent and cut his head; around the age of five or six, Petitioner got poked in the eye and had to wear a patch (Pet. Ex. 37 at 2); as a teenager, Petitioner was in two rollover truck accidents, multiple car accidents, and numerous motorcycle crashes without a helmet (Pet. Ex. 28 at 14; Pet. Ex. 30 at 3; Pet. Ex. 32 at 12; Pet. Ex. 35 at 4; Pet. Ex. 39 at 3).  In 1987, Petitioner was injured in a serious car accident in which he hit his head.  (Pet. Ex. 30 at 2-3.)  Additionally, Petitioner was exposed to Lorsban and DEET when he worked on the farm.  (*Id.* at 1; Pet. Ex. 34 at 2.)

Petitioner's three experts for this proceeding, Drs. Karen Bronk Froming, Lauro Amezcua-Patino, and Christopher Cuniff, were all provided with and reviewed extensive statements from family and friends; Petitioner's medical, mental health, school, military, criminal and prison records; Petitioner's parents' divorce and custody records; and other experts' reports.  (Pet. Ex. 8 at 1-6; Pet. Ex. 12 at 4-10; Pet. Ex. 16 at 5-7; Pet. Ex. 17 at 2-3.)

Dr. Froming was asked by Petitioner's counsel to conduct a neuropsychological evaluation of Petitioner to opine on his current functioning and assess his functioning at the time of the crime.  (RT 4/19/07 at 21.)  Dr. Froming's ultimate conclusion is that Petitioner suffers from brain dysfunction, which affects him cognitively, behaviorally, emotionally, and socially.  (Pet. Ex. 17 at 9.)  More specifically, Dr. Froming determined that Petitioner suffers

from impulsive errors in testing, has test results consistent with damage to the right hemisphere of the brain, and has damage in the frontal-subcortical areas of the brain, which causes impulsivity, impulsive errors, and problems in self-monitoring and auditory processing. (Pet. Ex. 16 at 23.) Dr. Froming agrees that Petitioner's functioning on the test batteries given by Dr. Briggs and herself was largely normal; however, she notes that Petitioner had significant difficulties in efficiency and impulsivity in responding. (RT 4/19/07 at 65.) Petitioner prioritizes speed over accuracy in completing tasks. (*Id.* at 73.) In particular, Petitioner's problem solving and reasoning abilities are good, but his ability to control his behavior or to respond to a problem in a measured way is poor, as is his cognitive flexibility in being able to recall rules and self correct (*id.* at 75, 89); these are "selected deficits" that exist despite his IQ level (*id.* at 89). The most noteworthy aspect of Petitioner's behavior for Dr. Froming was his impulsivity, which she determined to be brain based; Petitioner's errors in reaching a solution were the most extraordinary behavior she has witnessed in her entire practicing history. (*Id.* at 108; Pet. Ex. 16 at 23.) Dr. Froming found that while Petitioner's testing results were often in the unimpaired range, the manner in which he reached his results was often impaired. (Pet. Ex. 16 at 16.)

Dr. Froming believes, like Dr. Briggs (Pet. Ex. 20 at 1), that Petitioner's testing results from 2000 and 2006 were better than if he had been tested at the time of the crime because there would have been recovery of function due to Petitioner's abstinence from drugs and alcohol during that period. (Pet. Ex. 16 at 24; RT 4/19/07 at 39-40.) Further, if Petitioner had been evaluated at the time of sentencing by a neuropsychologist with sufficient background information, "chronic and serious neurological deficits" would have been found. (Pet. Ex. 17 at 10.) She further opined that Petitioner's ability to plan and make error-free decisions would be significantly more impaired while under the influence of alcohol, and that Petitioner's frontal lobe dysfunction is likely to be less apparent in the structure of the testing environment. (Pet. Ex. 16 at 24, 23; RT 4/19/07 at 96.) Dr. Froming opined that the expert information available at sentencing is distinguishable from that presented subsequently

because there had not been a neuropsychological evaluation.  (RT 4/19/07 at 125.)

Petitioner's psychiatric expert, Dr. Amezcua-Patino, diagnosed him with cognitive disorder not otherwise specified secondary to congenital deficits.  (Pet. Ex. 8 at 11; RT 4/17/2007 at 67.)  He concluded Petitioner had neuro-psychiatric conditions and cognitive deficits acquired at birth, likely a result of congenital malformations (cleft palate and lip), worsened by abuse and the use of illegal substances.  (Pet. Ex. 8 at 17, 18.)  In support of this conclusion, Dr. Amezcua-Patino notes that there is a high likelihood of neurocognitive deficits appearing early in life in children with cleft palate, and Petitioner's history indicates cognitive difficulties and neurological coordination problems.  (*Id.* at 16, 17.)  The subsequent abuse Petitioner experienced is highly likely to have caused a worsening of these problems.  (*Id.* at 17.)  These deficits impact Petitioner's impulse control and ability to problem solve.  (*Id.*)  Dr. Amezcua-Patino believes that Petitioner has demonstrated an inability to behave properly, rather than a willingness to misbehave.  (RT 4/17/07 at 90.)

Dr. Christopher Cunniff, pediatrician and medical geneticist, concurred that Petitioner has neurodevelopmental abnormalities.[5]  (*Id.* at 143.)  He further determined that Petitioner's profile is consistent with Alcohol Related Neurodevelopmental Disorder (ARND); however, because Petitioner experienced environmental and familial factors that could explain or have contributed to his neurodevelopmental problems, such a diagnosis could not be made.  (Pet. Ex. 12 at 3.)  The issues from Petitioner's life that are consistent with the central nervous system effect of ARND are impulsivity, and poor planning, executive functioning, and goal setting.  (RT 4/17/07 at 135.)

Respondents' neuropsychologist, Dr. James Sullivan, assessed Petitioner's functioning

---

[5]  Dr. Cuniff is the only one of Petitioner's experts who stated unequivocally that Petitioner's neuropsychological disabilities were "severe."  (RT 4/17/07 at 137.)  Dr. Cuniff did not conduct any testing nor meet with Petitioner before preparing his report.  (Pet. Ex. 12.)  Because the above-referenced conclusion was based entirely on the findings of Drs. Froming and Amezcua-Patino (Pet. Ex. 12 at 3; RT 4/17/07 at 137) – neither of whom used that language – the Court does not find support for Dr. Cuniff's finding.

1    as of the time of his evaluation; he did not conduct a comprehensive neuropsychological

2    assessment.  (Pet. Ex. 80 at 1, 6; RT 5/8/07 at 50.)  In preparing for his examination of

3    Petitioner, Dr. Sullivan reviewed the reports and data from Dr. Briggs and Dr. Froming (Pet.

4    Ex. 80 at 1-2); he was provided significantly more material that he did not review (RT 5/8/07

5    at 53).  He did not conduct further collateral review because, based on prior testing and his

6    own testing, he determined that Petitioner did not have any neuropsychological dysfunction

7    and had not had any for some time.  (*Id.* at 81-82.)  Dr. Sullivan assessed Petitioner's

8    intellectual functioning to be in the high average range, with his cognitive function intact and

9    average or above in all areas.  (Pet. Ex. 80 at 3, 4, 6.)  Dr. Sullivan concluded that

10   Petitioner's profile was one of an "immature, hostile, and extremely impulsive individual

11   who is easily frustrated and often aggressive." (Pet. Ex. 80 at 6.)  Dr. Sullivan did not make

12   any formal diagnosis of Petitioner based on his assessment. (*Id.*) Petitioner performed above

13   average on the one neuropsychological test administered by Dr. Sullivan, but based solely

14   on that test the doctor would not opine that Petitioner did or did not have any impairment.

15   (RT 5/8/07 at 20-21.)

16       Respondents' psychiatric expert, Dr. John Scialli, examined Petitioner to assess his

17   psychiatric status, meaning his state of mind at the time of the offense and/or sentencing.

18   (RT 4/17/07 at 49-50; Pet. Ex. 84 at 2.)   He diagnosed Petitioner with alcohol and

19   polysubstance dependence and antisocial personality disorder.[6]  (Pet. Ex. 84 at 10.)  Dr.

20

21          [6] Petitioner maintains he does not have antisocial personality disorder but the State
     contends such a diagnosis was before the sentencing court and has been confirmed by other
22   experts during these proceedings.  The only doctors to diagnose Petitioner with antisocial
     personality disorder are Larned State Hospital psychologist Lewis Young (a 1986 report
23   newly produced in these proceedings) and Dr. Scialli; in her 1991 report, Dr. Boyer provided
     only a diagnostic impression of probable antisocial personality disorder (Pet. Ex. 58 at 10).
24   Because Drs. Young and Scialli reviewed essentially no collateral information regarding
     Petitioner's history (*see* Pet. Ex. 62 at 15; Pet. Ex. 84 at 2-3), other experts agree that review
25   of historical information is critical to such a diagnosis (RT 4/19/07 at 46-47, 98-99, 105-06;
     RT 5/8/07 at 54-55), and the experts that reviewed substantial amounts of collateral
26   information disagreed with that diagnosis (RT 4/17/07 at 89-93; RT 4/19/09 at 115), the

27

28                                              - 29 -

Scialli agrees that Petitioner has minor brain dysfunction and some frontal subcortical insufficiencies in certain neuropsychological processes, but not significant brain damage and no dysfunction connected to the crime. (RT 4/17/07 at 33-35.) In other words, Dr. Scialli found no brain or emotional impairment that would mitigate Petitioner's culpability for the murder (Pet. Ex. 84 at 11); specifically, that no clinical data indicated that Petitioner was "other than consciously responsible for the offenses" (RT 4/17/07 at 12). Further, he noted that none of Petitioner's experts had explained a connection between the impairments they diagnosed and the offenses. (Pet. Ex. 84 at 12, 11.) Further, he concluded there is nothing in the more recent evaluations that had not been discovered and presented at sentencing. (*Id.* at 12.) Dr. Scialli disagreed with Dr. Froming's conclusions, stating that frontal lobe dysfunction does not mandate behavioral impulsivity. (RT 4/17/07 at 25.) He opined that there can be brain inefficiencies and disorders that have no behavioral consequences. (*Id.* at 56.) Further, Dr. Scialli noted that brain damage that has been associated with aggressive behavior is a distinct part of the brain called the ventro-medial pre-frontal cortex, distinct from the frontal lobe dysfunction found by Dr. Froming. (*Id.* at 25.)

All of the experts agree that Petitioner is of at least average intelligence and that his neuropsychological functioning is largely normal. However, based on the opinions of Drs. Briggs and Froming, who conducted the only comprehensive neuropsychological testing, the thorough record review conducted by Petitioner's experts, and the concession by Dr. Scialli, the Court finds that Petitioner suffers from some brain dysfunction that causes "selected" neuropsychological deficits. This medical finding, premised on neurodevelopmental and congenital defects, is new and was not presented at sentencing.

The primary notable impact of Petitioner's dysfunction, according to Dr. Froming, is impulse control (an issue noted repeatedly by mental health professionals who examined Petitioner over the years, including the 1985 psychological and psychiatric reports attached

---

Court finds that antisocial personality disorder has not been proven.

to the PSR). Drs. Froming and Amezcua-Patino noted that Petitioner has behavioral control problems generally, but did not note any specific behaviors other than impulsivity.

The Court first assesses this evidence as it relates to Petitioner's allegation that the new expert testimony satisfies the (G)(1) statutory mitigating circumstance: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703 (G)(1). As discussed above, the sentencing court found (G)(1) based on Petitioner's intoxication at the time of the crime. Due to Petitioner's assertion that he was in an alcoholic blackout at the time of the crime, and has no recollection of it, no one has been able to directly assess his mental state at the time of the crime. Regardless, Petitioner now asserts that (G)(1) also is satisfied by his brain dysfunction and neurological deficiencies, which are exacerbated when he is intoxicated. As an initial matter, Petitioner did not present any evidence or opinion that Petitioner could not appreciate the wrongfulness of his conduct based on mental impairments;[7] thus, the Court assesses only whether Petitioner satisfies the prong of (G)(1) based on inability to conform his conduct to the law.

First, according to his experts, the primary consequence of Petitioner's impairments is impulsivity. However, there is no evidence that the victim initiated the altercation leading to her murder or engaged in any behavior that would trigger an impulsive response from Petitioner. More significantly, the crime was not impulsive. Petitioner harassed and threatened the victim for a period of time before kidnapping her at knife point, removing her from the house to the car, and subsequently murdering her. Thus, the circumstances of the crime do not indicate that Petitioner's impulsivity precluded him from behaving in conformance with the law. Further, the Arizona courts do "not equate impulsivity or poor

---

[7] Petitioner's disposal of the body in a remote location and flight from the state indicate that he could in fact appreciate the wrongfulness of his actions. *See State v. Poyson*, 198 Ariz. 70, 81, 7 P.3d 79, 89 (2000).

1   judgment with mental inability to conform one's conduct to the law." *See State v. Hoskins*,

2   199 Ariz. 127, 149, 14 P.3d 997, 1019 (2000).

3       Second, although Petitioner's impairments are described as present from birth and

4   aggravated by events in his childhood, Petitioner has essentially no history of violence prior

5   to the murder, which undercuts his argument that he could not conform his conduct to the

6   law.  There is no evidence that Petitioner's impulsiveness in testing and as noted by others

7   translates to violent behavior in the real world.  (*See* RT 4/17/07 at 25 (noting that frontal

8   lobe executive functioning is a distinct portion of the brain from that associated with

9   aggressive behavior).)  To the contrary, numerous family members and friends attested that

10  they knew Petitioner to be a non-violent individual even when drinking (Pet. Ex. 27 at 3; Pet.

11  Ex. 29; Pet. Ex. 33; Pet. Ex. 35 at 5; Pet. Ex. 39 at 3), and Dr. Boyer opined that there was

12  no indication violence was a characterological pattern (Pet. Ex. 58 at 8).[8]  In sum, Petitioner

13  has not proven that his neurological impairments standing alone satisfy the (G)(1) factor (*see*

14  RT 4/17/07 at 12, 34 (finding by Dr. Scialli that no clinical data indicated that Petitioner was

15  not consciously responsible for the crime)).  *See Hoskins*, 199 Ariz. at 148-49, 14 P.3d at

16  1018-19 (finding essential to establishing the (G)(1) factor that experts offer "proof of actual

17  causation between the impairment and the criminal act").

18      Petitioner has strengthened his argument that his alcohol and drug dependence, which

19  exacerbates his impairments, was largely out of his control and due to numerous biological

20  and environmental influences.  This makes the (G)(1) factor somewhat more sympathetic

21  than voluntary intoxication and may increase the weight of the factor.  However, the

22  additional weight is limited as Petitioner was aware of his pattern of drinking to excess when

23

24      [8] Dr. Briggs noted that Petitioner may act based on instinct not reason (Pet. Ex. 22
25  at 6-7) and Dr. Amezcua-Patino noted that Petitioner historically is not unwilling but unable
    to behave (RT 4/17/07 at 90).  These comments were not specific to Petitioner's brain
26  dysfunction rather than his personality features, did not address the issue of violence, and
    were not about his behavior at the time of the crime; in fact, Dr. Briggs's opinion was based
27  primarily on Petitioner's functioning when affected by alcohol (Pet. Ex. 22 at 6-7).

28

1    he drank and had periods prior to the crime when he was able to not drink (Pet. Ex. 37 at 17;

2    RT 4/19/07 at 60-61).  Further, the sentencing judge was aware when he found and weighed

3    the (G)(1) factor that Petitioner's substance dependence began in childhood at the

4    encouragement of a parental figure.

5           Next, the Court assesses this category of evidence as relevant for non-statutory

6    mitigation.  Unrelated to the crime, there is nothing inherently mitigating in the fact that

7    Petitioner is impulsive in his day-to-day life.  Because Petitioner has not established that his

8    neurological impairments prevented him from complying with the law or knowing right from

9    wrong at the time of the crime, they are not of significant non-statutory mitigating weight.

10   *Johnson*, 212 Ariz. at 440, 133 P.3d at 750 ("[T]he weight to be given [to] mental impairment

11   should be proportional to a defendant's ability to conform or appreciate the wrongfulness of

12   his conduct.") (quoting *State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997)); *Ellison*,

13   213 Ariz. at 144, 140 P.3d at 927 ("The relationship between the mitigation evidence and the

14   crime . . . can affect the weight given to such evidence.") (citing *Newell*, 212 Ariz. at 405,

15   132 P.3d at 849).  Petitioner has not proven that he suffers from a mental impairment which

16   is a "major contributing cause" to his conduct at the time of the crime.  *See State v. Stuard*,

17   176 Ariz. 589, 610, 863 P.2d 881, 902 (1993) (finding of significant weight and meriting

18   leniency evidence of severe organic brain damage resulting in dementia and a borderline-

19   retarded IQ that were significant causative factors in the murders).  The Court finds that

20   Petitioner's impairments (selected deficits causing impulsivity) are entitled to only minimal

21   mitigating weight because he has no history of violence or evidence that the impairments

22   cause aggression, the crime was not impulsive, and the experts agree that Petitioner is largely

23   cognitively normal with at least an average IQ (*see* RT 5/8/07 at 80-81 (Dr. Sullivan notes

24   there is a five percent error rate in neuropsychological testing and that normal people with

25   no brain damage will have some impaired performances)).  *See State v. Stokley*, 182 Ariz.

26   505, 521, 898 P.2d 454, 470 (1995) (giving some mitigating weight to Petitioner's head

27   injuries and impulsive control problems, but finding it offset by average IQ and fact that

28

1    crime was not impulsive); *Johnson*, 212 Ariz. at 440, 133 P.3d at 750 (finding evidence of

2    some frontal brain dysfunction and executive function impairment of *de minimis* mitigation

3    weight because cognitive abilities average and intact).

4           Familial Love

5           In the letters submitted at sentencing, Petitioner's sister informed the court that

6    Petitioner always had a home with her family (Pet. Ex. 24 at 3), that Petitioner had family

7    support and close sibling relationships, and that she loved him dearly (Pet. Ex. 26).

8    Additionally, counsel asserted at sentencing that Petitioner was father to a ten-year-old son.

9           The evidence developed during these proceedings reiterated that numerous family

10   members and friends support Petitioner, believe him to be talented, generous and kind, love

11   him, and would be devastated by his execution.  (Pet. Ex. 28 at 22; Pet. Ex. 30 at 4; Pet. Ex.

12   32 at 14; Pet. Ex. 36 at 8; Pet. Ex. 39 at 3; RT 4/17/07 at 165, 167.)  If Petitioner were to be

13   resentenced to life in prison, his sister and brother-in-law would begin plans to move to

14   Arizona in order to visit him regularly.  (RT 4/17/07 at 165-66, 167-68.)  Petitioner has kept

15   in touch with his son through letters and some phone calls; his son feels like Petitioner

16   provides him support, and he knows he is loved by him.  (RT 4/19/07 at 7, 9-10, 12.)

17          Petitioner has proven by a preponderance of the evidence that his family loves and

18   supports him.  However, the evidence in support of this factor is not significantly different

19   than that provided by his sister at sentencing.  Further, while love of family can be

20   considered mitigating, it carries limited weight in Arizona in light of the fact that it did not

21   prevent Petitioner from committing a heinous murder.  *See State v. Phillips*, 202 Ariz. 427,

22   440, 46 P.3d 1048, 1061 (2002); *State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851

23   (1995) (familial support entitled to, at most, *de minimis* weight).

24          Adaption to Prison Environment

25          Petitioner's neuropsychological expert and sister opined that Petitioner has done

26   and/or would do well in the structure of a prison environment, with limited choices and clear

27   rules.  (Pet. Ex. 16 at 23; Pet. Ex. 28 at 21.)  This Court must assess whether the result of the

28

1    sentencing would have been different if counsel had presented this information.  In the

2    addendum to the PSR, the probation department stated that Petitioner had been written up

3    five times, including a major infraction, during the time he had been in prison since his first

4    trial.  (Pet. Ex. 71 at 1.)  At the time of the aggravation/mitigation hearing, Petitioner's

5    counsel contended that, if the sentencing judge were going to consider that information,

6    counsel would like further documentation.  (RT 2/6/95 at 23.)  The Court agreed not to

7    consider Petitioner's record of behavior in prison.  (*Id.*)  Petitioner has not presented any

8    evidence regarding his adaption to prison specific to the period prior to his 1995 sentencing;

9    thus, Petitioner has not proven by a preponderance of the evidence that he was well-adapted

10   to prison at the time of his sentencing.  The Court will not consider this as a mitigating factor.

11   Even if this were considered, all prisoners are expected to behave and adapt to life in prison;

12   therefore, the state courts do not afford much weight to this as a mitigating factor.  *See State*

13   *v. Tucker*, 215 Ariz. 298, 322, 160 P.3d 177, 201 (2007); *State v. Hinchey*, 181 Ariz. 307,

14   314-15, 890 P.2d 602, 609-10 (1995) (model prisoner behavior not necessarily mitigating).

15                    <u>Cumulative Prejudice Assessment</u>

16          Petitioner makes several specific arguments regarding why the PCR court's ruling

17   regarding prejudice is contrary to or an unreasonable application of Supreme Court law.

18   First, Petitioner contends that the ruling is contrary to controlling law because the facts of his

19   case are materially indistinguishable from *Wiggins* and *Williams*.  The Court disagrees.  In

20   both of those cases no mitigation of any weight was presented or argued to the jury, *Wiggins*,

21   539 U.S. at 515-16; *Williams*, 529 U.S. at 367; in contrast, here, significant mitigating

22   information was argued and available for review by the judge.

23          Second, Petitioner argues that the PCR court's ruling is unreasonable because it failed

24   to consider all of the factual evidence presented.  Again, the Court disagrees.  The PCR court

25   categorized the new evidence as falling into two categories:  expert neuropsychological

26   evidence by Dr. Briggs and evidence regarding Petitioner's abusive dysfunctional childhood

27   (not specifically limited to physical child abuse as suggested by Petitioner), which was

28                                      - 35 -

1  contained in statements by Petitioner's mother, sister, and stepfather. This fairly summarizes

2  the allegations and evidence presented in the PCR proceeding. (*See* ROA-PCR Doc. 13 at

3  15-19, Exs. 7-10.) Additionally, the PCR court's conclusion that the evidence regarding

4  Petitioner's childhood was cumulative was not objectively unreasonable; as discussed above

5  in the section on childhood abuse, little substantive new evidence not known at sentencing

6  was argued in or attached to the PCR petition.

7      Third, Petitioner alleges that the PCR court's decision was unreasonable because it

8  ignored evidence in concluding that Dr. Briggs's report was not "significantly different" from

9  the report considered at sentencing. The significant difference that Petitioner points to is Dr.

10  Briggs's conclusion that Petitioner has neuropsychological deficits. Dr. Briggs stated in his

11  report that Petitioner had a few impaired performances on his testing "which do not appear

12  to have major clinical significance." (Pet. Ex. 22 at 2, 6.) While Dr. Briggs noted that

13  Petitioner's functioning was recovered since the time of his head injuries and substance

14  abuse, he concluded that Petitioner's neuropsychological function was normal and that there

15  was no cognitive dysfunction. (*Id.* at 6, 3.) He also stated that Petitioner's psychological and

16  emotional profile was the most significant factor in his behavior. (*Id.* at 6.) Similarly, Dr.

17  Boyer concluded in 1991 that Petitioner's cognitive functioning was grossly intact, that he

18  was of at least average intelligence, that he did not have any major mental disorder or

19  psychiatric disturbance, but that his ability to relate emotionally was impaired and he had

20  antisocial attitudes. (Pet. Ex. 58 at 3, 7, 9.) Dr. Briggs's report is in conformance with all

21  of these findings. In light of the fact that Dr. Briggs indicated that Petitioner's impaired

22  performances were not of clinical significance and emphasized other issues as the major

23  contributing forces in his behavior, the PCR court's conclusion that his report was not

24  "significantly different" than Dr. Boyer's is not objectively unreasonable.

25      The Court now assesses whether the PCR court's finding of no prejudice was an

26  objectively unreasonable application of *Strickland*. To do so, the Court assesses the totality

27  of the mitigation, weighs it against the aggravation, and assesses whether there is a

28

reasonable probability that the sentence would have been different if the additional information had been presented.  *Wiggins*, 539 U.S. at 534.  Petitioner contends that the evidence presented in this proceeding is a significantly more humanizing, wholistic picture than that provided to the sentencing judge.  While the quality of mitigating evidence is much more in-depth and has provided a more sympathetic picture, it is clear that the sentencing judge assessed all of the written information available, including the PSR and mental health evaluations, and found numerous mitigating factors.  (RT 2/8/95 at 9-10 (finding Petitioner's childhood physical and mental abuse to be a mitigating factor based on the "attachments to [counsel's] proposed sentencing memoranda.").)  While in-person testimony often may be important to credibility determinations, there is no question the judge accepted and believed the written testimony provided by Petitioner's sister.  Further, counsel urged the judge to consider the connection between the crime and Petitioner's diminished capacity, childhood abuse, lack of prior violent crime convictions, and his remorse, in determining the appropriate punishment.  (RT 2/8/95 at 14.)

Petitioner has presented significant evidence of severe abuse and neglect that he suffered as a child; however, this was found to be a mitigating factor by the sentencing court, and the new information is not reasonably likely to have changed the weight of this factor. *See McDowell v. Calderon*, 107 F.3d 1351, 1363 (9th Cir.) (finding failure to introduce additional evidence of abuse, including sexual abuse and substance abuse, not prejudicial when evidence of severe physical abuse was presented), *vacated in part on other grounds*, 130 F.3d 833 (9th Cir. 1997).  Although Petitioner demonstrated that he experienced PTSD as a child, it is of little independent weight separate from its cause – the severe abuse he experienced.  Petitioner's extensive history of substance abuse and dependence was well documented at sentencing, and the sentencing judge found that Petitioner established both the (G)(1) statutory aggravator based on his intoxication at the time of the crime and a non-statutory mitigator based on his history of alcohol and drug abuse.  The only new related information is Petitioner's familial history of substance abuse, which the Court finds of

1   limited weight in light of Petitioner's extensive known history of substance abuse. Although

2   not discussed in these proceedings, the sentencing court found that Petitioner had proven

3   remorse and considered it to be a mitigating factor; therefore, it is weighed in this Court's

4   assessment.

5        The one new finding not weighed by the sentencing or PCR court is the conclusion

6   that Petitioner has selected neuropsychological deficits, which cause him to be impulsive.

7   Petitioner has failed to demonstrate that these impairments standing alone likely would have

8   satisfied the (G)(1) statutory mitigator. However, it adds some weight to the statutory factor,

9   originally based solely on intoxication, and some weight as a non-statutory mitigating factor.

10       The Court finds that Petitioner's familial love and family relationships are not of

11   meaningful mitigating weight. Further, the Court does not consider Petitioner's alleged

12   adaption to prison to have been proved as a mitigating factor.

13       In sum, despite extensive additional investigation into Petitioner's background and

14   mental health, Petitioner has not discovered significant new or more weighty mitigation than

15   was considered by the sentencing judge.[9] Although counsel was obligated to have conducted

16   a more thorough investigation and to have presented a more complete picture of the available

17   mitigation, the sentencing judge had a significant amount of information available which he

18   considered and weighed in mitigation. Further, the sentencing judge made specific findings

19   regarding aggravation, which must be weighed in the balance: the victim's throat was cut

20   from ear to ear, almost causing decapitation; the victim struggled for her life as reflected by

21   numerous defensive wounds; the victim was alive during a significant portion of the time

22   period during which the wounds were inflicted; the victim suffered severe mental anguish

23

24      [9] The Court has reviewed, considered and weighed (to the extent proven) all of the
     mitigating evidence presented during sentencing and post-conviction, as well as that
25   developed during these habeas proceedings, regardless of whether it has a causal connection
     to the crime. *Cf. Lambright v. Schriro*, 490 F.3d 1103, 1114-15 (9th Cir. 2007). However,
26   as cited throughout the prejudice analysis, the Court also has considered the weight given to
27   specific types of mitigating evidence under Arizona law.

28

and anxiety for a substantial portion of the approximate fifteen-minute period between her abduction at knife point from her house to the leaving of her body in the desert; the victim experienced excruciating pain and suffering before losing consciousness, based on the number and severity of the stab wounds inflicted with a sharp instrument; the forty wounds were more than required for death, amounting to gratuitous violence; Petitioner relished the killing as reflected in his statement to his co-defendant, "It's dead but it's warm.  Do you want a shot at it?"; the killing was senseless in that Petitioner was not in physical risk from the victim; the victim was helpless and Petitioner was able to not only kill her but make unwanted sexual advances on her at the time.[10]  The Arizona Supreme Court upheld each of these factual findings and the aggravating factor as a whole.  *Detrich II*, 188 Ariz. at 67-68, 932 P.2d at 1338-39.

Pursuant to the AEDPA, this Court is obligated to give deference to the PCR court's conclusion that Petitioner was not prejudiced by the actions of his counsel.  Applying that standard, the Court cannot say that it was objectively unreasonable to conclude that, weighing the totality of the mitigating evidence now available against the aggravation, there is not a reasonable probability that Petitioner's sentence would have been different.  Even if Petitioner is correct that no deference is owed under the AEDPA, the Court finds that Petitioner has failed to demonstrate prejudice under *Strickland*.

## DISCUSSION OF REMAINING CLAIMS

In addition to Claim B, Petitioner has six claims pending before the Court, Claims E, F, H, I, J, and L.  To the extent not previously resolved, the Court addresses the procedural posture and/or the merits of these claims.

### Principles of Exhaustion and Procedural Default

A writ of habeas corpus may not be granted unless it appears that a petitioner has

---

[10]  In Claim J of the Amended Petition, Petitioner challenges the (F)(6) aggravating factor as not being supported by sufficient evidence; in a discussion below the Court denies that claim.

- 39 -

exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).  If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc); *cf. Fields v. Washington*, 401 F.3d 1018, 1022 (9th Cir. 2005) (mere citation to a state case that conducts both a state and federal law analysis does not, by itself, satisfy exhaustion).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule

32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). A state procedural default is not independent if, for example, it depends upon a federal constitutional ruling. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam). A state bar is not adequate unless it was firmly established and regularly followed at the time of the purported default. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were

not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.

**Claim E**

Petitioner alleges that collateral estoppel should have barred the State from litigating the issue of sexual assault in Petitioner's second trial and the court from considering it for purposes of sentencing, because Petitioner was acquitted on the sexual assault charge in his first trial.  Respondents concede this issue was exhausted on direct appeal.  (Dkt. 61 at 70.)

Petitioner contests admission of the following evidence at his second trial (similar evidence was presented at his first trial (RT 10/24/90 at 78, 83)).  Petitioner's co-defendant testified that while he was driving he saw that Petitioner "was on top of [the victim] humping her," in an "up and down motion on her."  (RT 12/15/94 at 23, 24.)  Charlton testified that he later looked over and saw that the victim's throat was slit, and Petitioner asked him if he "wanted a shot at it, it is dead but it is warm, you want a shot at it."  (*Id.* at 25.)

Background

In Petitioner's first trial, the jury was instructed as follows on sexual assault: "intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person without consent of such person.  'Sexual intercourse' means penetration into the penis, vulva or anus by any part of the body or by any object or manual masturbatory contact with the penis or vulva."  (RT 11/2/90 at 33.)    The jury was also instructed on the lesser included offense of sexual abuse: "intentionally or knowingly engaging in sexual contact with any person . . . without consent . . . .  'Sexual contact' means any direct or indirect fondling or manipulating of any part of genitals, anus or female breast."  (*Id.*)  Petitioner was found not guilty of sexual assault but guilty of sexual abuse.  (*Id.* at 44-45.)

In Petitioner's second trial, the jury was given the following instruction on the elements of kidnapping:  knowingly restricting a person's movements; using physical force to accomplish the restriction; and the restriction was with the intent to inflict physical injury, death, or a sexual offense.  (RT 12/20/94 at 149-50.)  The trial court found that Charlton's testimony regarding the events of a sexual nature in the car could be presented as relevant

1   to the third element of the kidnapping charge, intent to commit a sexual offense.  (RT

2   12/13/94 at 131-32.)

3          The Arizona Supreme Court denied Petitioner's collateral estoppel claim, stating that

4   Charlton's testimony:

5          was not offered to prove sexual intercourse, sexual assault, or sexual abuse.
       Rather it was offered, together with defendant's statements at Souter's home
6          and testimony about Souter's half-nude body, to show defendant's *intent* to
       commit a sexual offense, an element of the offense of kidnapping.  At the
7          second trial, whether defendant actually had sexual intercourse with or
       sexually abused Ms. Souter was irrelevant; however, the state could, and did,
8          offer the evidence to show that defendant intended to commit a sexual offense
       on the victim.

9   *Detrich II*, 188 Ariz. at 63, 932 P.2d at 1334.

10         Analysis

11         Collateral estoppel means "when an issue of ultimate fact has once been determined

12  by a valid and final judgment, that issue cannot be litigated between the same parties in any

13  future" case.  *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).  This principle is embodied in the

14  Fifth Amendment prohibition against double jeopardy.  *Id.*  at 445.  The Court in *Ashe*

15  explained further the process:

16
       Where a previous judgment of acquittal was based upon a general verdict, as
17         is usually the case, this approach requires a court to "examine the record of a
       prior proceeding, taking into account the pleadings, evidence, charge, and
18         other relevant matter, and conclude whether a rational jury could have
       grounded its verdict upon an issue other than that which the defendant seeks
19         to foreclose from consideration."

20  *Id.* at 444 (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)).  *Ashe* does not

21  preclude evidence, otherwise admissible, "simply because it relates to alleged criminal

22  conduct for which a defendant has been acquitted," if "the prior acquittal did not determine

23  an ultimate issue in the present case."  *Dowling v. United States*, 493 U.S. 342, 348 (1990).

24  Petitioner bears the burden of demonstrating that "the issue he seeks to foreclose was actually

25  decided in the first proceeding."  *Id.* at 350.

26         Petitioner asserts that all of Charlton's testimony regarding acts of a sexual nature by

27  Petitioner in the car should have been foreclosed from presentation at his second trial because

28                                        - 43 -

1   he was acquitted of sexual assault.  Because Charlton's testimony was the only evidence of

2   sexual assault, Petitioner argues the jury necessarily rejected all of Charlton's testimony

3   regarding any sexual acts by Petitioner.  Petitioner alleges that the sexual abuse conviction

4   arose, not from Petitioner's actions in the car, but from his earlier actions as testified to by

5   other witnesses, Gwen Souter and Tami Winsett.  The Court disagrees; the Arizona Supreme

6   Court also rejected this argument, *Detrich II*, 188 Ariz. at 63, 932 P.2d at 1334.  Contrary to

7   Petitioner's argument, a thorough review of the transcripts from Petitioner's first trial reveals

8   that the sexual abuse conviction was necessarily based on Charlton's testimony of the events

9   in the car.[11]  Neither Souter nor Winsett testified to any actions on the part of Petitioner

10   amounting to sexual contact sufficient to sustain a sexual abuse charge.  (*See* RT 10/31/90

11   at 3-11, 27-46.)  As the Arizona Supreme Court concluded, "the jury must have determined

12   that Charlton saw defendant engage in some form of sexual contact, but that Charlton's

13   description of what he saw and heard fell short of describing completed sexual intercourse."

14   *Detrich II*, 188 Ariz. at 63, 932 P.2d at 1334.  Thus, the fact of Petitioner's acquittal on

15   sexual assault did not foreclose Charlton's testimony regarding sexual contact or a sexual

16   offense in the car.

17        The only issue related to a sexual offense that was litigated in Petitioner's second trial

18   was whether he had the intent to commit a sexual offense.[12]  Petitioner's argument that his

19   intent to commit sexual assault was litigated and decided in his favor in the first trial sweeps

20   too broadly.  The jury at Petitioner's first trial could have believed he had the intent to

21   commit sexual assault, but determined that there was not enough evidence to find beyond a

22

23       [11]  In making his argument, Petitioner relies, in part, on testimony from his second

24   trial.  (*See* Dkt. 75 (citing RT 12/14/94 at 33; RT 10/31/90 at 9, 32; RT 12/14/94 at 79-81).)

25       [12]  At Petitioner's second trial, the State did not introduce or argue explicit evidence

26   of sexual intercourse; rather, it introduced only the brief ambiguous testimony that Petitioner
was "humping" the victim.  In contrast, it was Petitioner's counsel who tried to impeach

27   Charlton with prior inconsistent statements about whether Petitioner had vaginal sex with the
victim.  (RT 12/15/94 at 47-48.)

28

1   reasonable doubt that he actually committed sexual assault.[13]  *See Dowling*, 493 U.S. at 352

2   (concluding the petitioner had not carried his burden of demonstrating that a prior acquittal

3   decided an ultimate issue in the subsequent trial); *see also Schiro v. Farley*, 510 U.S. 222,

4   233-34 (1994).  Further, all that was necessary to the kidnapping charge in the second trial

5   was intent to commit a sexual *offense*, not intent to commit a sexual assault nor proof of

6   intercourse.  *See United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997) (barring a

7   "subsequent prosecution only when a fact 'necessarily determined' in the first prosecution

8   is an essential element of the offense charged in the subsequent prosecution.").  The first jury

9   determined beyond a reasonable doubt that Petitioner committed a sexual offense; thus, the

10  State was not collaterally estopped from presenting evidence of those acts. Based on the

11  testimony presented, the jury could have premised a verdict of kidnapping on intent to

12  commit a sexual offense, without concluding that Petitioner had sexual intercourse with the

13  victim; thus, there is no collateral estoppel violation.  *See Ashe*, 397 U.S. at 444-45 (second

14  prosecution barred where prior acquittal necessarily established that defendant was not

15  present at the robbery).

16      The Arizona Supreme Court's denial of this claim was not an unreasonable

17  application of *Ashe*.  Habeas relief is therefore denied.

18  **Claim F**

19      Petitioner argues that his right to be free of double jeopardy was violated by the trial

20  court's reliance on evidence of sexual assault, of which Petitioner had been acquitted at his

21  first trial, in deciding to impose the death penalty.  The Court previously found this claim

22  exhausted on direct appeal. (Dkt. 93 at 23.)  The Arizona Supreme Court held that the State

23  did not accuse Petitioner of sexual assault or ask the jury to find him guilty of sexual assault

24  at his second trial; because the evidence was properly admitted, the court found Petitioner's

25  _____

26  [13]   The jury may have concluded that sexual assault was not proven beyond a

27  reasonable doubt because the medical examiner testified that there was no evidence of
    intercourse.  (RT 11/1/90 at 40.)

28

1    claim of improper admission of the evidence at sentencing to be moot.  *Detrich II*, 188 Ariz.

2    at 64 n.4, 932 P.2d at 1335 n.4.

3        In imposing sentence, the judge stated that the victim was helpless, one of the five

4    factors for the heinous/depraved aggravating circumstance, based, in part, on the fact that

5    "the Defendant not only was able to kill the victim, but also was able to make unwanted

6    sexual advances on her at the time."  (RT 2/8/95 at 8.)  Petitioner argues that the sexual

7    advances referenced by the judge was the alleged sexual assault of which Petitioner was

8    acquitted in his first trial.  Petitioner contends his sentence violated the Double Jeopardy

9    clause because it was premised on a crime of which he had been acquitted.

10       In resolving Claim E above, this Court determined that Petitioner's sexual abuse

11   conviction was premised on Petitioner's actions in the car in proximity to the time he killed

12   the victim.  Therefore, the judge's reference at sentencing to Petitioner's sexual advances on

13   the victim did not necessarily refer to a sexual assault; rather, it appropriately referred to

14   properly admitted evidence of sexual conduct that resulted in a sexual abuse conviction.

15   Because the factual premise of this claim fails, it is without merit.  The Arizona Supreme

16   Court's denial of this claim was not an unreasonable application of *Bullington v. Missouri*,

17   451 U.S. 430 (1981) (finding that life sentence by jury in a capital sentencing proceeding

18   amounted to acquittal of death penalty and double jeopardy barred seeking a death sentence

19   upon retrial) or *Arizona v. Rumsey*, 467 U.S. 203 (1984) (applying principles of *Bullington*

20   to Arizona's judge-sentencing scheme).  This claim is denied.

21       **Claim H**

22       Petitioner alleges that the prosecutor improperly vouched for his co-defendant by

23   eliciting a statement from Charlton that his plea agreement required him to testify truthfully.

24   Petitioner asserts this claim was raised in his PCR petition.  The Court disagrees.  Petitioner

25   raised an IAC claim for failure to object to Charlton's testimony about the plea agreement's

26   truthfulness provision, but he did not assert it as a claim of prosecutorial misconduct.  (ROA-

27   PCR Doc. 13 at 19.)  It is not enough to raise a similar claim or to put all the necessary facts

28                                          - 46 -

1   before the state court, a petitioner must fairly present to the state courts the substance of the

2   federal legal claim asserted in the habeas proceeding.  *See Harless*, 459 U.S. at 6.

3          Regardless of exhaustion, this claim is without merit.  *See* 28 U.S.C. § 2254(b)(2)

4   (allowing denial of unexhausted claims on the merits); *Rhines v. Weber*, 544 U.S. 269, 277

5   (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in

6   state court if they are subject to dismissal under (b)(2) as "plainly meritless").  In a prior

7   order, the Court evaluated Petitioner's related IAC claim and determined that Charlton's

8   limited testimony that his plea agreement required him to testify truthfully did not amount

9   to vouching.  (Dkt. 93 at 37 (citing *United States v. Tavakkoly*, 238 F.3d 1062, 1065 (9th Cir.

10  2001); *United States v. Necoechea*, 986 F.2d 1273, 1278-79 (9th Cir. 1993).)  To the extent

11  the testimony elicited could be considered vouching, Petitioner cannot establish that the

12  limited reference to the truthfulness provision "so infected the trial with unfairness as to

13  make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168,

14  181 (1986) (prosecutorial misconduct is reviewed in a habeas proceeding under the narrow

15  standard of due process) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).

16  Claim H is denied on the merits.

17  **Claim I**

18         Petitioner alleges that his due process rights were violated by the premeditation jury

19  instruction because it relieved the state of proving the actual reflection necessary for first

20  degree murder, allowing a conviction based merely on the passage of time.  Petitioner

21  concedes that he raised this issue for the first time in a motion for rehearing from the denial

22  of his PCR petition.  That is not a procedurally appropriate manner to fairly present a post-

23  conviction claim.  *See* Ariz. R. Crim. P. 32.5 (requiring all known claims to be included in

24  petition); Ariz. R. Crim. P. 32.6(d) (requiring good cause and leave of court to amend

25  petition); Ariz. R. Crim. P. 32.9(a)  (allowing a motion for rehearing to set forth how the

26  party believes the court erred in its final decision);  *see also O'Sullivan*, 526 U.S. at 848

27  (requiring that claims be presented in a procedurally proper manner).

28                                          - 47 -

1      Regardless of exhaustion, this claim is without merit.  *See* 28 U.S.C. § 2254(b)(2);

2   *Rhines*, 544 U.S. at 277.  The relevant jury instruction stated:

3          Premeditation means, one, that a person either intends or knows that his
           conduct will result in the death of another person; and two, his intention or
4          knowledge exists before the killing long enough to permit reflection.  An act
           is not done with premeditation if it is the instant effect of a sudden quarrel or
5          heat of passion.  But no appreciable length of time must elapse between the
           formation of the intent to kill and the act.  They may be as instantaneous as
6          successive thoughts in the mind.  However, it must be longer than the time
           required to form the intent or knowledge that such conduct will cause death,
7          and may be proven by direct or circumstantial evidence.

8   (RT 12/20/94 at 154.)  Contrary to Petitioner's argument, in the *Thompson* case, the Arizona

9   Supreme Court did not find the instruction at issue unconstitutional; rather, it found

10  erroneous a premeditation instruction that stated "actual reflection is not required."  *State v.*

11  *Thompson*, 204 Ariz. 471, 480, 65 P.3d 420, 429 (2003).  The court "discourage[d]" the use

12  of the term "instantaneous as successive thoughts of the mind," *id.* at 479, 65 P.3d at 428;

13  however, the use of an "undesirable, erroneous, or even 'universally condemned'" instruction

14  does not equate to a constitutional violation, *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

15  Further, the Arizona Supreme Court previously upheld a virtually indistinguishable

16  instruction.  *See State v. Guerra*, 161 Ariz. 289, 293-94, 778 P.2d 1185, 1189-90 (1989).

17      When a particular jury instruction is challenged, the question is whether the erroneous

18  instruction "so infected the entire trial that the resulting conviction violates due process."

19  *Cupp*, 414 U.S. at 147.  This Court must assess "'whether there is a reasonable likelihood

20  that the jury has applied the challenged instruction in a way' that violates the Constitution."

21  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380

22  (1990)).  Due process requires that the state prove every element of a crime beyond a

23  reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S.

24  510, 520-21 (1979).  Petitioner's allegation is that the premeditation jury instruction relieved

25  the prosecution of the burden of proving actual reflection beyond a reasonable doubt.

26      The Court finds that, on its face, the challenged jury instruction does not permit a

27  finding of premeditation based solely on the passage of time.  First, it explicitly distinguishes

28                                              - 48 -

intent as existing before, and as something distinct from, reflection.  Second, the exclusion of acts that are  the "instant effect of a sudden quarrel or heat of passion" from a finding of premeditation clarifies that impulsive acts do not satisfy the premeditation requirement.  The case of *State v. Ramirez*, 190 Ariz. 65, 67-68, 945 P.2d 376, 378-79 (Ct. App. 1997), upon which Petitioner relies, is distinguishable because the instruction at issue in that case did not include the "instant effect" language used at Petitioner's trial; the court in *Ramirez* found that such language would have balanced the remainder of the instruction by making clear that the act cannot be both impulsive and premeditated.  Third, nothing in the prosecutor's closing argument (RT 12/20/94 at 75-76) or the court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual premeditation.

Finally, the facts of this case are sufficient to support a finding of premeditation.  As summarized by the Arizona Supreme Court, witnesses testified that Petitioner became angry at the victim for purchasing him bad drugs; he harassed her for a period of time at her house, held a knife to her throat and threatened to kill her; ultimately, he took her to the car at knife point.  The pathologist testified that the victim suffered numerous cutting wounds over her hands, which are consistent with defensive-type injuries one would sustain while trying to fend off an attacker, and she suffered over forty stab wounds as well as blunt force injuries.  Petitioner confessed to a friend that he killed her because she had purchased bad drugs.  The Court finds there is not a reasonable likelihood that the jury applied the premeditation instruction in violation of due process by lessening the prosecution's burden to prove premeditation beyond a reasonable doubt.

**Claim J**

Petitioner alleges there was insufficient evidence to support the (F)(6) aggravating factor.  The Court previously determined that this claim was exhausted on direct appeal. (Dkt. 93 at 25.)  The Arizona Supreme Court upheld both prongs of the (F)(6) aggravating factor (cruelty and heinousness/depravity), as found by the trial court.

The appropriate standard of federal habeas review of a state court's application of an

aggravating circumstance is the "rational factfinder" standard; i.e., "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the  aggravating factor to exist.  *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This type of claim is properly analyzed under the deferential standard of § 2254(d)(1); thus, the Court asks whether it was an objectively unreasonable application of *Jackson* for the Arizona Supreme Court to deny this claim.  *See Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir.), *vacated in part on other grounds*, ___ F.3d ___, No. 05-35062, 2007 WL 2588811 (9th Cir. Sept. 10, 2007).

As an initial matter, Petitioner attempts to rebut the entirety of the (F)(6) factor by asserting that his co-defendant Charlton was the actual killer.  A thorough review of the trial record reveals that there is more than enough evidence, when viewed in the light most favorable to the prosecution, to conclude that Petitioner was the actual killer.  This is strongly supported by the jury verdict, in which nine of the jurors found beyond a reasonable doubt that Petitioner was guilty of premeditated murder.  (ROA-II 198.)  Similarly, the trial judge determined beyond a reasonable doubt that Petitioner killed the victim.  (RT 2/8/95 at 3-4.)

Cruelty Prong

The Arizona Supreme Court made the following findings regarding the crime being especially cruel:

> To find cruelty, the state must prove beyond a reasonable doubt that the victim consciously suffered physical pain or mental distress.  In determining whether a murder was especially cruel, we must view the entire murder scenario, not just the final act that killed the victim.  Having done so, we have determined that this murder was, without a doubt, especially cruel.

> We find overwhelming evidence that the victim was conscious throughout much of the crime.  Witnesses testified that the victim looked terrified as defendant dragged her to the car.  The pathologist testified that the victim suffered numerous cutting wounds over her hands, which are consistent with defensive-type injuries one would sustain while trying to fend off an attacker.  After her throat was slit, she attempted to answer defendant's questions, but was able only to gurgle in response.  The defense contends that her gurgling may have been merely reflexive breathing.  However, her gurgling was heard only after questions were posed to her.

> We find that the victim suffered physical pain.  She suffered forty cutting and

- 50 -

stab wounds about her face, hands, chest, neck, abdomen, and thigh. This includes a deep cutting wound that stretched across the victim's neck from ear to ear, cutting through the voice box, the esophagus, and into the cerebral column. Furthermore, she suffered blunt force injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. She must have suffered excruciating pain before she died.

We also find that the victim suffered mental distress. Mental distress includes uncertainty as to one's ultimate fate. Witnesses testified that defendant held a knife to the victim's neck, told her that he was going to kill her, and dragged her to the car. During this time, the victim had "terror" and "fear" in her eyes. Anyone in the victim's situation would have been uncertain as to his or her ultimate fate. Thus, this murder was especially cruel.

*Detrich II*, 188 Ariz. at 67-68, 932 P.2d at 1338-39 (citations omitted).

Petitioner contends the evidence is not sufficient to support a finding that the victim consciously suffered physical pain. Specifically, he asserts that the presence of multiple wounds is not sufficient without additional evidence; the medical examiner could not determine when the victim lost consciousness; the throat wound, combined with the other fatal wounds, would have caused a quick loss of consciousness due to loss of blood; the co-defendant's description of the victim making gurgling sounds could have been merely an attempt to breathe or other involuntary action; the wounds on the victim's hands were not definitively defensive wounds; and the co-defendant did not testify that the victim struggled.

In a prior order, denying Petitioner's request for factual development to rebut the cruelty finding, this Court made the following determination:

The finding that [the victim] attempted to speak after having her throat slit is only a partial basis for the cruelty finding, and the prong is sufficiently supported without it. Petitioner does not allege he can develop forensic evidence that would fully rebut the finding that the victim was conscious for much of the crime and suffered pain and mental distress, even if there were additional evidence about when the victim lost consciousness. The cruelty finding is sufficiently supported by the eyewitness testimony that the victim was taken to the car at knife point while Petitioner threatened her life, and evidence that she suffered over forty stab wounds, including defensive wounds, as well as blunt force injuries.

(Dkt. 105 at 12-13.) Additionally, the evidence contradicts Petitioner's contention that it is speculative to find that the victim suffered severe mental anguish. As relied on by the Arizona Supreme Court, Petitioner threatened the victim's life before taking her from the

house, and Charlton testified that the victim had fear and terror in her eyes as Petitioner took her from the house (RT 12/15/94 at 22).  Witness Tammy Winsett said she heard the victim say, "No," a couple of times as she was taken to the car.  (RT 12/14/94 at 37.)

In sum, Petitioner presents nothing more than another way to look at the evidence. When the evidence is viewed in the light most favorable to the prosecution, as it must be, a rational trier of fact could find the cruelty prong of the (F)(6) aggravating factor, and the Arizona Supreme Court's holding to that effect is not objectively unreasonable. *See Jeffers*, 497 U.S. at 781; *Sarausad*, 479 F.3d at 678.

<u>Heinous/Depraved Prong</u>

The Arizona Supreme Court made the following findings regarding the murder being heinous and depraved:

> This court has defined "heinous" as "hatefully or shockingly evil" and "depraved" as "marked by debasement, corruption, perversion or deterioration."  Heinousness and depravity focus upon the "defendant's state of mind at the time of the offense, as reflected by his words and acts."
>
> This court has set forth specific factors which, when found, may be used to justify a trial court's finding that a murder was especially heinous or depraved.  The factors are:  (1) whether the killer relished the murder; (2) whether the killer inflicted gratuitous violence on the victim beyond that necessary to kill; (3) whether the killer needlessly mutilated the victim; (4) whether the crime was senseless; and (5) whether the victim was helpless.
>
> We find that the record supports the trial court's finding of heinous and depraved conduct.  Defendant's statement to Charlton, "It's dead, but it's warm. Do you want a shot at it?" clearly shows that defendant relished the murder.  The trial court found that this statement showed an abhorrent lack of regard for human life, and we agree.  Furthermore, we find that defendant engaged in gratuitous violence beyond that necessary to cause death.  Of the forty cutting and stab wounds, only three were potentially fatal.  The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive.
>
> We also find that the victim was helpless.  Defendant held a knife to the victim's throat and forced her into the car.  She was unarmed and partially clothed, with no means of escape.  In the car, defendant was on top of her, abusing and stabbing her.  The victim was unable to resist defendant's attack.
>
> Finally, the murder was senseless.  A murder is senseless when it is unnecessary to achieve the killer's goal.  Defendant's apparent goal was to be paid back for the money he wasted on the bad drugs.  Killing the victim was unnecessary to accomplish this goal and in fact, ensured that he would neither

be paid back, nor find out the identity of the drug dealer.  In total, the record overwhelmingly supports a finding of heinous and depraved conduct.

*Detrich II*, 188 Ariz. at 68, 932 P.2d at 1339 (citations omitted).

Petitioner argues that the co-defendant's testimony relied on by the court to find that Petitioner relished the murder is unreliable, the multiple stab wounds do not demonstrate a shockingly evil mind or separate the crime from the norm of first degree murders, the murder was not senseless because it was ostensibly done for revenge, and nothing about the victim or the murder sets the victim apart from other murders regarding helplessness.

In an earlier order, the Court reached the following conclusion about Petitioner's arguments:  "The factors of relishing the murder based on Petitioner's statement to his co-defendant, gratuitous violence based on the excessive wounds and the helplessness of the victim and senselessness of the crime are sufficiently supported by the record to uphold the heinous/depraved finding."  (Dkt. 105 at 13-14.)  Viewing the evidence in the light most favorable to the prosecution there is more than sufficient evidence from which a rational trier of fact could find the heinous/depraved prong of the (F)(6) aggravating factor, and the Arizona Supreme Court's holding to that effect is not objectively unreasonable.  *See Jeffers*, 497 U.S. at 781; *Sarausad*, 479 F.3d at 678.

Finally, even if one prong of the (F)(6) factor were rebutted, Arizona law indicates that the finding of either especial cruelty or especial depravity alone will establish the (F)(6) factor and that the validity, or lack thereof, of the other prong does not affect the weight given to the circumstance.  *See, e.g., State v. Djerf*, 191 Ariz. 583, 597, 959 P.2d 1274, 1288 (1998) ((F)(6) circumstance upheld based on cruelty alone without considering validity of depravity finding); *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996) (same); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) (same); *State v. Roscoe*, 184 Ariz. 484, 500-01, 910 P.2d 635, 651-52 (1996) (upholding (F)(6) factor based on cruelty after invalidating depravity finding).  Based on all of the above, Claim J is denied.

1          **Claim L**

2                 Petitioner alleges he was entitled to a jury determination on the (F)(6) aggravating

3     factor and the *Enmund/Tison* finding. Claim L is premised on *Ring v. Arizona*, 536 U.S. 584,

4     609 (2002), which found that Arizona's aggravating factors are an element of the offense of

5     capital murder and must be found by a jury. However, in *Schriro v. Summerlin*, 542 U.S. 348

6     (2004), the Supreme Court held that *Ring* does not apply retroactively to cases already final

7     on direct review. Because Petitioner's direct review was final prior to *Ring*, he is not entitled

8     to relief premised on that ruling.[14]   Additionally, the Supreme Court has never held that

9     *Enmund/Tison* findings must be made by a jury; to the contrary, the Court has held that a trial

10    judge or appellate court may make that finding. *Cabana v. Bullock*, 474 U.S. 376, 387

11    (1986) (*Enmund* holds that the Eighth Amendment's bar on the death penalty is distinct from

12    a person's guilt of a capital crime under state law), *overruled on other grounds by Pope v.*

13    *Illinois*, 481 U.S. 497, 503 n.7 (1987).

14                        **CERTIFICATE OF APPEALABILITY**

15                In the event Petitioner appeals from this Court's judgment, and in the interests of

16    conserving scarce Criminal Justice Act funds that might be consumed drafting an application

17    for a certificate of appealability to this Court, the Court on its own initiative has evaluated

18    the claims within the petition for suitability for the issuance of a certificate of appealability.

19    *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

20                Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

21    is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

22    certificate of appealability ("COA") or state the reasons why such a certificate should not

23    _____

24          [14]  To the extent Petitioner is arguing that the aggravating factor should have been
      alleged in the indictment, it also fails. The Supreme Court has long held that the Fifth
25    Amendment provisions requiring indictment by a grand jury are not part of the due process
      of law incorporated as to *state* criminal prosecutions by virtue of the Fourteenth Amendment.
26    *See Hurtado v. People of State of Cal.*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408
27    U.S. 665, 688 n.25 (1972).

28                                           - 54 -

issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of the issues set forth in Claim B.  For the reasons stated in this Memorandum of Decision and Order, as well as the September 23, 2005 and January 19, 2006 Orders addressing the procedural status and merits of other claims in the Amended Petition (Dkts. 93, 105), the Court declines to issue a certificate of appealability with respect to the remaining claims and procedural issues.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 31) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on May 6, 2003 (Dkt. 3), is **VACATED**.

**IT IS FURTHER ORDERED** that the Court grants a Certificate of Appealability as to the following issue:  Whether Claim B, alleging a violation of Petitioner's right to effective assistance of counsel at sentencing based on counsel's failure to investigate and present additional mitigation evidence concerning Petitioner's childhood abuse and neglect, PTSD, history of and genetic propensity for substance abuse, developmental and neurological issues, familial love, and adaptation to prison, fails on the merits.

- 55 -

1      **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

2  to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

3  AZ 85007-3329.

4      DATED this 15th day of November, 2007.

David C. Bury
United States District Judge

*copy to Clerk, Arizona Supreme Court by cjs on 11/15/07*

- 56 -