**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Scott Detrich, | No. CV-03-00229-TUC-DCB |
| Petitioner, | <u>DEATH-PENALTY CASE</u> |
| v. | **ORDER** |
| David Shinn, et al., | |
| Respondents. | |

Petitioner David Scott Detrich is an Arizona death row inmate. The Court denied his amended petition for writ of habeas corpus (Doc. 31 (Amended Petition)) on November 15, 2007. (Doc. 260.) In doing so, the Court dismissed several of Detrich's ineffective assistance of counsel (IAC) claims as procedurally defaulted. (Doc. 93.)

While Detrich's appeal from the Court's decision was pending before the Ninth Circuit, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012). The Supreme Court held in *Martinez* that a state post-conviction relief (PCR) counsel's ineffective assistance in failing to raise trial-counsel IAC claims can excuse a procedural default of those claims. *Id.* at 17. Detrich moved for a remand to allow this Court to rule on his *Martinez* motion.

The Ninth Circuit granted Detrich's motion to remand, ordering this Court to rule on issues raised on appeal under *Martinez. See Detrich v. Ryan (Detrich V)*, 740 F.3d 1237, 1259 (9th Cir. 2013) (en banc). Pursuant to that judgment, this Court ordered Detrich to file a supplemental brief addressing (a) whether, under *Martinez*, cause and prejudice exists to excuse the procedural default of his claims alleging ineffective assistance of trial

1   counsel, and (b) whether he is entitled to habeas relief under 28 U.S.C. § 2254 on any of

2   these claims. (Doc. 294.)

3        Later, the Ninth Circuit expanded the scope of the remand to address the impact of

4   *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (*en banc*). (Doc. 447.) *McKinney* held that

5   the Arizona Supreme Court, for a period of time which included its consideration of

6   Detrich's direct appeal, had violated *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), in

7   its capital sentencing analysis by requiring a defendant to show a causal nexus between his

8   proffered mitigating evidence and the crime. Pursuant to that order, this Court ordered

9   Detrich to file a supplemental brief "addressing whether he is entitled to relief on his habeas

10  petition in light of *McKinney*." (Doc. 449.)

11       Briefing is complete on both the *Martinez* and *McKinney* issues. (Docs. 403, 411,

12  426, 429, 456, 458, 466, 467, 470, 471.) After fully considering the briefs and arguments,

13  the Court finds that Detrich has failed to demonstrate cause and prejudice to excuse the

14  procedural default of the remanded claims. The Court denies Detrich's request for

15  evidentiary development and for habeas relief under 28 U.S.C. § 2254. The Court allows

16  one exception to this ruling by authorizing an expansion of the record to include the

17  exhibits attached to the supplemental briefing for purposes of ruling on cause and prejudice

18  in the *Martinez* motion and on the *McKinney* issue only, but not for use in deciding the

19  merits of Detrich's habeas claims. The Court further finds its previous ruling denying

20  Detrich's amended habeas petition is not impacted by *McKinney*; Detrich has not

21  demonstrated the state courts imposed an impermissible causal nexus requirement on his

22  mitigation evidence.

23  **I.   BACKGROUND**

24       On Saturday afternoon, November 4, 1989, Detrich and his codefendant Alan

25  Charlton, two white men, left work in Benson, Arizona, and headed to a local bar where

26  they each consumed twelve to twenty-four beers in approximately two hours.[1] Two hours

27  ────────────────

28       [1] Except where otherwise indicated, this factual summary is taken from the Arizona
     Supreme Court opinion upholding Petitioner's convictions and sentence. *See State v.*

later the men drove to Tucson, Arizona, where they visited more bars and consumed more beer, and picked up the victim, Elizabeth Souter, a black woman, on the side of the road. Detrich asked her to help them obtain some cocaine. She agreed and directed them to a house where Detrich and Souter purchased the cocaine. (RT 12/15/94 at 12–13.)

The two men drove to Souter's home, where Detrich attempted to "cook a spoon" of cocaine so it could be injected. Detrich became angry because the syringe would not pick up the cocaine and began screaming and accusing Souter of providing him bad drugs. Detrich told Souter that she was going to pay for the bad drugs by having sex with him. Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim's daughter) confirmed that Detrich was holding a knife against Souter's throat. Additionally, Detrich threatened, "You must not believe me, I will kill you."

Detrich then told Souter, "Come on bitch, we are going for a ride." Detrich took the victim to the car at knife point. Charlton drove, Detrich sat in the middle, and the victim sat up against the passenger door. Charlton testified that he saw Detrich "humping" the victim and asking her if she liked it. Charlton subsequently looked and saw that the victim's throat was slit. Charlton indicated that Detrich then hit the victim and asked her three times from whom she got the drugs. Souter was unable to answer clearly; she gurgled in response each time. Charlton testified that he declined when Detrich asked, "It's dead but it's warm. Do you want a shot at it?" Charlton attested he never saw any stabbing though he was poked in the arm with the knife three or four times. The pathologist established that the victim was stabbed forty times and her throat was slit.

Charlton drove to a remote area near an airfield approximately fifteen minutes (seven to nine miles) from Souter's home. Charlton pulled the car over at Detrich's request, and Detrich dragged the victim's body into a remote area of the desert.

Detrich and Charlton's acquaintance, William Carbonell, testified that the two men showed up at his house at 4:00 a.m. Carbonell testified that Detrich was covered in blood and that Charlton had blood on his right side. Detrich confessed to Carbonell that he had

_Detrich_, 188 Ariz. 57, 60–61, 932 P.2d 1328, 1331–32 (1997).

1  killed a girl by slitting her throat, after forcing her into the car at knife point. He stated that
2  he killed the victim because the drugs she had purchased were bad.

3  After several days, Carbonell called in an anonymous tip to the police, who were
4  able to trace the call to Carbonell. After questioning Carbonell, the police arrested
5  Charlton, who confessed his involvement in the crime. Detrich was arrested in New Mexico
6  approximately two weeks later and in possession of a folding knife. Charlton identified the
7  knife as his; however, he explained that it often fell out of his pants. Charlton confirmed
8  that Detrich possessed the knife the night of the murder. Charlton also noticed that Detrich
9  had the knife the morning after the murder and that it was covered with blood.

10  Charlton pled guilty to kidnapping and testified against Detrich in exchange for a
11  ten-and-a-half-year sentence.

12  Detrich was represented in his first and second trial by James Glanville. Detrich's
13  first trial ended in a mistrial after a prosecution witness testified that Detrich had invoked
14  his rights under the Fifth Amendment during the investigation. *State v. Detrich* (*Detrich I*),
15  178 Ariz. 380, 382, 873 P.2d 1302, 1304 (1994). On November 2, 1990, after a second
16  trial, Petitioner was convicted by a jury of kidnapping, sexual abuse, and first-degree
17  murder. Pima County Superior Court Judge Michael D. Alfred sentenced Detrich to death
18  for the murder and to a term of years for the other counts.[2] The Arizona Supreme Court
19  affirmed the sexual abuse conviction but reversed Detrich's convictions for kidnapping and
20  first-degree murder. *Detrich I*, 178 Ariz. 380, 873 P.2d 1302.

21  Harold Higgins was appointed to represent Detrich following the reversal and Pima
22  County Superior Court Judge Richard Nichols presided over Detrich's third trial. On
23  December 20, 1994, Detrich was again convicted by a jury of kidnapping and first-degree

24  _____

25  [2] At the time of Detrich's trial, Arizona law required trial judges to make all factual
26  findings relevant to the death penalty and to determine the sentence. Following the United
   States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that
27  a jury must determine the existence of facts rendering a defendant eligible for the death
   penalty, Arizona's sentencing scheme was amended to provide for jury determination of
28  eligibility factors, mitigating circumstances, and sentence.

murder. Nine jurors found Detrich guilty of premeditated murder. Three jurors found him guilty of only felony murder. *See Detrich V*, 740 F.3d at 1241.

Following an aggravation and mitigation hearing, Judge Nichols found that the murder was especially cruel, heinous and depraved. *See State v. Detrich* (*Detrich II*), 188 Ariz. 57, 67, 932 P.2d 1328, 1338 (1997) (citing A.R.S. § 13–703(F)(6)).

The judge found the following statutory and non-statutory mitigating circumstances:

> (1) Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired but not so impaired as to constitute a defense to prosecution [(A.R.S. § 13-751(G)(1))].
>
> (2) Defendant comes from an abusive background, including both physical and mental abuse.
>
> (3) Defendant feels some remorse for the killing.
>
> (4) Defendant does not have prior violent convictions.
>
> (5) Defendant has had a longstanding history of alcohol and drug abuse.

*See id.* Judge Nichols, however, found the mitigating circumstances were not "sufficiently substantial to outweigh the aggravating circumstances of having committed this offense in an especially cruel, heinous or depraved manner" and sentenced Detrich to death for the murder and to a term of years for kidnapping. *See id.* On appeal, the Arizona Supreme Court affirmed Detrich's convictions and sentences. *See id.* at 69, 932 P.2d at 1340.

Detrich filed a Petition for Writ of Habeas Corpus in this Court on April 29, 2003. (Doc. 1.) Detrich raised eighteen claims in his Amended Petition, filed on April 15, 2004, including two trial-counsel IAC claims (Claims A and B), each comprised of multiple subclaims.[3] (Doc. 31.)

---

[3] The Court granted an evidentiary hearing on Claim B, a sentencing IAC claim. The Court found that Detrich's counsel performed deficiently by failing to investigate and present mitigating evidence at sentencing, contrary to the holding of the state PCR court. The Court found that Detrich failed to show prejudice resulting from that deficient performance as required under *Strickland v. Washington*, 466 U.S. 668 (1984), and denied relief. (Doc. 260.) The Ninth Circuit reversed, holding that the PCR court's conclusion that Detrich was not prejudiced by trial counsel's failure to investigate and present mitigating

1    In Claim A, Detrich alleged counsel provided ineffective assistance during his trial

2    in violation of his rights under the Sixth and Fourteenth Amendments based on counsel's

3    failure to: (1) adequately investigate the case and prepare for trial; (2) object to

4    prosecutorial vouching; (3) interview witness Phillip Shell[4] and call him to testify live at

5    trial; (4) interview other witnesses; (5) investigate or test the physical evidence and seek

6    expert assistance regarding forensic evidence; (6) actively participate in *voir dire*; (7) have

7    the peremptory strike process recorded; (8) rehabilitate jurors regarding issues about the

8    death penalty; (9) ensure Detrich's presence at all proceedings; and (10) cumulatively do

9    all of the things set forth above.[5]

10   The Court denied evidentiary development and dismissed eleven claims in the

11   Amended Petition. (Docs. 93, 105.) With the exception of parts of Claims A(2) and A(5)[6],

---

12   evidence was based on an unreasonable determination of the facts. *Detrich v. Ryan (Detrich*

13   *IV)*, 677 F.3d 958 (2012). That decision was vacated by the Supreme Court in light of its

     decision in *Cullen v. Pinholster* 563 U.S. 170 (2011). *Ryan v. Detrich*, 563 U.S. 984 (2011)

14   (mem.). On remand, the three-judge panel again reversed the district court and vacated the

15   death sentence. *Detrich v. Ryan,* 677 F.3d 958 (9th Cir. 2012) The Ninth Circuit, sitting en

16   banc, did not reach the non-defaulted sentencing-phase IAC claims, explaining that they

     could not properly evaluate the claims that Detrich's trial counsel's ineffectiveness

17   prejudiced him at sentencing because "[i]t would be premature to evaluate prejudice from

18   his non-defaulted claims before we know what additional prejudice might have resulted

     from the defaulted ones." *Detrich V*, 740 F.3d at 1259. As explained in the body of this

19   order, the Court finds no additional prejudice from Detrich's defaulted claims. The Court,

20   therefore, has no "occasion to revisit its earlier conclusion in this case that the deficient

     performance of trial counsel did not cause prejudice within the meaning of *Strickland*." *Id.*

21   at 1248.

22   [4] Phillip Shell is also referred to as William Schell in various pleadings and rulings

23   in both state and federal court. Upon review of the record, this Court agrees with Judge

     Graber that the references to William Schell are "just a mistake." *See Detrich V*, 740 F.3d

24   at 1271 n.11.

25   [5] Detrich did not categorize the subclaims in his Amended Petition, rather, the Court

     previously recognized ten discrete ineffective assistance of trial counsel claims. (*See* Doc.

26   93 at 10.) Detrich's arguments and evidence concerning what has been referred to as

27   Claims A(1) and A(4) overlap in part and stem from a common theme: that trial counsel

     failed to investigate the case, interview witnesses, and prepare for trial. Thus, the Court

28   considers allegations of these two claims together.

     [6] The Court found exhausted the portion of Claim A(2) alleging trial counsel failed

1    the Court found Claims A(1) through A(10) procedurally defaulted and, under then-

2    governing law, rejected Detrich's argument that the ineffectiveness of his state PCR

3    counsel excused the procedural default of the claims. (Doc. 93 at 13–14.)

4    　　　　After an evidentiary hearing on Claim B, the Court rejected Detrich's non-defaulted

5    claims on the merits. (Doc. 260.) Now, an en banc panel of the Ninth Circuit has granted

6    Detrich's motion to remand the appeal for this Court to decide Detrich's *Martinez* motion.

7    *Detrich V,* 740 F.3d 1237.

8    **II.    DISCUSSION PART I - *MARTINEZ***

9    　　　　On remand, Detrich submits he has presented cause to excuse the procedural default

10   of Claims A(1), A(3), A(4), A(5) (in part), A(8), and A(10), and is further entitled to relief

11   on these claims. (Doc. 403 (Supplemental Brief).)

12   　　　　Respondents argue that the default of several claims, or portions of those claims,

13   cannot be excused under *Martinez* because (1) the Ninth Circuit held that the claims cannot

14   be excused by *Martinez*, (2) the claims were raised in PCR proceedings but not fully

15   exhausted, or (3) the claims were raised for the first time in Detrich's Supplemental Brief.

16   Respondents also assert that, even if *Martinez* applies to all the claims, Detrich cannot

17   establish that his PCR counsel was ineffective or that the underlying IAC claims are

18   substantial.

19   　　　　　A.　Applicable law

20   　　　　　　　*1.　Martinez v. Ryan*

21   　　　　Federal review is generally unavailable for a claim that has been procedurally

22   defaulted. In such situations, review is barred unless the petitioner can demonstrate cause

23   and prejudice or a fundamental miscarriage of justice that excuses the default. *Coleman v.*

24   _____

25   to object when the prosecutor allegedly vouched for Charlton during his direct testimony,

26   and the portion of Claim A(5) alleging IAC based on counsel's failure to present any blood
pattern evidence generally, and relating particularly to the car seat covers and blue jeans

27   found in the car, or to seek the appointment of any forensic experts to examine that
evidence. (*See* Doc. 93 at 12–13.) The Court denied those claims on the merits. (*Id.* at 37;

28   Doc. 105 at 16.)

1    *Thompson*, 501 U.S. 722, 750 (1991). *Coleman* held that ineffective assistance of counsel

2    in post-conviction proceedings cannot establish cause for a claim's procedural default. *Id.*

3        In *Martinez*, the Supreme Court announced a new, "narrow exception" to that rule.

4    The Court explained that:

5        Where, under state law, claims of ineffective assistance of trial counsel must

6        be raised in an initial-review collateral proceeding, a procedural default will
not bar a federal habeas court from hearing a substantial claim of ineffective

7        assistance at trial if, in the initial-review collateral proceeding, there was no
counsel or counsel in that proceeding was ineffective.

8

9    566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 418 (2013).

10        Accordingly, under *Martinez*, an Arizona habeas petitioner may establish cause and

11    prejudice for the procedural default of a claim of ineffective assistance of trial counsel by

12    demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective

13    assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting

14    *Martinez*, 566 U.S. at 14); *Atwood v. Ryan*, 870 F.3d, 1033, 1059–60 (9th Cir. 2017).

15        To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR

16    counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne*

17    *v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney*, 813

18    F.3d at 819. *Strickland* requires a demonstration "that both (a) post-conviction counsel's

19    performance was deficient, and (b) there was a reasonable probability that, absent the

20    deficient performance, the result of the post-conviction proceedings would have been

21    different." *Id.* at 377 (citation omitted).[7]

22        To establish "prejudice" under the second prong of *Martinez*'s "cause and

23    prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance

24    of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined a

25            [7] Detrich argues that to establish "cause," he need only show deficient performance

26    by state post-conviction counsel resulted in the default of a "substantial" claim of
ineffective assistance of trial counsel. (Supp Brief at 17.) The Ninth Circuit, however, has

27    "consistently . . . reaffirmed the *Clabourne* framework, which requires a petitioner to
establish "cause" by showing *Strickland* prejudice." *Hooper v. Shinn*, 985 F.3d 594, 627

28    & n.29 (9th Cir. 2021) (citing *Rodney v. Filson*, 916 F.3d 1254, 1260 & n.2 (9th Cir. 2019)).

"substantial" claim as a claim that "has some merit," noting that the procedural default of a claim will not be excused if the IAC claim "is insubstantial, i.e., it does not have any merit or . . . it is wholly without factual support." *Martinez*, 566 U.S. at 14–16.

The standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id*. at 14; *see Detrich*, 740 F.3d at 1245. Under that standard, a claim is "substantial" if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

A finding of "prejudice" for purposes of the "cause and prejudice" analysis, which requires only a showing that the underlying claim of ineffective assistance of trial counsel is substantial, "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377.

The Ninth Circuit has offered guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of *state habeas* counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of *trial* counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60; *Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

In *Runningeagle v. Ryan*, 825 F.3d 970 (9th Cir. 2016), the court addressed the

1  standard necessary to find PCR counsel's performance prejudicial. The court explained

2  that although the prejudice at issue under *Martinez* is that in PCR proceedings, this is a

3  "recursive standard":

> It requires the reviewing court to assess trial counsel's as well as PCR
> counsel's performance. This is because, for us to find a reasonable
> probability that PCR counsel prejudiced a petitioner by failing to raise a trial-
> level IAC claim, we must also find a reasonable probability that the trial-
> level IAC claim would have succeeded had it been raised.

*Id.* at 982; *see Murray v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

The *Martinez* exception to procedural default applies only to claims of ineffective

assistance of trial counsel. It has not been expanded to other types of claims. *Martinez*

*(Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR

counsel can constitute cause only to overcome procedurally defaulted claims of ineffective

assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015)

(explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the

scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732

F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the

application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63,

2065–66 (2017) (holding that the *Martinez* exception does not apply to claims of

ineffective assistance of appellate counsel).[8]

_____

[8] The Court therefore rejects Detrich's contention (*see* Doc. 403 at 88 n. 18) that the
Court should address Claim C(1) of the Amended Petition, alleging the trial court erred in
death-qualifying the jury and removing jurors for cause based on their opposition to the
death penalty. Detrich asserts that funding restrictions and the Court's denial of evidentiary
development prevented him from presenting all available evidence in support of the claim,
and that now he has obtained further evidence supporting the claim in the form of a juror
declaration. This assertion, however, falls far outside the scope of *Martinez* and the Court
does not consider it. Similarly, Detrich avers, throughout the Supplemental Brief, to
possible violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and other prosecutorial
misconduct. These potential claims also fall outside the scope of the Court's authority to
consider in this remand.

## 2.  Ineffective of assistance of counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland* is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 394 (2000)).

For claims of ineffective assistance of counsel at sentencing in capital cases, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of the evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529 U.S. at 397–98). "If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694). The reweighing court should not consider the "idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Strickland*, 466 U.S. at 695.

"In the context of the penalty phase of a capital case, it is enough to show 'a reasonable probability that at least one juror' would have recommended a sentence of life instead of death." *Andrews v. Davis*, 944 F.3d 1092, 1108 (2019) (quoting *Wiggins*, 539 U.S. at 537). "The likelihood of that result must be 'substantial, not just conceivable.'" *Id.* (quoting *Richter*, 562 U.S. at 112).

A court need not address both components of the *Strickland* inquiry or follow any particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is easier to dispose of a claim on just one of the components, then that course should be taken. *Id.* Here, the Court focuses on the prejudice prong of *Strickland*. *See Jackson v. Calderon*, 211 F.3d 1148, 1155 n.3 (9th Cir. 2000); *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998).

Though Detrich argued in his Amended Petition that trial counsel's ineffectiveness prejudiced him because "adequate pretrial preparation and investigation would have produced a conviction of a lesser degree of homicide," the Court will focus its prejudice analysis on the potential impact of counsel's allegedly ineffective assistance on sentencing because, as Judge Fletcher explains:

Even if, based on new evidence, the jury were unwilling to find beyond a

reasonable doubt that Detrich was the actual killer, it would almost certainly convict him of felony murder. Under the circumstances of this case, a felony-murder conviction would likely still make Detrich death-eligible. However, the trial judge did not sentence Detrich to death for felony murder. Instead, the judge sentenced Detrich to death based on his own conclusion, beyond a reasonable doubt, that Detrich rather than Charlton killed Souter. Thus, in practical effect, Detrich's trial-counsel IAC claims are primarily directed to his sentence rather than his conviction. The question is whether, if the evidence that Charlton was the actual killer were stronger—and the evidence against Detrich therefore weaker—Detrich would nonetheless have been sentenced to death.

*Detrich V*, 740 F.3d at 1249 (Fletcher, J., plurality opinion, with two judges joining).[9] Thus, "[t]he central question" at issue before the Court "is whether any of Detrich's newly presented trial-counsel IAC claims prejudiced him at *sentencing*." (*Id.*)

The Court first addresses the claims that the Respondents assert were found by the Court of Appeals to be outside the scope of *Martinez*.

## B.  Claims (A)(3) and (A)(8)

### Claim A(3):  Failure to interview or call witness Phillip Shell

Detrich asserted in his Amended Petition that counsel performed deficiently by failing to interview or call Phillip Shell as a witness. (Doc. 31 at 38–43.)  According to Detrich, Shell was the one known witness to whom Charlton confessed that he, not Detrich,

---

[9] Because the jury did not unanimously find Detrich guilty of premeditated murder, the trial court was required to make findings, under *Edmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), that Detrich actually killed, attempted to kill, or intended to kill, or that he was a major participant in the underlying felony and acted with reckless indifference to human life. In establishing these requirements for death eligibility, the trial court found Detrich "alone killed the victim in this case." (Doc. 403-2, Ex. 20 at 3.) The trial court's *Edmund/Tison* finding, however, is not before the Court. Though Detrich argued the *Edmund/Tison* finding was erroneously made, he has never asserted that the finding was a result of counsel's alleged ineffective assistance. Moreover, even if he had preserved such a claim, the Court is in agreement with Judge Fletcher's statement that, considering the circumstances of this case, "a felony-murder conviction would likely still make Detrich death-eligible." *Detrich V*, 740 F.3d at 1249. Accordingly, the Court considers the impact of Detrich's *Martinez* claims on his sentence, i.e., the balance of the totality of aggravating and mitigating circumstances.

1    killed Souter. (*Id.* at 38.) Detrich alleged counsel failed to contact Shell until less than two

2    weeks before the third trial began and admitted this was not enough time to secure an out-

3    of-state subpoena for Shell, who was living in Missouri at the time. (*Id.* at 38.) Rather than

4    obtain his live testimony at Detrich's trial, counsel agreed to allow his investigator to read

5    Shell's testimony from Detrich's second trial in 1990 into the record. (*Id.* at 38–39.) Detrich

6    alleged he was prejudiced by counsel's deficient performance because, had Shell testified

7    in 1994, he would have appeared more credible, and the prosecutor, who had attacked the

8    defense's failure to call witnesses in his closing argument, would not have been able to do

9    so. (*Id.* at 39–40.)

10       In his Supplemental Brief, Detrich argues that, as a result of counsel's deficient

11   performance, the judge who sentenced him was unaware of crucial evidence rebutting the

12   allegation of premeditated murder and establishing that Detrich was a minor participant in

13   furtherance of his "mere presence defense theory." (Doc. 403 at 78.) Shell's testimony,

14   Detrich claims, "would have challenged the forensic evidence, supported a jury verdict of

15   acquittal on premeditated murder, and provided powerful mitigating evidence of minor

16   participation." (*Id.*)

17       Respondents assert that a majority of the en banc panel has already held that this

18   claim has been adjudicated on the merits and that *Martinez* does not apply to such a claim.

19   (Doc. 426 at 11–12.)

20       ***Claim A(8):  Failure to rehabilitate jurors regarding death-penalty qualification.***

21       Detrich argues in his Amended Petition and in his Supplemental Brief that counsel

22   had a duty to be familiar with the precedents related to the questioning and challenging of

23   potential jurors, yet "failed to advocate for adherence to long-standing U.S. Supreme Court

24   precedent on jury selection." (Doc. 31 at 51; Doc. 403 at 87–88.) Had counsel requested

25   appropriate follow-up questioning of a juror who indicated an equivocal answer regarding

26   her ability to be fair in a capital murder prosecution, Detrich asserts his case would

27   necessarily have been reversed on direct appeal as structural error. (*Id.*) He also claims that

28   trial counsel's deficient performance resulted in a jury pool that was skewed toward

1    conviction, denying his federal constitutional right to a fair trial. (Doc. 403 at 93.)

2        Respondents argue that, like Claim A(3), a majority of the en banc panel has already

3    held that *Martinez* does not apply to Claim A(8). (Doc. 426 at 11-12.)

4                        **1.  Additional background**

5                            *a.  Voir dire*

6        During voir dire at Detrich's third and final trial in 1994, the trial court asked seven

7    of the potential jurors whether their opposition to the death penalty would "interfere" with

8    their "deliberations," (RT 12/13/94 at 27–30, 34, 47–48, 72–73) and asked one juror if his

9    opposition to the death penalty would interfere with his ability to decide the case. The court

10   excused six of the seven jurors who responded that their opposition to the death penalty

11   would interfere with their deliberations or their ability to decide the case without engaging

12   in rehabilitative questioning to clarify the meaning of their answers. (*Id.* at 30–31, 35, 47–

13   48, 98.) Counsel objected to their dismissal but did not request to ask the jurors whether

14   they would decide the case based on the evidence, did not object to the court's failure to

15   ask rehabilitative questions to explain what the jurors meant by "interfere," and did not

16   attempt to ask those questions himself. (*See id.* at 30–31, 34, 48, 98.) Neither counsel nor

17   the court asked the excused jurors whether their beliefs would prevent them from making

18   a fair and impartial decision as to guilt or follow the law given to them by the court.

19                          *b.  Phillip Shell's testimony*

20       During Detrich's second trial in 1990, counsel called a single defense witness,

21   Phillip Shell. Shell had been housed with Charlton in the Pima County Adult Detention

22   Center. (RT 11/01/90 at 54.) Shell testified he was being detained at the jail as a material

23   witness to testify in Detrich's case and shared a pod with Charlton. (RT 11/1/90 at 53–54.)

24   He testified that Charlton told him about the murder. (*Id.* at 55) Charlton was "bragging

25   about it and laughing about it" and told Shell what "actually happened." (*Id.* at 55–56.)

26   Shell testified that Charlton explained "he was pretty mad at Detrich" and "he would say

27   anything . . . whatever he had to make up to get the guy the death penalty," but confessed

28   to Shell that it was he, Charlton, who had committed the crime. (*Id.* at 56.) Specifically,

Charlton told Shell that he and Detrich "were parked behind some bar in the parking lot" where Charlton sat drinking while Detrich "had this woman in the car, a black woman, that had just short-changed him on a drug deal; and that he was kissing her." (*Id.*) Charlton was upset with Detrich at the time "because he was kissing with a black woman." (*Id.* at 57.) Charlton "reached under the seat where he had a knife and he stabbed her." (*Id.* at 56–57.) Charlton said she "went crazy" and he had to "do something," so "he cut her throat." (*Id.* at 57.) Afterwards, Charlton continued drinking in the back seat and passed out. (*Id.*) Shell testified that Charlton referred to the victim and to Detrich's involvement with her in racially derogatory terms. (*Id.* at 58.) Shell testified that months later he met Detrich in jail but did not discuss the case with him at Detrich's request. (*Id.* at 58–60.)

The prosecutor cross-examined Shell, who admitted he had previously changed his last name (*id.* at 61), was AWOL from the military (*id.* at 61–62) and had pleaded guilty to a drug possession charge in Missouri (*id.* at 66). The prosecutor challenged Shell's ability to correctly identify Charlton and impeached him with a prior statement to the Legal Defender's Office where he neglected to tell them that the victim "went nuts" after first being stabbed by Charlton. (*Id.* at 70–71.) The prosecutor also impeached Shell with a statement he had made in a pretrial interview that Charlton told him he had dropped the victim's body off by a golf course but then, after being asked the name of the golf course, changed his description to an airfield. (*Id.* at 72–73.) The prosecutor elicited testimony from Shell that, despite Detrich's claim that he was in a bar all night, Detrich told him that somebody "had gotten killed that night," and Detrich knew that the killing happened in a parking lot and Charlton was driving the car. (*Id.* at 77–78.)

Shell did not testify at Detrich's 1994 trial, instead, Shell's testimony from Detrich's 1990 trial was read into the record.

### c.  Post-conviction proceedings

In Detrich's PCR petition, he alleged that counsel had been ineffective for failing to call Shell to testify. (Doc. 426-1, Ex. A at 4–5.) Detrich asserted that counsel could have summoned Shell to appear under Arizona law. (*Id.* at 14.) Detrich alleged Shell would have

testified that Charlton had confessed to him, when they were both in jail together, that Charlton killed Souter. (*Id.*) Detrich argued that Shell's live testimony "might well have been the needed difference to secure a verdict of not guilty of premeditated murder." (*Id.* at 15.) In support, Detrich pointed out that because the jury did not unanimously find Detrich guilty of premeditated murder, some jurors must have believed Charlton was lying about the individual who did the actual killing.[10] (*Id.*)

Detrich also claimed that trial counsel failed to object to the improper removal and death qualification of jurors. (Doc. 426-1, Ex. A at 6, 23–24.)

The PCR court denied relief on March 7, 2002, and later adopted the State's proposed order which set forth the court's ruling in more detail. (*Id.*, Exs. B, C.) The PCR court found Claim A(3) speculative because Detrich presented no legal authority to support it. (*Id.* at 1.) The court also found Detrich failed to demonstrate that admission of the previously reported trial testimony prejudiced him, given the overwhelming evidence of Detrich's guilt and the fact that the jury convicted him in 1990, despite its opportunity to hear Shell's live testimony. (*Id.*)

The PCR court summarily dismissed Claim A(8), stating that "the jury panel was properly 'death qualified.'" (*Id.*, Ex. C at 2.)

Detrich failed to raise either claim as error in his petition for review to the Arizona Supreme Court and, on April 24, 2003, the Arizona Supreme Court denied Detrich's petition for review of the trial court's ruling. (*Id.*, Exs. D, E.)

### d. Federal habeas petition

Detrich asserts, in his Amended Petition, that trial counsel was ineffective for failing to secure the testimony of Shell at his third trial, leaving Shell without an effective defense. (Doc. 31 at 38–39.) Because the jury did not unanimously convict on a premeditation theory, Detrich asserts the jury "obviously did not entirely believe Charlton's story, so it is

---

[10] Though as Judge Graber points out in the dissent, the three jurors who voted for felony murder may have concluded that Detrich killed the victim in the course of kidnapping her but without the requisite intent to establish premeditated murder rather than concluding Charlton was lying. *Detrich V*, 740 F.3d at 1269 n.7.

1    reasonable to believe that live testimony from Mr. Shell would have made a difference in

2    the ultimate verdict." (*Id.* at 40.)

3          Additionally, Detrich argues trial counsel failed to introduce Shell's corroborating

4    statements into the record as rebuttal. Detrich asserts the statements contained evidence not

5    addressed at all in the 1990 trial testimony, such as:

6          Charlton was sitting in a pool of Ms. Souter's blood, (2) Charlton said that
          "the black bitch got his car all bloody" and the blood ruined the car seats, (3)
7          Charlton always kept the knife under his car seat "real sharp," ( 4) Charlton
          mentioned to others in prison that "cutting somebody's throat is the most
8          horrible thing," (5) after Charlton killed Ms. Souter he "didn't want to touch
          the black bitch," (6) Charlton was "doing everything he could to get [Detrich]
9          the gas chamber" by turning state's evidence, and that (8) Charlton was going
10         to "lay it on as thick and heavy as he could" to get Mr. Detrich the death
          penalty.
11

12   (*Id.* at 41.)

13         Detrich asserts that, had Shell testified in 1994, he would have appeared more

14   credible to the jury because, unlike his appearance at the trial in 1990, he would have been

15   dressed in street clothes and wearing no handcuffs. (*Id.* at 42.) Shell also would have been

16   more coherent and compelling, Detrich explains, because he "would have been farther

17   removed from the emotional trauma and exhaustion he felt from being wrongfully accused

18   of first-degree murder and spending the prior year in jail," in addition to being forced to

19   wait in jail for two weeks after his acquittal to testify on behalf of Detrich in the second

20   trial. (*Id.*)

21         Mr. Shell's testimony would have rebutted Charlton's story, challenged the
          forensic evidence about blood pattern evidence in the car, and likely would
22         have changed the verdict. The evidence provided by Mr. Shell established
          Mr. Detrich's innocence of first-degree murder, under both a felony murder
23         and a premeditated murder theory, and thus counsel's failure to assure its
24         proper introduction was extremely prejudicial.

25   (*Id.* at 43) (citing *Id.*, Ex. 57).

26         Detrich raised a claim in his Amended Petition that trial counsel was ineffective for

27   failing to request follow-up questioning of jurors who were equivocal in their response to

28

questions regarding their ability to be fair in a capital murder prosecution. (Doc. 31 at 51.)

The Court found PCR counsel failed to allege any of the facts necessary to fairly present these claims to the state's highest court. (Doc. 93 at 11.) The Court therefore dismissed Claims A(3) and A(8) as technically exhausted but procedurally defaulted. (*Id.* at 12.)

Under then-controlling law, this Court rejected Detrich's argument that the default could be excused because of PCR counsel's ineffectiveness. (*Id.* at 13–14.)

### e. Federal habeas appeal

While no one opinion garnered a majority in *Detrich V*, eight judges on the en banc panel found three claims, including Claims A(3) and A(8), were not procedurally defaulted because they were adjudicated on the merits in state court. *Detrich V*, 740 F.3d at 1254 (Fletcher, J., plurality opinion, with two judges joining); *id.* at 1268 (Graber, J., dissenting, with 4 judges joining).

## 2. Analysis

### a. Martinez

Detrich and Respondents agree that the en banc panel's procedural characterization is not entirely accurate as it relates to the procedural default analysis of Claims A(3) and A(8). A writ of habeas corpus cannot be granted unless the petitioner has properly exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman*, 501 U.S. at 731. To exhaust state remedies, the petitioner must "fairly present[]" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Detrich failed to fully exhaust Claims A(3) and A(8) because he did not present them in his petition for review to the Arizona Supreme Court. (*See* Docs. 426 at 11 n.5, 439 at 10.) Because Detrich cannot return to state court to exhaust these claims, *see* Ariz. R. Crim. P. 32.2(a)(3), they are "technically" exhausted. *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."). Thus, the claims are technically exhausted but procedurally defaulted.

Respondents assert that, irrespective of the Ninth Circuit's procedural finding, *Martinez* does not permit a court to excuse a default from "attorney errors in . . . petitions for discretionary review in a State's appellate courts." (Doc. 426 at 11 n.5) (citing *Martinez*, 566 U.S. at 16.)

A majority of the en banc judges agreed that *Martinez* does not apply to Claims (A)(3) and (A)(8). *Detrich V*, 740 F.3d at 1254 (Fletcher, J., plurality opinion, with two judges joining); *id.* at 1268 (Graber, J., dissenting, with 4 judges joining). Writing for five judges in the dissent, Judge Graber explained that "the claim that counsel should have called Shell as a live witness was explicitly considered on the merits by the state court after Petitioner raised it during the initial-review collateral proceeding. *Martinez* is therefore inapposite." *Id.* at 1271. Judge Graber also wrote that counsel's alleged failure to rehabilitate jurors regarding death-penalty qualification was rejected by the merits in the PCR court's decision. *Id.* at 1268. It is therefore, "not subject to *Martinez*." *Id.* at 1271. Judge Fletcher, joined by two judges, agreed with the dissent, noting that some of the trial-counsel IAC claims were adjudicated on the merits, including the claim that trial counsel failed to bring witness Shell to court to testify and failed to rehabilitate jurors regarding death-penalty qualification, and that *Martinez* does not apply to such claims. *Detrich V*, 740 F.3d at 1254. This Court agrees.

Although the PCR court adjudicated Claims A(3) and A(8) on the merits, this Court previously held (*see* Doc. 93 at 11–12), and continues to maintain, the claims were not fairly presented to the State's highest court in order to fully exhaust the claims. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Respondents assert that *Martinez* does not permit the Court to excuse such a default arising from attorney errors in petitions for *discretionary* review to a State's appellate courts. (*See* Doc. 426 at 11 n.5) (quoting *Martinez*, 566 U.S. at 16). Detrich counters this argument by attempting to distinguish his case from *Martinez*, a non-capital case, pointing out that in a capital case in Arizona a petition for review to the Arizona Supreme Court is not discretionary, thus *Martinez* does not exclude errors in petitions for review from its holding. (Doc. 439 at 10–11.)

The Court is persuaded by Detrich's argument that, at least in capital cases, the Supreme Court's reference to "discretionary review" was referring to reviews such as motions for new trial or motions for reconsideration that would occur after the review necessary for exhaustion. But, in addition to prohibiting its holding from applying to petitions for discretionary review, the Court in *Martinez* explained that its holding also does not extend to "appeals from initial-review collateral proceedings," *Martinez*, 566 U.S. at 16, such as the petition for review in which Detrich failed to raise Claims A(3) and A(8). This conclusion is further supported by the Supreme Court's directive that *Martinez* "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial. . . ." *Id.* (citations omitted). Thus, the Court finds that Detrich fails to satisfy the *Martinez* framework—his counsel did raise Claims A(3) and A(8) in his initial-review post-conviction proceedings yet failed to raise them in his petition for review, i.e., his appeal of that decision, to the Arizona Supreme Court. The *Martinez* exception therefore does not apply to these claims.

### b. Fundamentally altered claims

In an attempt to persuade the Court that he is entitled to evidentiary development of Claims A(3) and A(8), Detrich asserts these claims have been fundamentally altered by additional evidence that bolsters the claims in federal court, and are thus "new," yet procedurally defaulted, claims. (Doc. 439 at 90.) A claim has not been fairly presented in state court if new evidence fundamentally alters the legal claim already considered by the state court or places the case in a significantly different and stronger evidentiary posture than it was when the state court considered it. *See Dickens v. Ryan*, 740 F.3d 1302, 1318–19 (9th Cir. 2014) (en banc) (citing, *inter alia*, *Vasquez v. Hillary*, 474 U.S. 254, 260 (1986); *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988); *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988)).

Accordingly, the Court considers whether the new evidence fundamentally alters these claims such that they are new and procedurally defaulted claims to which the

*Martinez* exception applies.[11]

In *Dickens*, the petitioner argued in state court that his sentencing counsel provided ineffective assistance by failing to direct the work of a court-appointed psychologist and to adequately investigate the petitioner's background. 740 F.3d at 1317. These general allegations did not identify any specific conditions that sentencing counsel failed to uncover. The state court denied the claim on the merits, finding that counsel's performance was not deficient and that the petitioner had failed to demonstrate he was prejudiced. *Id.* In his federal habeas petition, however, the petitioner "changed his claim to include extensive factual allegations suggesting Dickens suffered from FAS [(Fetal Alcohol Syndrome)] and organic brain damage." *Id.*

In determining whether the petitioner's claim was unexhausted, the court in *Dickens* explained that factual allegations not presented to a state court may render a claim unexhausted if the allegations "fundamentally alter" the legal claim presented and considered by the state courts. *Id.* at 1318 (citing *Vasquez*, 474 U.S. at 260). New evidence fundamentally alters a claim if it places the claim in a *significantly different and stronger evidentiary* posture than it had in state court. *Dickens*, 740 F.3d at 1318 (citing *Aiken*, 841 F.2d at 883, 884 n.3) (emphasis added).

Applying these principles, the court found that Dickens's "new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts." *Id.* at 1319. It further noted that the claim urged in state court only "generally alleged that sentencing counsel did not effectively evaluate whether Dickens 'suffer[ed] from any medical or mental impairment'" and that specific conditions like FAS and organic brain damage placed the claim in a "significantly different" and "substantially improved"

---

[11] Attempting to persuade the Court that evidentiary development of these claims is not barred, Detrich argues that they are fundamentally altered by additional evidence submitted with his supplemental *Martinez* brief. (Doc. 439 at 90.) Though not argued by Detrich, it follows from his argument that these claims, if indeed found to be "new," would be procedurally defaulted. Thus, the Court considers whether *Martinez* would apply to a "new" and "fundamentally altered claim" presented for the first time in his Supplemental Brief.

1    evidentiary posture. *Id.* Having determined that Dickens's fundamentally altered IAC

2    sentencing claim was unexhausted and procedurally barred, the court remanded for

3    consideration of cause and prejudice under *Martinez*. *Id.* It further instructed that §

4    2254(e)(2) did not bar the district court from hearing new evidence to determine the

5    existence of cause and prejudice.

6        Under *Dickens*, the question of whether *Martinez* applies to Claims A(3) and A(8)

7    hinges on whether the claims, as presented in these federal proceedings, are fundamentally

8    different from the claims presented in state court. They are not.

9        Detrich suggests that the claims are fundamentally altered by evidence referred to

10   in several sections of his Supplemental Brief. (Doc. 439) (citing Doc 403 at §§ VI(B)(1),

11   (2), & (4)).[12] While the new evidence related to Claim A(3) casts additional aspersions on

12   counsel's performance, (*see* Doc. 403, Exs. 10, 12, 22), it does not fundamentally alter the

13   claim because at its core it is the same claim: counsel's failure to secure Shell's testimony

14   at the trial made Shell a less credible witness. This claim is not significantly different or in

15   a significantly stronger evidentiary posture than it was when it was considered by the state

16   court.

17       Detrich also asserts that when the state court considered Claim A(8), it had no juror

18   declarations before it, arguing that the juror declaration puts this claim in a stronger posture

19   than it was when the state court considered it. (Doc. 439 at 12–13.) While arguably

20   strengthening Claim A(8), the declaration of the excused potential juror does not

21   fundamentally alter the claim at its core or place it in a significantly stronger evidentiary

22   posture.

23       <u>Conclusion</u>

24       The new evidence and allegations presented for the first time in Detrich's

25   Supplemental Brief do not fundamentally alter Claims A(3) and A(8). As a majority of the

26   en banc panel concluded in *Detrich V*, Detrich may not be permitted to excuse the default

27

28   ───────────────

    [12] This citation in Detrich's brief appears to be a typographical error referencing the wrong section. The Court presumes Detrich is referring to §§ IV(B)(1), (2) & (4).

of Claims A(3) and A(8) based on PCR counsel's claimed ineffectiveness in failing to present the claims because PCR counsel presented the claims in state court. *Martinez* cannot be applied to excuse the procedural default of these claims that were raised in initial review collateral proceedings. *See Martinez*, 566 U.S. at 16. Accordingly, these claims remain procedurally defaulted and the Court declines to consider the merits of these claims.

### C. Claims A(1) and A(4)

In Claims A(1) and A(4) of the Amended Petition, Detrich alleged that trial counsel performed ineffectively by failing to adequately investigate the case, interview witnesses and prepare for trial. Specifically, Detrich argued that counsel's heavy caseload and lack of experience resulted in counsel's failure to perform a sufficient investigation or file pretrial motions on critical issues. (Doc. 31 at 31–33.) This Court found Claims A(1) and A(4) technically exhausted but procedurally defaulted. (Doc. 93 at 11–12.) To excuse the default of the claims under *Martinez*, Detrich must show that PCR counsel performed ineffectively under *Strickland* by failing to raise the underlying claims of ineffective assistance of trial counsel and that the claims themselves were substantial or had some merit. *Martinez*, 566 U.S. at 14–16.

In Detrich's Supplemental Brief, he claims that the procedural default of his claim that trial counsel failed to investigate or interview either Charlton, William Carbonell, or Detective Downing can be excused under *Martinez* because PCR counsel failed to raise these claims. (Doc. 403 at 27–28, 52–77) The Court will assume without deciding that the claims are substantial, thereby satisfying *Martinez*'s prejudice prong. With respect to the cause prong, the Court will assume that PCR counsel's failure to raise the claims constituted deficient performance under *Strickland*. Accordingly, the Court's analysis will focus on whether PCR counsel's failure to raise the claims was prejudicial; that is, whether there was a reasonable probability of a different outcome during the PCR proceedings if counsel had raised the claims. To make that determination, the court evaluates the strength of the underlying claims of ineffective assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

The Court will begin its analysis by addressing trial counsel's alleged failure to investigate co-defendant Charlton.

### 1. Failure to investigate Paul Charlton

Detrich claimed in his Amended Petition that trial counsel failed to investigate Detrich's co-defendant, Alan Charlton. Specifically, he alleged trial counsel failed to explore (a) the benefit Charlton hoped to receive in exchange for testifying, (b) allegations that, by killing Souter, Charlton earned a "Taking Care of Business" prize from the biker gang to which he belonged, (c) Charlton's Aryan Brotherhood connections, including Charlton's knife with an Aryan Brotherhood slogan carved into it, and (d) potential witnesses, including Charlton's cellmates, to whom Charlton may have confessed or who would have had knowledge of Charlton's racist beliefs. (Doc. 31 at 36.)

Detrich also asserted trial counsel failed to file pretrial discovery requests regarding Charlton, including requests for Charlton's prison, jail and arrest records and his medical and mental health records regarding the conflicting number of alcoholic blackouts he had suffered. (*Id.* at 32.)

Detrich claimed trial counsel's failure to investigate Charlton resulted in the "prejudicial failure to prevent admission of Charlton's damaging statements, failure to prove the fact that Charlton killed the victim spurred on by racist hatred, and failure to disprove Charlton's version of the events." (Doc. 31 at 37.) Detrich also alleged that, because counsel failed to interview key witnesses, he did not know what physical evidence to pursue and was unable to develop inconsistencies in the state's physical evidence and version of the case. (*Id.* at 45.)

Detrich includes additional allegations in his Supplemental Brief in support of his claim that counsel failed to investigate Charlton. Respondents assert that several of these allegations were not raised in the Amended Petition and were not among the claims found defaulted by this Court and remanded by the Ninth Circuit, and thus the Court should not consider them. (Doc. 426 at 31, 37–38.) Specifically, Respondents oppose the Court's consideration of claims that had counsel conducted an adequate investigation, he would

have discovered that (a) Charlton initially offered to plead guilty to manslaughter and kidnapping but his final plea agreement to kidnapping was better than what Charlton had proposed; (b) Charlton's plea agreement allowed him to be released for 60 days before beginning his sentence; (c) Charlton first recounted Detrich's damaging statement that "it's dead but it's warm. Do you want a shot of it?" only after entering into the plea deal; (d) Charlton had violent tendencies and was mentally unstable; and (e) Charlton was a "known liar." (Doc. 426 at 30.) Additionally, Respondents oppose consideration of claims that counsel failed to cross-examine Charlton regarding (a) physical evidence that Detrich believes conflicts with Charlton's account of the murder, (b) the victim's position in the car, (c) how the victim was dragged from the car, (d) the timeline that leaves "several hours unaccounted for," (e) Detrich's motive, and (f) the drag marks and tire track evidence. (Doc. 426 at 37–42.) Respondents also assert that Detrich did not allege counsel was ineffective for failing to present a *Christensen*[13] defense in his Amended Petition. (*Id.* at 21.)

Detrich does not contest that these allegations were not presented in his Amended Petition. Instead, he finds it "noteworthy that Respondents cite to no authority holding that *Martinez* claims must have been raised in an Amended Habeas Petition." (Doc. 439 at 15.) It is not noteworthy at all. A petitioner is required to "specify all the grounds for relief available to the petitioner" in the petition and "state the facts supporting each ground." *See* Rule 2(c), Rules Governing Section 2254 Cases in the United States District Court. Thereafter, if the limitation's period of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(d)(1), has run, as it has in this case, a petitioner may amend only if the original and amended petitions are tied to a common core of operative facts, *Mayle v. Felix*, 545 U.S. 644, 655, 664 (2005). Detrich has not requested, nor has the Court

---

[13] Under *State v. Christensen*, 129 Ariz. 32 (1981), expert testimony regarding "a character trait of acting reflexively in response to stress" is permitted for the sole purpose of rebutting the premeditation element of a crime. State v. *Mott*, 187 Ariz. 536, 543, 931 P.2d 1046, 1054 (1997) (citing *Christensen*, 129 Ariz. at 34–36, 628 P.2d at 582–84).

1   authorized, amendment of his petition to include new claims. As this Court has previously
2   explained, because an appeal has been taken from this Court's final judgment, the Court
3   lacks jurisdiction to consider any claims other than the IAC claims this Court found
4   procedurally defaulted and that were specifically remanded by the Ninth Circuit. (*See* Doc.
5   440) (rejecting Detrich's argument that the Court has jurisdiction to consider new claims
6   after entering final judgment without first receiving authorization from the Court of
7   Appeals) (citing *Gould v. Mut. Life Ins. Co. of New York*, 790 F.2d 769, 772 (9th Cir.
8   1986)). This by itself is sufficient grounds to deny consideration of the new allegations.

9        However, even if the Court had jurisdiction to allow amendment of the petition, the
10  claims are untimely. *See* 28 U.S.C. § 2244(d)(1) (providing that a one-year statute of
11  limitations applies to petitions for writ of habeas corpus by prisoners in custody pursuant
12  to a state court judgment). Detrich maintains that the claims in his *Martinez* brief relate
13  back to the claims raised in the Amended Petition, thus satisfying the one-year statute of
14  limitations. (Doc. 439 at 15–17); *see Hebner v. McGrath*, 543 F.3d 1133, 1134 (9th Cir.
15  2008) ("[A] new claim in an amended petition relates back to avoid a limitations bar, when
16  the limitations period has run in the meantime, only when it arises from the same core of
17  operative facts as a claim contained in the original petition."). Detrich also contends that if
18  the Court does not find that the claims relate back, the Court should apply equitable tolling
19  to excuse the statute of limitations. (Doc. 439 at 18.) Detrich asserts he cannot be faulted
20  for failing to raise claims that he could not win at the time of filing his Amended Petition.
21  (Doc. 439 at 19–20.) He argues he is entitled to equitable tolling, under *Martinez*, based on
22  PCR counsel's deficient performance. (*Id.*)  Before the *Martinez* decision, he states, there
23  was "no point in including claims that were clearly defaulted." (*Id.* at 19.)

24       *Martinez*, however, has never been found to toll the limitations period of § 2244(d).
25  *See e.g.*, *Johnson v. Warden*, 738 F. App'x 1003, 1007 (11th Cir. 2018) ("*Martinez* does
26  not apply to equitable tolling[.]"); *Brown v. Ryan*, No. CV-14-8229-PCT-DJH, 2015 WL
27  3990513, at *9 (D. Ariz. June 30, 2015) ("*Martinez* ... does not address the timeliness of a
28  habeas petition or the tolling of the AEDPA limitations period."); *Lambrix v. Sec'y, Florida*

1    *Dept. of Corr.*, 756 F.3d 1246, 1249 (11th Cir. 2014) ("[T]he equitable rule in *Martinez*

2    applies only to the issue of cause to excuse the procedural default of an ineffective

3    assistance of trial counsel claim that occurred in a state collateral proceeding and has no

4    application to the operation or tolling of the § 2244(d) statute of limitations for filing a §

5    2254 petition"); *Madueno v. Ryan*, No. CV-13-01382-PHX-SRB, 2014 WL 2094189, at

6    *7 (D. Ariz. May 20, 2014) ("*Martinez* has no application to the statute of limitations in

7    the AEDPA which governs Petitioner's filing in federal court.")).

8         However, to the extent the new allegations provide additional evidentiary support

9    for claims raised in the Amended Petition, without fundamentally altering those claims, the

10   Court will consider the evidence presented in the Supplemental Brief for the purpose of

11   analyzing whether the procedural default should be excused. *See Detrich*, 740 F.3d at 1247

12   ("*Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a

13   *Martinez* case."). In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held

14   that where the state court has denied a habeas petitioner's claim under 28 U.S.C. § 2254(d),

15   review by the federal court "is limited to the record that was before the state court that

16   adjudicated the claim on the merits." *Id.* at 181. However, where a state court has not

17   adjudicated the merits of a claim because of a procedural bar, the Ninth Circuit has held

18   that a district court may consider new evidence in determining whether the petitioner can

19   overcome that bar. *See Dickens*, 740 F.3d at 1321 (holding that *Pinholster* did not bar

20   petitioner from presenting new evidence to support a cause-and-prejudice argument under

21   *Martinez* because *Pinholster* applies only to claims previously "adjudicated on the merits

22   in State court proceedings").

23        In *Dickens* the court rejected the argument that 28 U.S.C. § 2254(e)(2) barred

24   evidentiary development in federal court, explaining that a petitioner seeking to show

25   "cause" under *Martinez* is not asserting a "claim."[14] 740 F.3d at 1321. ("A federal court's

26

27        [14] Twenty-eight U.S.C. § 2254(e)(2) severely limits the circumstances in which a
     federal habeas court may hold an evidentiary hearing on claims not developed in state
28   court.

- 28 -

1  determination of whether a habeas petitioner has demonstrated cause and prejudice . . . is

2  not the same as a hearing on a constitutional claim for habeas relief."); *see Woods v.*

3  *Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (explaining that neither *Pinholster* nor

4  § 2254(e)(2) "categorically bar [a petitioner] from obtaining such a hearing or from

5  presenting extra-record evidence to establish cause and prejudice for the procedural

6  default. . . .").

7          However, after completion of the supplemental briefing on the *Martinez* issue in

8  this case, the Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), "hold[ing]

9  that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or

10  otherwise consider evidence beyond the state-court record based on ineffective assistance

11  of state postconviction counsel." *Id.* at 1734. The Court further stated that, "if [§2254(e)(2)]

12  applies and the prisoner cannot satisfy its 'stringent requirements,' . . . a federal court may

13  not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and

14  prejudice under *Martinez.*" *Id.* at 1740 (quoting *Williams (Michael) v. Taylor*, 529 U.S.

15  420, 433 (2000)). This approach makes "eminent sense," the Court explained, because

16  holding evidentiary hearings without first asking whether the evidence the petitioner seeks

17  to present would satisfy AEDPA's demanding standards would "needlessly prolong federal

18  habeas proceedings." *Id.* (quoting *Pinholster*, 563 U.S. at 208–09 (Sotomayor, J.,

19  dissenting)).

20          In *Ramirez*, however, the two death-sentenced prisoners had conceded that their

21  claims failed on the state-court record alone, *id.* at 1730, and that they did not satisfy §

22  2254(e)(2)'s narrow exceptions, *id.* at 1734. Detrich has not made any similar concessions.

23  The Court finds, however, that protracting this case further to consider supplemental

24  briefing on this point is unnecessary. *Ramirez* did not overrule *Martinez*; its narrow

25  exception to procedural default is still good law. Thus, it follows that Detrich may be able

26  to demonstrate that he can satisfy the requirements of § 2254(e)(2) on grounds separate

27  from the ineffectiveness of PCR counsel. He has, for example, asserted throughout his

28

briefing that *Brady*[15] violations prevented him from discovering certain new evidence, suggesting the responsibility for failing to develop this new evidence lies with the State. Without commenting on the merits of such arguments, Detrich might also argue, among other things, that his claims stand on the state court record alone, that he is developing new evidence in his pending petition before the state court that would also permit consideration of the evidence here, or that the deficiencies of PCR counsel who may not have met the minimum qualifications of appointment under State law may be attributed to the State. *See Ramirez*, 142 S. Ct. at 1741 (Sotomayor, J., dissenting) ("Arizona state law sets minimum qualifications that attorneys must meet to be appointed in capital cases" but the Arizona Supreme Court waived those requirements and appointed PCR counsel who lacked those qualifications.). Here, the Court has already considered the new evidence proffered by Detrich to determine whether any of his claims should be excused under *Martinez* and reached a negative conclusion. Therefore, expansion of this remand to consider the viability of the merits of any new claim through the lens of § 2254(e)(2) is unnecessary.

Thus, to the extent the challenged allegations provide evidentiary support for claims that were raised in Detrich's Amended Petition but do not fundamentally alter the claims, the Court considers, as discussed below, the new evidence and allegations in its analysis of the application of *Martinez* to Detrich's procedurally defaulted claims from the Amended Petition.

### a.  Failure to present a coherent defense

Detrich asserted that because his trial counsel failed to investigate his case, counsel's theory of defense was scattered, inherently inconsistent and nonsensical. (Doc. 31 at 34.) Specifically, Detrich alleged counsel noticed an impermissible intoxication defense, then put forth a misidentification defense that was "predestined" to fail. (*Id.*) Detrich argues that, had counsel investigated and pursued the reasonable defense theory of mere presence, Detrich would not have been found guilty of first-degree murder. (*Id.* at 35.)

---

[15] *Brady v. Maryland*, 373 U.S. 83 (1963).

In his Supplemental Brief, Detrich argues, consistent with his Amended Petition, that because counsel did not sufficiently investigate and formulate a coherent defense theory, he argued two separate and opposing theories of defense at trial—that Detrich had been misidentified and was not present at all and that Detrich was present but not responsible for Souter's death. (Doc. 403 at 79) (citations to the record omitted). The result, Detrich asserts, was an inherently inconsistent and nonsensical defense. (*Id.*)

However, even if counsel performed deficiently in presenting a misidentification defense rather than relying solely on a mere presence defense, Detrich does not allege, let alone demonstrate, that he was prejudiced. At worst, any conflict in the presentation of both defenses resulted in the jury concluding that Detrich was with Charlton when Souter was murdered, thus disregarding the misidentification defense. Because Detrich asserts counsel should not have presented that defense, he could not have been prejudiced by the jury's disregard of it. Accordingly, Detrich has failed to demonstrate cause, under *Martinez*, to excuse the procedural default of this claim.

He also argues that had trial counsel investigated Detrich's social history and mental health status, he could have pursued an impulsivity defense to premeditation under *State v. Christensen*, 129 Ariz. 32 (1981). *Christensen* permits expert testimony regarding "a character trait of acting reflexively in response to stress" for the sole purpose of rebutting premeditation. State v. *Mott*, 187 Ariz. 536, 543, 931 P.2d 1046, 1054 (1997) (citing *Christensen*, 129 Ariz. at 34– 36, 628 P.2d at 582–84).

In his Amended Petition, Detrich did not allege counsel was ineffective for failing to present a *Christensen* defense. (Doc. 31.) Detrich's *Christensen* argument, presented for the first time in his Supplemental Brief, is not merely additional evidence in support of an existing claim. In other words, the *Christensen* allegations fundamentally alter Claim A(1). In fact, a *Christensen* defense would have directly conflicted with the defense Detrich asserted should have been pursued in his Amended Petition—that it was Charlton, and not Detrich, who killed the victim. Because Detrich did not present this *Christensen* claim in his Amended Petition, the claim could not have been among the claims found defaulted by

this Court and remanded by the Ninth Circuit for consideration by this Court.

Detrich also asserts the same evidence supporting the *Christensen* defense "would have been powerful mitigating evidence for sentencing." (Doc. 403 at 87.) But, as Respondents correctly note, Detrich's claim that counsel was ineffective for investigating and presenting mental health evidence as mitigation is currently pending before the Ninth Circuit *en banc* panel.[16] *Detrich V*, 740 F.3d at 1259 ("We do not reach Detrich's non-defaulted sentencing-phase IAC claims. . . . We will reach the non-defaulted claims, if appropriate, after the district court has decided Detrich's *Martinez* motion and any trial-counsel IAC claims for which Detrich's state-court procedural default is excused.").

Detrich has not requested, nor has the Court authorized, amendment of his petition to include new claims. The Court lacks jurisdiction to consider Detrich's guilt-phase *Christensen* claim because the Ninth Circuit did not remand the claim, nor did it authorize this Court to review it. Additionally, to the extent Detrich argues the evidence is relevant to his claim counsel was ineffective for investigating and presenting mental health evidence as mitigation, that claim is currently before the Ninth Circuit. The Court therefore declines to consider Detrich's *Christensen* claim in this remand.

---

[16] This Court held a four-day evidentiary hearing, considering much of the same evidence presented here, and found Detrich was not prejudiced by counsel's failure to investigate and present mental health evidence, primarily evidence of impulsivity, at sentencing. (Doc. 260.) The Court found, "significantly, the crime was not impulsive." (Doc. 260 at 31.) Additionally, (1) "[t]he circumstances of the crime do not indicate that [Detrich's] impulsivity precluded him from behaving in conformance of the law," (2) there is "no evidence that [Detrich's] impulsiveness in testing and as noted by others translates to violent behavior in the real world," and, having failed to establish that his neurological impairments prevent him from complying with the law or knowing right from wrong, "there is nothing inherently mitigating in the fact that [Detrich] is impulsive in his day-to-day life." (*Id.* at 32–33.) Applying AEDPA deference to the exhausted claim, the Court held that it was "not objectively unreasonable to conclude that, weighing the totality of the mitigating evidence now available against the aggravation, there is not a reasonable probability that Petitioner's sentence would have been different." (Doc. 260 at 39.) The Court also found that, applying no deference, the result is the same. (*Id.*)

1

2

             *b.  Failure to investigate the benefit Charlton hoped to receive in exchange for testifying.*[17]

3

      Detrich alleges trial counsel failed to investigate a potential *Brady* violation

4

involving the benefit Charlton indicated he hoped to receive in exchange for testifying at

5

Detrich's second trial. (Doc. 31 at 36.)

6

<u>Additional background</u>

7

      After Charlton was arrested in Benson, he agreed to talk to Pima County Sheriff's

8

Detectives during the drive to Tucson. During this interview, Charlton described the

9

kidnapping and murder of Souter. (Doc. 403-1, Ex. 6 at 1.) At that time, he told police that

10

Detrich raped and murdered Souter and that Detrich asked Charlton if he "wanted a shot at

11

it," meaning would Charlton like to rape the victim. (*Id.* at 4.) Almost a year later, after

12

entering into a plea agreement, Charlton was interviewed by Detrich's counsel, James

13

Glanville, before Detrich's first trial. (*Id.*, Ex. 8.) In this interview, Charlton elaborated on

14

his previous statement, adding that, after killing Souter, Detrich asked him, "it's dead, but

15

it's warm" before asking Charlton "Do you want a shot of it?" (*Id.* at 45.) Charlton also

16

stated that after he declined, Detrich raped the victim. (*Id.* at 43–45.)

17

      In exchange for testifying at Detrich's trial, Charlton secured a plea deal for

18

kidnapping with an agreed upon ten-and-a-half-year-sentence. Charlton admitted that he

19

had testified at Detrich's second trial that he only took a plea deal to avoid the death

20

penalty. (*See* RT 12/15/94 at 52.) At Detrich's third trial, Charlton testified that he

21

requested "something more," some "additional consideration" from the prosecution to

22

entice him to testify again. (RT 12/15/94 at 53).

23

      On the first day of Detrich's 1994 trial, trial counsel asked prosecutor Kenneth

24

25

26

27

28

      [17] The Court notes that this is not a claim that the plurality in *Detrich V* found "sufficiently plausible to warrant remanding to the district court." *See Detrich V*, 740 F.3d at 1254. Nevertheless, because this claim was found procedurally defaulted and a majority of the en banc court in *Detrich V* agreed to remand Detrich's *Martinez* motion for consideration by this Court in the first instance, the Court will, out of an abundance of caution, consider whether the procedural default of this claim can be excused under *Martinez*.

Peasley about what additional consideration Charlton hoped to receive from Detective Clark in exchange for his second round of testifying. (RT 12/13/94 at 122–23.) Peasley stated there "has been no additional consideration afforded Mr. Charlton nor will there be" but he would ask Detective Clark what they were talking about during the interview. (*Id.* at 123.)

Though there was nothing further on the record indicating what Charlton and Detective Clark might have discussed regarding the additional consideration, Higgins cross-examined Charlton on the matter:

> Q: And [Detective Clark] said: Are you going to come down and
>
> testify? And you said: Well, I need something more from you.
>
> Didn't you?
>
> A: Yes.
>
> Q: You asked for some additional consideration, didn't you?
>
> A: Uh-huh.

(RT 12/15/94 at 53.)

Detrich contends that Higgins, who erroneously believed he had no right to interview Charlton (*see* RT 12/13/94 at 122), should have asked Charlton "what Charlton wanted, or even if Charlton ultimately got what he wanted from another state actor despite Detective Clark telling him he would not." (Doc. 403 at 66) (emphasis omitted).)

During the trial, Charlton testified he drove away from Souter's house with Detrich and Souter and periodically experienced "blackouts," but also lucidity during this time. (RT 12/15/94 at 25, 41, 54–56.) According to Charlton, during one of his lucid moments he observed Souter bleeding profusely on the bench seat next to him, with Detrich on top of her. (*Id.* at 25.) He asserted Detrich was "humping" the victim. (*Id.* at 24.) He further testified, consistent with his statement given after he reached a plea deal, that at some point before Detrich dragged Souter's body from his car and into the desert, Detrich stated, "it is dead but it is warm, you want a shot at it[?]" (*Id.* at 25.) *See Detrich II*, 188 Ariz. at 61, 932 P.2d at 1332.

Detrich now alleges for the first time in the Supplemental Brief that it was not until after Charlton reached a plea deal that he first accused Detrich of stating to him "it's dead but it's warm" and then proceeded to rape the victim a second time after Charlton declined. (Doc. 403 at 53) (citing Doc. 403-1, Exs. 6–8.) Had trial counsel investigated Charlton's plea deal, Detrich asserts, he would have discovered that Charlton's counsel initially proposed a plea deal for manslaughter and kidnapping, yet the prosecution offered a better plea for only kidnapping. (*Id.* at 54, Exs. 7, 40.) While there is no evidence why this offer was made, Detrich argues one "obvious reason" for the deal could be the late allegation Charlton made against Detrich which highly aggravated the crime.[18] (*Id.* at 54.) Because trial counsel failed to file a motion to disclose evidence under *Brady* and did not conduct a sufficient investigation, Detrich asserts, he did not discover this evidence.

Detrich also alleges that trial counsel did not investigate the terms of the "suspiciously beneficial portion of the plea deal" that permitted Charlton to be released for 60 days after testifying before serving his kidnapping sentence or ask Charlton any questions on cross-examination about this. (Doc. 403 at 56.)

These additional allegations are sufficiently related to Detrich's claim that trial counsel failed to investigate the benefit Charlton hoped to receive in exchange for testifying a second time at Detrich's 1994 trial. Thus, the Court considers this evidence in determining whether trial counsel failed to sufficiently investigate the benefits Charlton hoped to receive from testifying for the prosecution, for purposes of examining whether Detrich has demonstrated cause to excuse the procedural default of this claim under

---

[18] Though not a factor in the Court's decision, the Court notes that there are other reasons Charlton's final plea deal may not have included a manslaughter charge. First, at the time of Detrich's trial, Manslaughter was a Class 3 Felony, while Kidnapping was a Class 2 Felony, thus it is not evident the prosecution offered Charlton a "better plea deal" in terms of actual prison time. *See* A.R.S. § 1303(B) (manslaughter); A.R.S. § 13-1304(B) (kidnapping). While the plea deal may have been "better" in the sense it contained fewer charges, Detrich has failed to demonstrate the original plea offered by Charlton would have resulted in a sentencing range any greater than a plea to kidnapping alone. Second, Charlton, who maintained he was not involved in killing Souter, may have had difficulty forming the factual basis for a plea to manslaughter.

1    *Martinez.*

2        Though Detrich alleged trial counsel's ineffectiveness prejudiced him at the guilt

3    phase, Judge Fletcher explains, writing for the plurality in *Detrich V*, that the trial judge

4    "sentenced Detrich to death based on his own conclusion, beyond a reasonable doubt, that

5    Detrich rather than Charlton killed Souter. . . . The question is whether, if the evidence that

6    Charlton was the actual killer were stronger—and the evidence against Detrich therefore

7    weaker—Detrich would nonetheless have been sentenced to death." 740 F.3d at 1249. If

8    counsel's allegedly deficient performance prevented the trial judge from considering such

9    evidence, the Court must consider whether the new evidence is sufficiently prejudicial that

10   it can conclude the likelihood of a different sentencing outcome is reasonably probable.

11       Detrich has not demonstrated that he was prejudiced by trial counsel's failure to

12   inquire further into the benefits Charlton received or hoped to receive in exchange for his

13   testimony. Detrich submitted a declaration from Charlton in these proceedings, but it is

14   silent as to the question of what additional benefit Charlton was seeking or may have gotten

15   for his testimony at the 1994 trial. (Doc. 403-2, Ex. 16.) Charlton states in the declaration

16   that he "asked the prosecution what they were going to do for me if I testified. The

17   prosecutor told me I had to testify." (*Id.* at ¶12.) This is consistent with Peasley's avowal

18   to the trial court. There is no evidence in the record suggesting that Charlton received, or

19   expected to receive, any additional benefit for testifying a second time. Thus, Detrich

20   cannot demonstrate he was prejudiced by counsel's failure to investigate this issue further.

21       Detrich's contention that his trial counsel should have cross-examined Charlton on

22   these matters or asked the court to suppress the statement, "it's dead but it's warm," (Doc.

23   403 at 54), does not relate back to Detrich's claim that trial counsel should have

24   investigated and discovered evidence that Charlton's plea deal was more favorable than

25   what Charlton had initially proposed. Trial counsel conducted the second interview during

26   which Charlton made the aggravating statement and was thus aware of the statement yet

27   chose not to move to suppress it or cross-examine Detrich on the subject. Because these

28   allegations of deficient performance differ significantly from the failure to investigate

1  alleged in the petition, amending the claim to include these allegations would

2  fundamentally alter the claim, and such a claim is not properly before the Court. *See Mayle*,

3  545 U.S. 644(permitting relation back under Rule 15(c) only when the new claim arises

4  "out of the conduct, transaction, or occurrence set forth . . . in the original pleading").

5        Even if the Court considers the new allegations, Detrich does not identify the

6  grounds on which the "dead but warm" statement should have been suppressed. (Doc. 403

7  at 54.) "To show prejudice under *Strickland* from failure to file a motion, [a petitioner]

8  must show that (1) had his counsel filed the motion, it is reasonable that the trial court

9  would have granted it as meritorious, and (2) had the motion been granted, it is reasonable

10 that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d

11 986, 990 (9th Cir. 1999) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373– 74 (1986)).

12 Having failed to demonstrate grounds on which the trial court might reasonably have

13 suppressed the statement, Detrich has failed to demonstrate prejudice from counsel's

14 failure to attempt to suppress the statement.

15       The Court also finds there is no reasonable probability that had counsel successfully

16 suppressed the statement or adequately cross-examined Charlton it would have resulted in

17 a different outcome.

18       During the 1994 trial, Charlton did not testify that Detrich raped Souter after killing

19 her. (*See* RT 12/15/94 at 24) (Charlton testifying that Detrich was "humping" Souter but

20 Charlton did not know whether Detrich was "inside of her")." Nor did the physical

21 evidence indicate that Souter had been raped. (RT 12/14/94 at 104–05.) Because Charlton

22 did not testify that Detrich raped the victim twice, counsel was not ineffective for failing

23 to challenge that testimony.

24       Furthermore, even if counsel performed deficiently in failing to suppress or impeach

25 the "dead but warm" statement, there is no reasonable probability that challenging the

26 statement would have resulted in a different outcome.

27       In aggravation, the trial court found that the murder was especially cruel, heinous

28 and depraved under A.R.S. § 13–703(F)(6). (Doc. 403-2, Ex. 20 at 5–6.) "The term

'heinous or depraved' is used to describe a defendant's state of mind" and is established, for example, upon a showing that the defendant relished the murder or inflicted gratuitous violence on the victim. *State v. Murdaugh*, 209 Ariz. 19, 97 P.3d 844, 856 (2004). On the other hand, in determining whether a murder was especially cruel the court considers the entire murder scenario, not just the final act that killed the victim to determine if the victim consciously suffered physical pain or mental distress. *Detrich*, 188 Ariz. at 67, 932 P.2d at 1338 (citing *State v. Amaya-Ruiz*, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990); *State v. Jiminez*, 165 Ariz. 444, 453, 799 P.2d 785, 794 (1990)).

In finding the murder "depraved," the trial court stated that the "dead but warm statement" was "almost" the "dictionary definition of depravity." (*Id.* at 7.) Upon independent review, the Arizona Supreme Court found both prongs of the (F)(6) factor supported, making the following findings:

> We find that the record supports the trial court's finding of heinous and depraved conduct. Defendant's statement to Charlton, "It's dead, but it's warm. Do you want a shot at it?" clearly shows that defendant relished the murder. The trial court found that this statement showed an abhorrent lack of regard for human life, and we agree. Furthermore, we find that defendant engaged in gratuitous violence beyond that necessary to cause death. *See State v. Jones*, 185 Ariz. 471, 488, 917 P.2d 200, 217 (1996). Of the forty cutting and stab wounds, only three were potentially fatal. The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive.
>
> We also find that the victim was helpless. Defendant held a knife to the victim's throat and forced her into the car. She was unarmed and partially clothed, with no means of escape. In the car, defendant was on top of her, abusing and stabbing her. The victim was unable to resist defendant's attack. Finally, the murder was senseless. A murder is senseless when it is unnecessary to achieve the killer's goal. *State v. Ross*, 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994). Defendant's apparent goal was to be paid back for the money he wasted on the bad drugs. Killing the victim was unnecessary to accomplish this goal and in fact, ensured that he would neither be paid back, nor find out the identity of the drug dealer. In total, the record overwhelmingly supports a finding of heinous and depraved conduct.

*Id.* at 68, 932 P.2d at 1339.

Though the "dead but warm" statement factored significantly into the trial court's

- 38 -

finding of depravity, it was not the only evidence the court found that demonstrated depravity. Other evidence of depravity included: "that the infliction of death encompassed gratuitous violence, in that more than 40 wounds were inflicted on the victim, which was a far greater number than necessary to cause death," the killing was senseless "in that there was no need to kill the victim under the circumstances," and the victim was "helpless, and could not resist the attacks of the defendant and the codefendant in any way." (Doc. 403-2, Ex. 20 at 6–7.) These additional circumstances by themselves fully support the (F)(6) finding of depravity.

Detrich asserts that the gratuitous violence finding, based entirely on the number of wounds, is at odds with caselaw holding that a finding of especial heinousness and depravity must be based on the mental state of the defendant. (*See* Doc. 439 at 33.) (citing *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983); *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980)). Detrich's cited authority does not support his argument. In *Gretzler*, the court considered the number of times a defendant wounded a victim "for no apparent reason" to be an indicator of gratuitous violence. *Id.* at 52, 659 P.2d at 11. The court reiterated that a "defendant's conduct in continuing his barrage of violence, inflicting wounds and abusing his victims, beyond . . . even the point necessary to kill, is such an additional circumstance of a . . . depraved nature so as to set it apart from the usual or the norm." *Id.* (citing *State v. Ceja*, 126 Ariz. 35, 40, 612 P.2d 491, 496 (1980) (internal quotations omitted)).

Gratuitous violence can be established by evidence of the perpetrator "as reflected in his words *and actions*." *Clark*, 126 Ariz. at 436, 616 P.2d at 896 (emphasis added). Here, as the trial court found, Detrich's actions in inflicting a number of wounds far greater than necessary to cause death supports a finding of gratuitous violence. Detrich's argument that the crime was a result of his brain damage, neurological deficits, and PTSD causing an inability to curb his impulses, change course of action midstream, and appreciate the consequences of his actions, rather than a depraved mind, is unsupported by the record. As this Court previously concluded, "[Detrich] has no history of violence or evidence that

1    impairments [causing impulsivity] cause aggression, the crime was not impulsive, and the

2    experts agree that [Detrich] is largely cognitively normal." (Doc. 260 at 33.)

3    　　　Moreover, even without a finding of depravity, the (F)(6) factor was established by

4    the cruelty of the murder. Even if one prong of the (F)(6) aggravating factor is rebutted,

5    Arizona law indicates that the finding of either especial cruelty or especial depravity alone

6    will establish the (F)(6) factor. *See, e.g., State v. Djerf*, 191 Ariz. 583, 597, 959 P.2d 1274,

7    1288 (1998) ((F)(6) factor upheld based on cruelty alone without considering validity of

8    depravity finding); *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996) (same);

9    *State v. Roscoe*, 184 Ariz. 484, 500–01, 910 P.2d 635, 651–52 (1996) (upholding (F)(6)

10   factor based on cruelty after invalidating depravity finding); *State v. Bolton*, 182 Ariz. 290,

11   312, 896 P.2d 830, 852 (1995) ((F)(6) factor upheld based on cruelty alone without

12   considering depravity finding).

13   　　　The Arizona Supreme Court confirmed that the murder was "without a doubt"

14   especially cruel. *Detrich II*, 188 Ariz. at 67, 932 P.2d at 1338.

15   　　　　We find overwhelming evidence that the victim was conscious throughout

16   　　　much of the crime. Witnesses testified that the victim looked terrified as

17   　　　defendant dragged her to the car. The pathologist testified that the victim
         suffered numerous cutting wounds over her hands, which are consistent with

18   　　　defensive-type injuries one would sustain while trying to fend off an attacker.
         After her throat was slit, she attempted to answer defendant's questions, but

19   　　　was able only to gurgle in response. The defense contends that her gurgling

20   　　　may have been merely reflexive breathing. However, her gurgling was heard
         only after questions were posed to her.

21   　　　　We find that the victim suffered physical pain. She suffered forty cutting and

22   　　　stab wounds about her face, hands, chest, neck, abdomen, and thigh. This
         includes a deep cutting wound that stretched across the victim's neck from

23   　　　ear to ear, cutting through the voice box, the esophagus, and into the cerebral
         column. Furthermore, she suffered blunt force injuries, including bruises on

24   　　　her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth.

25   　　　She must have suffered excruciating pain before she died.

26   　　　　We also find that the victim suffered mental distress. Mental distress includes
         uncertainty as to one's ultimate fate. *State v. Lopez,* 175 Ariz. 407, 411, 857

27   　　　P.2d 1261, 1265 (1993). Witnesses testified that defendant held a knife to the
         victim's neck, told her that he was going to kill her, and dragged her to the

28   　　　car. During this time, the victim had "terror" and "fear" in her eyes. Anyone

1

2

in the victim's situation would have been uncertain as to his or her ultimate fate. Thus, this murder was especially cruel.

3

*Id.* at 67–68, 932 P.2d at 1338–39.

4

5

6

7

The Arizona Supreme Court further determined that the finding of cruelty, by itself, was sufficient to satisfy the (F)(6) factor. *Id.* at 68; 932 P.2d at 1339. The court described the evidence supporting the aggravating factor as "substantial and horrific." *Id.* at 69, 932 P.2d at 1340.

8

9

10

11

12

13

14

15

16

17

18

19

There is no reasonable probability, given the other evidence of depravity and the overwhelming evidence of cruelty, that had trial counsel successfully suppressed Charlton's statement that he raped the victim post-mortem, or suppressed or cross-examined Charlton on the "dead but warm" statement, that Detrich would have received a life sentence. The mitigating evidence was not especially powerful. The trial court found, as statutory mitigation, that Detrich's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired but not so impaired as to constitute a defense to prosecution under A.R.S. § 13-703(G)(1). (Doc 403-2, Ex. 20 at 7–8.) As relevant nonstatutory mitigating circumstances, the trial court found Detrich came from an abusive background, including both physical and mental abuse, felt some remorse for the killing, and had a longstanding history of alcohol and drug abuse. (*Id.* at 9.)

20

21

22

23

24

The Arizona Supreme Court did not discuss independently each mitigating factor found by the sentencing court but determined that when the mitigation was balanced against the circumstances of the singular aggravating factor it was not sufficient to warrant leniency. *Detrich II*, 188 Ariz. at 69, 932 P.2d at 1340. There is no reasonable probability that suppression of the statements would have resulted in a different outcome.

25

26

27

28

Nor is there a reasonable probability of a different outcome if counsel had investigated the benefit Charlton hoped to receive in exchange for testifying at the second trial because Detrich has failed to demonstrate any prejudice from this alleged failure. Specifically, there is no evidence that Charlton received, or expected to receive, any

additional benefit from any state actor, in fact, the evidence is to the contrary.

In sum, Detrich's allegations made for the first time in his Supplemental Brief—that he was prejudiced by counsel's failure to move to suppress or impeach Charlton based on statements he first made in his second interview—are outside the scope of this remand. Even if they were not, however, the Court finds he was not prejudiced by counsel's failure to move to suppress or impeach Charlton based on these statements. First, Charlton did not testify that Detrich raped Souter after her death. Second, though the "dead but warm" statement was taken into consideration by the trial court in imposing Detrich's death sentence, there is no reasonable probability of a different outcome had the statement been suppressed or had Charlton been cross-examined on the statement. The remaining (F)(6) factors demonstrating depravity and cruelty are substantial. The court has considered the totality of the available evidence, both that adduced at trial and in subsequent proceedings,[19] weighed it against the aggravating factor, and determined that there is not a reasonable probability that the sentencer, presented with that evidence, "would have recommended a sentence of life instead of death." *See Andrews*, 944 F.3d at 1108 (quoting *Wiggins*, 539 U.S. at 537).

### c. Failure to investigate Charlton's racist beliefs and Aryan Brotherhood connections

Detrich alleges that his trial counsel was ineffective for failing to interview or investigate Charlton and for failing to investigate witnesses, such as Charlton's cellmates, to get information about other confessions Charlton may have made, Charlton's racism, and his connections to the Aryan Brotherhood. (Doc. 31 at 35–36.) Detrich asserts counsel's alleged deficiency resulted in counsel's "failure to prove the fact that Charlton killed the victim spurred on by a racist hatred." (Doc. 31 at 37.)

James Williams, the defense investigator, stated in a post-trial affidavit:

I was not asked by defense counsel to pursue or conduct interviews of witnesses pertaining to the issue of [Charlton's] involvement with the Aryan

---

[19] Including subsequent proceedings in this Court. (*See* Doc. 260.)

> Brotherhood; I believe this was important since [Charlton] was known to be involved with the Aryan Brotherhood, and have a hatred of African-Americans, whereas Mr. Detrich did not have such a hatred; the victim in this matter was African-American.

(Doc. 403-5, Ex. 45 at ¶4.)

Detrich cannot demonstrate he was prejudiced by his counsel's alleged failure to investigate Charlton's involvement with the Aryan Brotherhood because he has not demonstrated that Charlton was involved with them at the time of the offense. Though Detrich submitted a declaration from Charlton in these proceedings, it is silent on the subject. (Doc. 403-5, Ex. 16.) Although his investigator, James Williams, stated in his 1999 declaration that Charlton was "known to be involved with the Aryan Brotherhood," he did not identify the source of that knowledge. (Doc. 403-5, Ex. 45 at ¶ 4.) In an interview with Williams conducted by Detrich's federal habeas counsel, Williams indicated the information was provided by Charlton's wife, Deborah. (*Id.*, Ex. 38 at 6.)

But counsel presented evidence of Charlton's racism at trial, through Deborah's testimony. Deborah testified that Charlton did not like black people and called them "mud ducks." (RT 12/15/94 at 143.) In his 1990 testimony, which was read to the jury at Detrich's 1994 trial, Shell stated that Charlton called Detrich a "Nigger lover" and called the victim a "black bitch." (RT 11/1/90 at 58.) Thus, the jury and the sentencing judge heard evidence that Charlton was racist.

In these supplemental proceedings, Detrich has submitted a signed declaration from Charlton's former brother-in-law, John Hershiser, in which Hershiser states he would have provided information to Detrich's defense team if asked. (Doc. 403-5, Ex. 46 at 3.) As to the information he would have provided, Hershiser's declaration is vague and not very persuasive; he states only that "[Charlton] said racist things about blacks and Mexicans," but Hershiser was not sure that Charlton even "realized he was prejudiced." (Doc. 403-5, Ex. 46 at 2.) Hershiser's recollection of Charlton's racist statements is much less persuasive evidence of motive than Deborah's allegations that Charlton didn't just say racist things, but actually disliked black people.

Further, Hershiser admits he was contacted by a defense investigator in 1990. (*Id.* at 2.) He does not explain whether he shared this information at the time, or, if he did not, why he failed to do so. Even assuming Higgins was ineffective in failing to reinvestigate Hershiser before the 1994 trial, Hershiser's declaration is cumulative to and less persuasive than the evidence of Charlton's racism that counsel presented at trial. The largely cumulative nature of the evidence offered about Charlton's racism diminishes the likelihood of prejudice. *See Wong*, 558 U.S. at 22–23 (finding no prejudice where additional evidence was cumulative to that presented at trial); *Leavitt v. Arave*, 646 F.3d 605, 615 (9th Cir. 2011) (" [C]umulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing." ); *Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011) (finding no prejudice despite the fact that new evidence " exceed[ed] what was uncovered and presented by trial counsel"  in part because " much of the newly adduced evidence [wa]s cumulative" ).

Detrich also cites Charlton's declaration stating that Charlton wrote a letter to the victim's family in 1990 or 1991 and gave the letter to his attorney for delivery. (Doc. 403-2, Ex. 16 at ¶ 9.) Charlton states that the letter included a poem that "went something like, 'She used to shuck and jive, now she has no time.'" (*Id.*) He does not, however, explain how counsel could have discovered this evidence of Charlton's racism in 1994. Although Charlton provided a declaration in 2015, there is no reason to believe he would have been as cooperative in 1994, when he was in prison and Detrich was accusing him of the murder. In any event, the letter would have been merely cumulative to the evidence of Charlton's racism that was presented. *See Wong*, 558 U.S. at 22–23.

Detrich has failed to establish a reasonable probability that the court would have given Detrich a life sentence had Hershiser testified or had the letter been presented at trial. The Court agrees with J. Graber's dissent, explaining that "[g]iven that counsel introduced ample evidence of Charlton's racism and that it was only one piece of a much larger strategy to impeach Charlton's testimony, neither deficient performance nor prejudice can be attributed to counsel's failure to produce more such evidence." *Detrich V*, 740 F.3d at

1271 (Graber, J., dissenting).

Further, as discussed above, there is no reasonable probability a sentencer would not have found the F(6) factor satisfied and substantially aggravating regardless of Detrich's direct involvement in murdering the victim because the murder remains, without a doubt, especially cruel. Under Arizona law, the especially cruel factor is not dependent on Detrich's state of mind while murdering the victim, but on whether the victim consciously suffered physical pain or mental distress. *See Amaya-Ruiz*, 166 Ariz. at 177, 800 P.2d at 1285.

### d. Failure to obtain prison records

Detrich contends that his counsel should have obtained Charlton's prison records to discover inmates to whom Charlton may have confessed that he had murdered the victim. (Doc. 403 at 59–60.) This claim was not presented in the Amended Petition and is not before the Court. Moreover, even if the Court considered the new evidence, Detrich must also demonstrate that, had counsel investigated further, he would have discovered evidence that was reasonably likely to result in a life sentence. He has not done so and cannot overcome the procedural default of this claim.

### e. Failure to investigate violent tendencies

Had trial counsel investigated Charlton or the people who knew him, Detrich alleges he would have discovered evidence of Charlton's violent tendencies and mental instability. (Doc. 403 at 58–59.) This claim also was not raised in the Amended Petition. Moreover, even if the Court considered the new evidence, Detrich must also demonstrate that, had counsel investigated further, he would have discovered evidence that was reasonably likely to result in a life sentence. He has not done so and cannot overcome the procedural default of this claim.

Detrich submitted an unsigned declaration from Maxine Shaffer, Charlton's former girlfriend, stating that Charlton hung multiple nooses from the pipes of her basement and had a toolbox with "Satan is Lord" written on it. (Doc. 403-5, Ex. 47 at ¶ 7.) As Respondents contend, correctly, this is not evidence of violent tendencies, per se.

1    Moreover, although Shaffer did sign a declaration stating she agrees the unsigned

2    declaration is true and correct, she would not sign the declaration because she is afraid of

3    Charlton. (Doc 403-5, Ex. 47, Attachment at 1.) In doing so she also crossed out a line in

4    the declaration that if she "had been asked to testify to the things I have stated in this

5    declaration, I would have done so." (Doc. 403-5, Ex. 47 at 3.) Thus, there is no reasonable

6    probability of a different outcome at trial if counsel had investigated because Shaffer would

7    not have testified favorably at Detrich's trial.

8         Detrich also asserts that Charlton's violent tendencies were corroborated by an

9    email from Charlton's ex-wife, Deborah, in which Deborah asks current counsel not to

10   contact her and states, "The most I can tell you is [Charlton] could just as well killed that

11   woman if he was drunk or high." (Doc. 403 at 59) (citing 403-5, Ex. 48.) Charlton's wife

12   was not present during the murder. Nor was she relating any confession or other

13   information Charlton gave her. In any event, Deborah testified at Detrich's trial that

14   Charlton carried a pocketknife and a larger knife and had "almost like an obsession with

15   Bruce Lee" and martial arts. (RT 12/15/94 at 142.) She also testified that Charlton had a

16   drinking problem but had never experienced blackouts, contrary to Charlton's testimony

17   (*id*. at 142–43), and that although Charlton had threatened her with a knife once, he did not

18   injure her, and she did not consider him to be violent. (*Id*. at 152–54.) Thus, Deborah's

19   current claim that Charlton "could just as well killed that woman" contradicts her testimony

20   at trial. Deborah's unsworn supposition years later that Charlton *could have* murdered

21   Souter does not rebut the presumption that counsel acted reasonably in investigating this

22   case. Nor is it sufficient to establish prejudice.

23                    *f.   Failure to present evidence that Charlton was a known liar*

24        Detrich contends that counsel should have presented evidence that Charlton was a

25   "known liar." (Doc. 403 at 60.) Detrich did not present this claim in his habeas petition.

26   Thus, it is not among the claims found defaulted by this Court and remanded by the Ninth

27   Circuit, and this Court will not consider it.

28        Even if the Court considered it, the new evidence Detrich cites in support of this

1    claim—a declaration by Hershiser that he told his superior officer he was using drugs to

2    get out of boot camp (Doc. 403-5, Ex. 46 at ¶4), and his former employer Betty Cate's

3    declaration that Charlton "bragged" to make himself look better (Doc. 403-5, Ex.49 at

4    ¶22)—do not establish that Charlton was a liar.

5                            *g.  Conclusion*

6            As discussed above, the Court lacks jurisdiction to consider allegations presented

7    for the first time in Detrich's Supplemental Brief. Further, Detrich has failed to demonstrate

8    prejudice from counsel's alleged failure to investigate Charlton. Accordingly, even if the

9    Court could consider the claim, Detrich has not established cause, under *Martinez*, to

10   excuse the procedural default of this claim.

11              **2.  Failure to investigate William Carbonell**

12           In the Amended Petition, Detrich asserted that evidence of William Carbonell's

13   dishonesty and his motivation to provide evidence for the prosecution was available to trial

14   counsel, had counsel bothered to conduct a basic investigation. Specifically, Detrich

15   asserted counsel failed to: (1) interview or investigate Carbonell, (2) cross-examine

16   Carbonell on a "glaring inconsistency" in his testimony or (3) file pretrial motions on the

17   critical issue of Carbonell's arrest records. (*Id.* at 32, 44.)

18                   *a.  Failure to interview or investigate Carbonell*

19           In his Supplemental Brief, Detrich alleges that trial counsel was ineffective for

20   failing to conduct a basic investigation and discover "impeachment evidence of Carbonell's

21   dishonesty and his motivation to provide evidence for the prosecution." (Doc. 403 at 70.)

22   Detrich asserts that Carbonell was an interested witness because he was very close to

23   Charlton and believed he would receive a monetary benefit for testifying for the

24   prosecution. (*Id.*, citing RT 12/20/94 at 3, 8, 12–14.)

25           First, Detrich asserts that Carbonell was "predisposed" to testify in favor of Charlton

26   because the two were "drinking budd[ies] from work." (*Id.*) But the jury heard that

27   Carbonell worked with Charlton and Detrich and spent time socially with Detrich. (RT

28   12/14/94 at 160.) Carbonell was drinking with both men at a bar in Benson on the Saturday

1    before Charlton and Detrich came to Tucson and picked up the victim. (RT 12/14/94, at

2    160–62.) Detrich does not suggest what additional evidence should have been presented to

3    establish a friendship between Carbonell and Charlton. Thus, even if this demonstrated

4    deficient performance, Detrich fails to establish any prejudice from this failure.

5         Second, Detrich suggests that Carbonell would have lied to help the prosecution in

6    an effort to have his car returned to him—the car in which Souter was murdered. (Doc. 403

7    at 70.) Carbonell testified that Charlton still owed him $250 for the car. (RT 12/14/94 at

8    162, 179.) Although trial counsel did not present evidence that Charlton was still trying to

9    have the car returned to him, he did ask him whether the timing of his call to the police had

10   anything to do with collecting his money from Charlton, and he also elicited that Carbonell

11   hoped to receive a reward for the information he supplied to police. (RT 12/20/94 at 13–

12   14.) Given that the jury apparently believed Carbonell's testimony even after hearing he

13   was trying to recover a reward, there is no reasonable probability Detrich would have

14   received a life sentence if the sentencer knew Carbonell was trying to recover from the

15   police the car he sold to Charlton.

16                    *b.  Failure to cross examine Carbonell*

17        Detrich alleged in his Amended Petition that Carbonell gave conflicting statements

18   about the blood pattern evidence in the case, first describing both Detrich and Charlton as

19   "full of blood," then later claiming that Detrich had more blood on him than Charlton.

20   (Doc. 31 at 44) (citing RT 11/1/90 at 21; RT 12/14/94 at 165, 178.) Detrich also claims that

21   Carbonell first said that he surmised who killed Souter from what Charlton told him, but at

22   trial claimed that Detrich confessed to killing Souter. (*Id.*) (citing Doc. 403-5, Ex. 52 at 11;

23   RT 12/14/94 at 166). Detrich argues that counsel was ineffective for failing to cross-

24   examine Carbonell regarding inconsistencies between his pretrial statements and his

25   testimony at trial. (Doc. 403 at 72–73.)

26        First, the Court notes that Carbonell's statements regarding the blood on Detrich

27   and Carbonell are not inconsistent, as one statement is a quantitative description while the

28   other is a comparative one. Moreover, trial counsel did attempt to impeach Carbonell with

his earlier statement by asking Carbonell if he failed to tell the detective the first time he talked to him that one of them had more blood than the other. (RT 12/14/94 at 178–79.) In his opening statement he pointed out that Carbonell first told the police that the two men were drenched in blood, but then testified that Charlton had some blood on him, but not as much as Detrich. (RT 12/15/94 at 132, 136.)

Second, Carbonell testified at trial that Charlton and Detrich came to his house after 4:00 a.m. on the morning of the murder and they were both "covered with blood." (RT 12/14/94, at 163–65.) Initially, Carbonell explained, Charlton and Detrich told him they had been in a fight. (*Id.* at 165–66.) Later, when Charlton was in the bathroom, Detrich confessed to Carbonell that: "he killed a girl. . . . He said he had gone to some house where there was—went to get some drugs, and some bad drugs, and he grabbed the girl out of the house by knife point and jumped in the car and they left. That is when he killed her. (*Id.* at 166.) Carbonell also stated that Detrich said he killed her "[w]ith a knife" and cut her throat. (*Id.* at 166.) Carbonell did not see Detrich again after that. (*Id.* at 169.)

Charlton told Carbonell "approximately the same story." (*Id.* at 167.) Carbonell testified that Charlton returned to his house Sunday night, started crying, and "told him he really killed a girl." (*Id.*) The prosecutor asked if Charlton told Carbonell that "in fact [Detrich] had killed [the victim]?" (*Id.*) Carbonell responded, "Yes, sir. He [,Charlton,] said he was driving the car." (*Id.* at 167–68.)

Detrich contends that counsel should have impeached this testimony with Carbonell's statement in a pretrial interview that he merely "surmised" that Detrich was the killer because Detrich had told him that Charlton was driving the car. (Doc. 403 at 73) (citing Doc. 403-5 Ex. 52, at 10).

In the pretrial interview, Carbonell stated he saw both Charlton and Detrich on Sunday and talked to each of them separately. Charlton told him that he and Detrich killed a girl the night before. (Doc. 403-5, Ex. 52 at 10.) Detrich told him the same thing. (*Id.*)

When asked if Detrich told him if Charlton had anything to do with it, Carbonell explained "he [(Detrich)] didn't say that . . . all he [(Detrich)] said  . . . [was] that [Charlton]

1  was driving the car. So I guess—I just surmised that . . . he [(Detrich] had been the one that

2  cut the girl." (*Id.* at 11.)

3         Later, Sunday evening, Charlton came over to his house, and explained that he and

4  Detrich "killed the girl . . . over a dope deal." (*Id.*) Charlton told him that Detrich dragged

5  the girl into the car, and as Charlton was driving down the road, Detrich "got crazy" and

6  "started cutting the girl up" and they left her body near the airport. (*Id.*)

7         In addressing this issue, the five-judge dissent in *Detrich* noted: "Any inconsistency

8  between [Carbonell's statement that he surmised Detrich had killed Ms. Souter] and

9  Carbonell's testimony at trial is negligible because the earlier statement clearly shows that

10 Carbonell inferred [Detrich's] conduct, at least in part, from what [Detrich] said. It was

11 objectively reasonable for [Detrich's] counsel to avoid further discussion of this apparent

12 confession during the cross-examination of Carbonell." *Detrich V*, 740 F.3d at 1270

13 (Graber, J., dissenting).

14        Detrich has not demonstrated that counsel was deficient in strategically choosing

15 not to emphasize his confession during Carbonell's cross-examination. Nor has Detrich

16 demonstrated he was prejudiced. Trial counsel impeached Carbonell on the fact that he

17 stated in the 911 call that both Detrich and Charlton could be found at their place of work

18 in Benson, although Carbonell knew that Detrich had not been at work during the week

19 after the murder. (RT 12/14/94, at 172–74.) Counsel also emphasized that Carbonell told

20 police that both Detrich and Charlton were "full of blood" and suggested that Carbonell

21 called 911 to collect the money Charlton owed him. (*Id.* at 178–79.) Pointing out any

22 claimed inconsistencies in Carbonell's statements addressing whether Detrich actually

23 confessed to the murder would have merely placed emphasis on both Charlton's and

24 Detrich's accounts of that night, in which both agreed that Charlton was driving while the

25 victim was murdered. Further, at best, any impeachment of Carbonell would have

26 established that Carbonell initially told police that both Detrich and Charlton had

27 committed the murder. (Doc. 403 at 73 (emphasizing Carbonell's statements that Charlton

28 told him both Detrich and he had killed a woman).) Thus, implicating Charlton would not

1    have resulted in a not-guilty verdict for Detrich, nor a reasonable probability of a lesser

2    sentence. Detrich fails to demonstrate cause to excuse the default of this claim.

3                    *c. Failure to discover Carbonell's arrest records*

4    Detrich also contends that trial counsel should have impeached Carbonell's

5    credibility with his statement in a 1990 pretrial interview that he had been arrested for "a

6    couple of fights" with his ex-wife, "no big things," (Doc. 403 at 71) (citing Doc. 403-5,

7    Ex. 52 at 18–19), when in fact his arrest record indicates he had been arrested for criminal

8    assault (knowingly causing physical injury), leaving the scene of an accident (causing death

9    or injury), and driving on a suspended license. (*Id.*) (citing Doc. 403-5, Ex. 53.) In stating

10   that he had been arrested for domestic violence, however, Carbonell was responding to the

11   investigator's questioning about whether he had "any priors—felonies." (*Id.*, Ex. 52 at 18–

12   19.) The investigator had not asked about his arrest record; the context of the question

13   indicates the investigator was asking about any prior felony convictions and Carbonell

14   spontaneously offered the details about his arrest for domestic violence. (*See id.*)

15   There is no reasonable probability that impeaching Carbonell with his incomplete

16   recitation of his arrests four years before his interview in response to a question about his

17   prior convictions would have resulted in a different outcome at sentencing.

18   Detrich also contends that counsel should have discovered that Carbonell stole from

19   his former employers, Betty Cates and Clarence Belville, after he left their employment in

20   1989. (Doc. 403 at 72.) He criticizes counsel for not interviewing Cates to obtain that

21   information. (*Id.*) But even had counsel interviewed Cates and discovered her allegation

22   that Carbonell had stolen from her, this evidence would not have been admissible. *See* Ariz.

23   R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is

24   not admissible to prove specific instances of a witness's conduct in order to attack or

25   support the witness's character for truthfulness."). Even if it had been admissible, this

26   evidence would not have sufficiently discredited Carbonell's testimony to result in a

27   different outcome. Detrich was not prejudiced by his counsel's claimed failure to discover

28   this information about Carbonell.

1

### d.  Conclusion

2    Detrich has failed to demonstrate prejudice from counsel's alleged failure to

3 investigate or impeach Carbonell. Accordingly, Detrich has not established cause, under

4 *Martinez*, to excuse the procedural default of this claim.

5

### 3.  Failure to investigate Detective Downing

6    Detrich contends counsel was ineffective for failing to interview Detective Downing

7 regarding Shell's accusations that "Downing told Mr. Shell to leave town and never come

8 back after Mr. Shell's favorable testimony at Mr. Detrich's 1990 trial." (Doc. 403 at 77;

9 403-1, Ex. 10.) But on the first day of trial, counsel told the court that Shell was unwilling

10 to come to Tucson. (RT 12/13/94 at 3–4.) Counsel's contemporaneous statements to the

11 court do not indicate that Shell told him about any threats by Downing that required

12 investigation. Shell's claim 10 years after the fact that he told counsel of such threats is at

13 best questionable and does not rebut the presumption that counsel acted reasonably. Detrich

14 also contends that counsel should have "investigate[d] Downing by obtaining Downing's

15 internal files to discover if he had been disciplined for other acts in violation of his

16 department's rules and procedures." (Doc. 403 at 77.) Detrich cannot, however, establish

17 any deficient performance or prejudice resulting from this claimed failure. He agrees that

18 he cannot now obtain Downing's internal files because they were destroyed in 2001, five

19 years after Downing left the Pima County Sheriff's Department. (*Id.*; 403-5, Ex. 59.)

20 Therefore, he cannot demonstrate he was prejudiced by counsel's failure to obtain these

21 records.

22

### 4.  Failure to investigate other witnesses

23    Detrich lists the names of 17 people he contends trial counsel performed

24 ineffectively by failing to investigate or interview before trial. (Doc. 403 at 49–50.) With

25 the exception of three of these people (Alan Charlton, William Carbonell, and Detective

26 Downing), however, Detrich fails to identify any information such investigations would

27 have uncovered. As five judges on the en banc panel noted, Tammy Winsett, Gwen and

28 Caprice Souter, and Rondal Bridgemon all testified, and "little or no prejudice resulted

1  from counsel's failure to interview them because those witnesses . . . were effectively cross-

2  examined by defense counsel." *Detrich V*, 740 F.3d at 1269 (Graber, J., dissenting).

3  Further, Gwen and Caprice Souter were the victim's daughters, and Detrich had no right

4  to interview them. *Id.* at 1269 n.8 (citing and A.R.S. § 13–4401(19)). In any event, Detrich

5  identifies no additional information that would have been gleaned from a pretrial interview

6  or further investigation into these witnesses.

7      Regarding Maxine Shaffer, John Hershiser, Ira Flesher, Jerry Reid, Jim Bagley, and

8  Diane Moragi, Detrich did not allege in his Amended Petition that counsel was ineffective

9  for failing to investigate these witnesses. (Doc. 403 at 49–50; Doc. 31, at 43–44 n.9.) Nor

10 has Detrich identified any relevant information that would have been obtained had these

11 individuals been investigated. Detrich submits declarations from Maxine Shaffer and John

12 Hershiser in support of his claim that counsel was ineffective for failing to present evidence

13 that Charlton was a liar and had violent tendencies. (Doc. 403-5, Ex. 46, 47.) The

14 declarations, however, do not in fact support those claims, and testimony from these

15 witnesses would have likely been inadmissible character evidence under Arizona Rule of

16 Evidence 404(b).

17          **5.  Failure to obtain records and evidence**

18      Detrich contends in his Supplemental Brief that trial counsel was ineffective for

19 failing to obtain "the arrest or incarceration records of any witnesses and access to forensic

20 evidence in the custody of law enforcement." (Doc. 426 at 50–51.) Other than with regard

21 to witnesses Carbonell and Charlton, however, Detrich does not identify what arrest and

22 incarceration records counsel should have obtained. Therefore, to the extent Detrich

23 contends that counsel should have obtained records related to any other witnesses, he has

24 failed to establish either deficient performance or prejudice. Likewise, to the extent Detrich

25 contends that trial counsel should have obtained forensic evidence from law enforcement

26 other than that specifically identified in his Supplemental Brief, that claim also fails to

27 establish that counsel performed deficiently or that Detrich was prejudiced.

28

### 6. Conclusion

Detrich has failed to demonstrate prejudice from counsel's alleged failure to investigate or impeach Carbonell. Accordingly, Detrich has not established cause, under *Martinez*, to excuse the procedural default of this claim.

### D. Claim A(5)

Detrich alleges that trial counsel performed ineffectively by failing to investigate or test the physical evidence and seek expert assistance regarding forensic evidence. (Doc. 31 at 45–50.) Respondents contend that *Martinez* does not apply to two subclaims raised in Detrich's PCR, and that three subclaims that were raised for the first time in the Supplemental Brief are not properly before the Court. Respondents argue the remaining allegations of Claim A(5) are without merit.

### 1. Failure to challenge "gurgling" testimony and independently test fingernail evidence

Respondents contend that *Martinez* cannot excuse the procedural default of two A(5) subclaims that were raised in Petitioner's PCR but not fairly presented to the Arizona Supreme Court.

In his Amended Petition, Detrich asserted counsel refused to seek expert assistance regarding forensic evidence, and that an independent pathologist would have testified that, after being stabbed, the victim could not have made gurgling sounds in response to Detrich's questions. (Doc. 31 at 48–49.) Detrich asserted an independent pathologist would have testified that even if Souter did emit a gurgling sound, that sound is "unlikely to be reflective of a conscious attempt to talk." (Doc. 403-2, Ex. 17 at ¶ 15.) Instead, the sound could have been from the involuntary passing or expelling of blood through the airway which may occur "even if a person is unconscious or dead." *Id*. at ¶15(l). The trial court relied on the "gurgling" testimony to demonstrate Charlton's testimony was consistent with the injuries documented in the photographs and autopsy report. The trial court also based its "especially cruel" finding in part on the gurgling testimony.

Detrich argued in his PCR petition that counsel was ineffective for failing to

challenge the State's expert testimony that the victim could have made such sounds after her throat was slit. (Doc. 426-1, Ex. A at 22.) The PCR court rejected the claim, finding Detrich failed to raise a colorable claim and failed to show prejudice because evidence other than Charlton's testimony supported a finding of cruelty at sentencing and "overwhelming evidence" apart from Charlton's testimony supported the finding that Detrich committed the murder. (*Id.*, Ex. C at ¶ 4.)

The second claim Respondents assert was not fairly presented to the Arizona Supreme Court is Detrich's claim that counsel was ineffective for failing to have additional testing performed by an independent expert on a fragment of a fingernail that was identified as coming from the victim. Detrich raised a claim in his PCR that blood on the fingernail was consistent with having come from Charlton, but not Detrich, and alleged trial counsel was ineffective for failing to have further testing performed on the fingernail fragment. (*Id.*, Ex. A at 11.) Testing completed during the PCR proceeding, however, demonstrated the blood had a female profile similar to the victim's. (Doc. 403-2, Ex. 15 ¶ 16.) PCR counsel conceded that trial counsel was not ineffective for failing to have the fingernail tested, and the PCR court dismissed the claim. (*Id.*, Ex. C at 1.) Detrich now asserts that the state expert that performed the testing misread the test results. (Doc. 403 at 25.)

Neither of these claims were raised in Detrich's petition for review to the Arizona Supreme Court. (*See* Doc. 426-2, Ex. D.) As discussed above in addressing Claims A(3) and A(8), the default of claims that were adjudicated on the merits in state court, but were not fully exhausted by being presented in a petition for review, may not be excused under *Martinez*. *See Martinez*, 566 U.S. at 16 (citations omitted). Thus, the Court finds as to these two allegations that Detrich fails to satisfy the *Martinez* framework—his counsel did raise these two parts of Claim A(5) in his initial-review post-conviction proceedings yet failed to raise them in his petition for review, i.e., his appeal of that decision, to the Arizona Supreme Court. The *Martinez* exception, therefore, does not apply to these claims. *See id.*

### 2. Failure to utilize an independent pathologist

In his Supplemental Brief, Detrich contends trial counsel was ineffective for failing

to retain an independent pathologist to (1) show "that the physical evidence is contradictory to Charlton's story about how Ms. Souter obtained her wounds" and "what happened during and after Ms. Souter's death," (2) rebut the state's pathologist's testimony regarding how long Souter would have remained conscious following the infliction of three potentially fatal wounds, the length of time she could have lived given her extensive injuries, and the vitreous level measurements reported, and (3) would have demonstrated that the cause of death could have been a blunt force injury and that Souter's blood could have been further tested for the presence of illicit substances. (Doc. 403 at 30–38.) Detrich failed to raise these claims in his Amended Petition.

Although Detrich argued in his Amended Petition that DNA testing of items in the car "may have revealed the positioning of the individuals in the car, the pattern of bleeding, and nature of Ms. Souter's wounds," he did not raise a claim with regard to counsel's failure to utilize a pathologist to rebut the state pathologist's testimony, demonstrate the cause of death could have been a blunt force injury, or test Souter's blood for illicit substances. (*See* Doc. 31 at 47.)

Therefore, Detrich's claims alleging ineffective assistance of counsel for failing to retain an independent pathologist to rebut physical evidence, other than the gurgling testimony, were not presented in his Amended Petition and were not found procedurally defaulted by this Court. As a result, these claims were not remanded by the Ninth Circuit, and the Court is without jurisdiction to consider them.

### 3. Failure to examine physical evidence and seek out exculpatory evidence

Detrich alleged in his Amended Petition that counsel failed to examine the physical evidence used against him at trial and failed to seek out exculpatory evidence such as the hairs found in the victim's hand or on the victim's body, the knife found at the scene or the knife the prosecution alleged to be the murder weapon, the bloody seat covers or blood pattern evidence from Charlton's car, clothing found in Charlton's car, or the needle and drugs that were used at the victim's house. (Doc. 31 at 45–48.)

In his Supplemental Brief, Detrich contends that trial counsel was ineffective for failing to have one of the knives in Charlton's possession at the time of his arrest tested for the presence of blood (Doc. 403 at 40–41) and failing to examine or conduct DNA testing on the hairs found on Souter's body (*id.* at 41–42), a "reddish brown spot" on the passenger side door of Charlton's car (*id.* at 43–44), and vaginal swabs taken from the victim (*id.* at 44).

Respondents assert that Detrich could have, but has not, taken advantage of specific provisions in state law that have existed since 2000 to permit a defendant to "request the forensic [DNA] testing of any evidence that is in the possession or control of the court or the state, that is related to the investigation or prosecution that resulted in the judgment of conviction, and that may contain biological evidence." (Doc 426 at 59) (citing A.R.S. § 13–4240(A)). Thus, Respondents argue, he cannot establish he was prejudiced by counsel's failure to request such testing. Respondents also argue that each specific allegation is meritless. (Doc. 426 at 59–63.)

*a.  Charlton's knives*

Detrich contends that "consultation, investigation, or testing . . . could have revealed that one of the knives found in Charlton's possession was used to attack Ms. Souter." (Doc. 403 at 40.) Charlton had a knife in his possession at the time of his arrest, the "FTW" pocketknife, or Trial Exhibit F, and another was recovered from his residence, the "Gerber" sheath knife, or Trial Exhibit M. (Doc. 403 at 40; Doc. 403-2, Exs. 23–26.)

Dr. Thomas Henry, the state's pathologist, testified that the knife found on Detrich at the time of his arrest, Trial Exhibit 1, was not the murder weapon because it was almost twice as wide as Souter's wounds. (RT 12/14/94 at 122); *see Detrich*, 740 F.3d at 1252. Dr. Henry testified that the FTW knife was more consistent with Souter's wounds than the knife found on Detrich but was "still a little on the wide side, and [he would] expect [the murder weapon] to be a little bit narrower than that." (*Id*. at 122–23) (identifying Trial Exhibit F as Charlton's knife).)

Detrich now contends that the Gerber sheath knife and the FTW pocketknife should

have been tested for the victim's blood. (Doc. 403 at 41.) Detrich contends, based on the declaration of his expert, Dr. Norah Rudin, that even if the FTW pocketknife had been cleaned, it is possible small amounts of blood remained in the crevices, and, along with the Gerber sheath knife, could have been tested for latent blood, which, if present, could have been tested for DNA using technology available in 1994.[20] (Doc. 403, Ex. 15.) Based on this record, Detrich cannot establish that counsel performed ineffectively by failing to investigate and present expert testimony about testing of the knives. Speculation about the results unidentified experts could have obtained is insufficient to establish prejudice. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (acknowledging that conjecture that a favorable expert might have been found cannot establish prejudice); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (concluding that speculation about how an expert might have testified is not enough to establish prejudice).

But, even had the knife been tested and Souter's blood found on it, this would not have added significantly to Detrich's defense. Although Dr. Henry testified that the FTW pocketknife matched the victim's wounds more closely than the knife in Detrich's possession, he still expressed doubt that the FTW pocketknife could have been the murder weapon. (RT 12/14/94, at 122–23.) Further, the knife Detrich had when he was arrested was tested for blood evidence but, although testing showed evidence of blood on the knife, there was not a large enough sample to test for blood type, or even to identify the blood as human. (Doc. 403 Ex. 28, at 8–9.) Given that Charlton's knives also apparently had no visible traces of blood on them, testing them likely would have yielded the same result.

Additionally, even if counsel could have demonstrated that the victim's blood was on Charlton's knife, this would not have changed the outcome given that Detrich's counsel established that the knife found on Detrich could not have been the murder weapon and Detrich has not established that the knives found on Charlton could have been the murder

---

[20] Detrich's counsel assert they have requested microscopic and DNA testing of the knives and will supplement with the results of this testing as it becomes available. (Doc. 403 at 44.) To date, no supplement has been provided.

weapon. Detrich has not shown he was prejudiced by counsel's failure to have other knives tested.

### b.  Hairs

Detrich contends his trial counsel was ineffective for failing to have hairs collected from Souter's body "macroscopically or microscopically examine[d] or conduct DNA testing on the hair." (Doc. 403 at 41.) Specifically, Detrich contends that two hairs, identified as items V-12 and V-13, collected from the victim's pubic area should have been tested. (*Id.*) Item V-12 was a pubic hair pulled from the victim. (Doc. 403-4, Ex. 27 at 1.) Item V-13 was a hair combed from the victim's pubic area. (*Id.* at 2.) Neither V-12 nor V-13 was among the hairs examined by criminalist Deborah Friedman. (Doc. 426-4, Ex. J (identifying hairs V-1, W-4, W-2, W-3, and H-4 as being examined).) Nevertheless, Detrich has not demonstrated that trial counsel was ineffective for failing to request any hairs to be tested.

In her interview before Detrich's second trial, Friedman stated that, "[i]n terms of DNA, I don't think it's on-line yet for hair analysis. It's still the basic microscopic, macroscopic exam." (Doc. 403-4, Ex. 28 at 18.) Detrich's counsel could not have been deficient in failing to request testing that was not yet available. Nor has Detrich demonstrated prejudice. Even if testing was available that could have identified the hairs found on the victim's body as Charlton's, Detrich has not established any prejudice because he has not conducted further macroscopic or microscopic testing on the hairs to determine their source.

### c.  Spot on passenger door.

Detrich contends his trial counsel was ineffective for failing to have a "reddish brown spot" on the passenger door of the car tested for DNA. (Doc. 403 at 43.) Although the evidence showed that Souter was stabbed in the car and bled to death in the front seat, Detrich believes that this single spot may be Charlton's blood and, if it is, that the blood came from scratches on his left arm.

Charlton testified that the front passenger side door "was covered in blood" and he

washed it out with a sponge. (RT 12/15/94 at 34.) Additionally, "half the windshield was covered [in blood] and half of the dash was covered [in blood]." (*Id*. at 35.) There is no reason to believe, given the quantify of blood in the interior of the car, that testing would have revealed Charlton's blood in the car. Even if it did, it says nothing about when the blood was deposited on the door or how he received the injuries to his arm as it could have been deposited at any time before or after the offense, including when Charlton was cleaning the car. Detrich's claim is highly speculative, and he has failed to demonstrate he was prejudiced by counsel's alleged failure to test the reddish-brown spot for DNA.

Detrich further asserts that evidence of Charlton's blood on the passenger door would have impeached Charlton's testimony that Detrich poked Charlton with the knife while Charlton was driving, because Charlton had scratches on his left arm and not his right. (Doc. 403 at 43.) But Charlton testified that, although he was poked with the knife, he was not injured. (RT 12/15/94 at 65–66.) Therefore, demonstrating that his blood was on the door would not have refuted his testimony that Detrich "poked" him in his right arm. Further, Charlton never asserted that the scratches on his left arm were sustained that night. Given that Detrich has not sought to test this spot himself, he cannot demonstrate that trial counsel was ineffective for failing to have a spot on the passenger door tested for DNA evidence, and post-conviction counsel was not ineffective for failing to raise this meritless claim.

### d.  Vaginal swabs

Detrich also appears to contend that counsel was ineffective for failing to have vaginal swabs taken from Souter tested for Charlton's semen. He presents no argument on this claim, contending only that "if the vaginal swabs contain Charlton's semen," this evidence would have contradicted Charlton's testimony. (Doc. 403 at 44.) But the vaginal swabs were tested and showed no semen was present. (RT 12/14/94 at 105; *see* Doc. 426-4, Ex. J (stating no semen found on oral, anal, or vaginal swabs).) Trial counsel was not deficient in failing to test the vaginal swabs for semen, as testing that was conducted revealed no semen.

Detrich suggests that, at the time of his post-conviction proceeding, testing was available that would "potentially identify a male profile even in the absence of semen." (Doc. 403 at 24 n.4.) But Dr. Rudin's declaration, which Detrich cites for this claim, states that testing, specifically Y-STR systems, is *currently* sensitive enough to "detect a male profile in the absence of detected semen." (Doc. 403 Ex. 15, at ¶ 17.) Dr. Rudin states that "no DNA testing was performed [in 1990] because no result would have been expected using the technology available at the time." (*Id.*) Dr. Rudin also states that "*[e]arly* Y-STR systems were available in 2001," (*id.* at ¶ 16) (emphasis added), but that the current Y-STR systems are much more sensitive and discriminating than the system available in 2001. Dr Rudin's declaration does not establish that testing was available in 2001 that would have identified a male profile even in the absence of semen. Even if such testing was available by the time of Detrich's post-conviction proceeding, trial counsel could not have been ineffective for failing to request testing that was not available at that time, and post-conviction counsel was not ineffective for failing to assert such an ineffectiveness claim.

### e.  Conclusion

In sum, Detrich has failed to demonstrate prejudice from counsel's failure to request forensic testing of the items discussed above. Detrich has failed to show how trial counsel's deficient performance resulted in a failure to present "stronger evidence" that Charlton, rather than Detrich, killed Souter. *See Detrich V*, 740 F.3d at 1249.

### E.  Claim A(10)

Detrich alleges he was prejudiced by trial counsel's multiple omissions and failures at the guilt phase of trial. (Doc. 31 at 52.) He contends that, had counsel "investigated sufficiently and formed a reasonable theory of defense, he would have negated core components of the State's case and filled evidentiary voids in the record." (*Id.*) He claims prejudice is established because he has demonstrated that "adequate pretrial preparation and investigation would have produced a conviction of a lesser degree of homicide." (*Id.* at 53.)

Detrich asserts the cumulative effect of counsel's multiple errors was "devastating." (Doc. 403 at 94.) He contends there is a reasonable probability that, but for counsel's errors, the jury would have acquitted him of premeditated murder, the judge would not have found the (F)(6) aggravator established beyond a reasonable doubt, and he would not have been sentenced to death.

Respondents argue that, because the Arizona Supreme Court did not recognize the "so-called cumulative error doctrine" at the time of Detrich's trial and post-conviction proceedings, any post-conviction claim of cumulative ineffective assistance would have been rejected. Thus, Respondents assert, PCR counsel was not ineffective for failing to present such a claim and *Martinez* does not permit this Court to excuse the default of that claim. (Doc. 426 at 64) (citing *State v. Hughes*, 193 Ariz. 72, 78, 969 P.2d 1184, 1190–91, (Ariz. 1998), and *State v. Dickens*, 187 Ariz. 1, 21, 926 P.2d 468, 488 (Ariz. 1996) ("We reiterate the general rule that several non-errors and harmless errors cannot add up to one reversible error.")).

The Court need not resolve the issue of Claim A(10)'s procedural status because it is plainly meritless. *Cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."). "Procedural bar issues are not infrequently more complex than the merits issues . . . , so it may well make sense in some instances to proceed to the merits if the result will be the same." *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." ); *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state

1    of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA

2    can ever succeed in showing that the state court's decision on the merits was contrary to or

3    an unreasonable application of clearly established law" ).

4        Detrich asserts that in *Strickland*, 466 U.S. at 695–96, the Supreme Court applied a

5    cumulative prejudice analysis by considering the "totality of the evidence" when assessing

6    claims of ineffective assistance of counsel at trial. (Doc. 439 at 86.) According to Detrich,

7    this "totality of the evidence" standard was extended to sentencing claims in *Williams*

8    *(Terry)*, 529 U.S. at 397–98, and is applied by the Ninth Circuit in evaluating IAC claims

9    as set forth in *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir 1992). (Doc. 439 at 86–87).

10        To the extent Detrich urges the Court to apply a "totality of the evidence" standard

11    in assessing prejudice, the Court agrees this is the applicable standard as described by the

12    Supreme Court in *Strickland* and *Williams (Terry)* for analyzing IAC claims. For purposes

13    of analyzing Detrich's claims, the Court has considered the merits of several claims from

14    his Amended Petition, not otherwise prohibited from review in this remand, and, presuming

15    counsel's deficient performance, found no prejudice.[21]

16        The Ninth Circuit has held that in some cases, although no single trial error is

17    sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

18    nonetheless prejudice a defendant to such a degree that his conviction must be overturned.

19    *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds*

20    *by Slack v. McDaniel*, 529 U.S. 473 (2000). However, even if the Court presumes

21    constitutionally deficient performance in the claims listed above and applies a totality of

22    the evidence standard to all the allegations of prejudice, there is still not a reasonable

23    probability of a different outcome at sentencing. Detrich's allegations of prejudice are

24    _____

25        [21] Claim A(1) and A(4) (incoherent defense (*supra* at 31), benefits from plea deal

26    (*id.* at 36), involvement with the Aryan Brotherhood (*id.* at 43–45), failure to interview,
      investigate, cross examine or impeach Carbonell (*id.* at 47–52), failure to investigate

27    Detective Downing (*id.* at 52), failure to investigate other witnesses (*id.* at 53), failure to
      obtain records and evidence (id. at 53–54)), and Claim A(5) (failure to examine physical

28    evidence and seek out exculpatory evidence (*id.* at 56–61)).

- 63 -

conclusory and/or speculative, as this Court found in considering Detrich's claims on the merits. *Supra* at 31, 36, 43, 48, 52, 53, 57, 59, 60. The only claim supported by more than conclusory evidence of prejudice is the allegation that counsel failed to interview, investigate, cross-examine, or impeach Carbonell. For the reasons stated above, however, this claim is meritless. Thus, Detrich has failed to demonstrate any prejudice, individually or cumulatively, that would support a finding of a reasonable probability of a different outcome. *Mancuso*, 292 F.3d at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate to [the] level of a constitutional violation."); *see, e.g.*, *Morris*, 677 F.3d at 1132 ("[N]one of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Detrich, the claim of cumulative prejudice is meritless. Claim A(10) is denied.

## F. Evidentiary development

Detrich requests evidentiary development with respect to the remanded claims. He seeks discovery, an evidentiary hearing, and expansion of the record under Rules 6, 7, and 8 of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

The claims for which Detrich seeks evidentiary development were not presented in state court. Therefore, the Court's "'discretion . . . to consider new evidence' . . . is instead cabined by the requirement in § 2254(e)(2) that the petitioner must have attempted 'to develop the factual basis of [the] claim in State court.'" *Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir. 2011) (quoting *Pinholster*, 563 U.S. at 186).

Under § 2254(e)(2), a federal court may not hold an evidentiary hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court. *See Williams (Michael)*, 529 U.S. at 432. If the failure to develop a claim's factual basis is attributable to the petitioner, the court may hold a hearing only if the claim relies on (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (2) "a factual

1    predicate that could not have been previously discovered through the exercise of due

2    diligence." In addition, "the facts underlying the claim [must] be sufficient to establish by

3    clear and convincing evidence that but for constitutional error, no reasonable fact finder

4    would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. §

5    2254(e)(2).

6        Section 2254(e)(2) limits a petitioner's ability to expand the record through a Rule

7    7 motion to the same extent that it limits the availability of an evidentiary hearing. *See*

8    *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005), *overruled on other*

9    *grounds by Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016); *Holland v. Jackson*, 542 U.S.

10    649, 652–53 (2004) (per curiam). Accordingly, a petitioner who seeks to introduce new

11    affidavits and other documents never presented in state court must demonstrate diligence

12    in developing the factual basis in state court or satisfy the requirements of § 2254(e)(2).

13        Detrich contends that the failure to develop the factual basis of these claims resulted

14    from the ineffective assistance of PCR counsel. (*See, e.g.*, Doc. 23 at 22.) This argument

15    is foreclosed by the Supreme Court's recent decision in *Ramirez*, which held that "under §

16    2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise

17    consider evidence beyond the state-court record based on ineffective assistance of state

18    postconviction counsel." *Ramirez*, 142 S. Ct. at 1734. According to *Ramirez*, a petitioner

19    is at fault when PCR counsel is negligent in developing the record, and therefore "a federal

20    court may order an evidentiary hearing or otherwise expand the state-court record only if

21    the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 1735.

22        Detrich does not attempt to meet those standards. The claims for which he seeks

23    evidentiary development do not rely on a new, retroactive rule of constitutional law. Nor

24    do they rely on a factual predicate that could not have been discovered previously through

25    due diligence. Accordingly, the Court denies Detrich's request for evidentiary

26    development.

27        Respondents, however, do not object to expansion of the record to include the

28    exhibits attached to Detrich's supplemental brief. Accordingly, the record is expanded to

1    include the exhibits attached to Detrich's Supplemental Brief (Doc. 403-1–6, Exs. 1–74)

2    and Notice of Filing Supplemental Exhibit (Doc. 411-2, Ex. 75). The Court denies

3    Detrich's request for discovery, however, as he has not demonstrated that he "can satisfy

4    § 2254(e)(2)'s stringent requirements," *Ramirez*, 142 S. Ct. at 1735, with respect to any

5    newly discovered evidence of trial counsel's ineffectiveness.

6    **III.   DISCUSSION PART II- *MCKINNEY***

7         While on remand before this Court for further consideration in light of *Martinez v.*

8    *Ryan*, 566 U.S. 1 (2012), the Ninth Circuit ordered that the remand be expanded to address

9    the impact of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (*en banc*). (Doc. 447.)

10   Pursuant to that order, this Court ordered Detrich to file a supplemental brief "addressing

11   whether he is entitled to relief on his habeas petition in light of *McKinney*." (Doc. 449.)

12        Detrich asserts that the Arizona courts improperly applied a causal nexus

13   requirement to mitigating evidence he presented in the penalty phase of his trial, in

14   violation of *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings*, 455 U.S. 104. (Doc. 456.)

15   Detrich asserts this error had a substantial and injurious effect on his sentence because the

16   courts gave no weight to a significant amount of mitigating evidence that could reasonably

17   have led to a life sentence. (*Id.*) Respondents claim Detrich has procedurally defaulted his

18   claims that the trial court and Arizona Supreme Court violated *Eddings* by applying a

19   causal nexus test to his mitigating evidence. Alternatively, Respondents argue the claim is

20   without merit.

21        A.   Applicable law

22        In *McKinney*, the Ninth Circuit held that the Arizona Supreme Court, during a time-

23   period encompassing its review of Detrich's case, "consistently" applied an impermissible

24   causal nexus test to mitigating evidence in capital cases in violation of *Eddings*. *McKinney*,

25   813 F.3d at 803. The court explained:

26        The decisions of the Arizona Supreme Court make clear that family
         background or a mental condition could be given weight as a nonstatutory
27        mitigating factor, but only if defendant established a causal connection
         between the background or condition and his criminal behavior. For a little
28

over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test. . . .

*Id.* at 815.

A sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114; *see Lockett*, 438 U.S. at 604. Applying *Lockett* and *Eddings*, the Supreme Court has held that a state cannot adopt a "causal nexus" rule—that is, a rule precluding a sentencer from considering mitigating evidence unless a causal connection is established between the evidence and the murder. *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). While the sentencer "may determine the weight to be given relevant mitigating evidence," it "may not give it no weight by excluding such evidence from [its] consideration." *Eddings*, 455 U.S. at 114–15. The sentencer may, however, consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011), *overruled on other grounds by McKinney*, 813 F.3d at 819.

### B. Causal-nexus claim

Detrich argued in the Amended Petition that the trial court and Arizona Supreme Court unconstitutionally refused to consider mitigating evidence of an abusive background because the courts found no causal nexus between that evidence and the offense.[22] (Doc. 31 at 93–97.)

### 1. Sentencing court

This Court determined that Detrich had not fairly presented an *Eddings* claims with respect to the trial court's decision in his direct appeal because "he did not allege that these errors violated any specific provisions of the federal constitution." (Doc. 93 at 19.)

---

[22] As previously discussed, the Court addresses only the claims brought in the Amended Petition and not new claims raised for the first time in Detrich's Supplemental Brief. In the Amended Petition, Detrich argued that the Arizona courts committed a causal nexus error with respect to evidence of Detrich's "turbulent childhood," but not with respect to any other mitigating circumstance (Doc. 31 at 93–94).

The Court subsequently denied the claim of trial court error on the merits, finding that the trial court did not impose a causal connection requirement:

> Contrary to Petitioner's argument, the trial court did not impose a causal connection requirement on Petitioner's turbulent childhood; rather, the court found that Petitioner's abusive childhood was a mitigating factor. ([RT 2/8/95] at 9-10.) Again, the court was not constitutionally required to give that evidence any particular weight. At the conclusion of sentencing, the trial court stated that it had considered all of the mitigating circumstances Petitioner had put forward and weighed them against the aggravating circumstances. This Court must assume that the court did what it said it did–considered all the mitigation against the aggravation. *See Parker v. Dugger*, 498 U.S. 308, 314 (1991) (holding that a court is deemed to have taken into account all mitigating evidence where the court so states); *Ortiz [v. Stewart]*, 149 F.3d [923,] 943 (if all mitigating evidence is considered then explicit discussion of cumulative weight not necessary). Again, how the court chose to weigh the totality of mitigation against the aggravation is not a question of constitutional magnitude reviewable by this Court.

(Doc. 93 at 20–21.)

At the time of Detrich's sentence, the Arizona Supreme Court independently reviewed each death sentence to determine the presence or absence of aggravating and mitigating factors and the weight to which the factors were entitled. *See Gretzler,* 135 Ariz. at 54, 659 P.2d at 13. This independent review has, in some cases, been found to establish exhaustion for purposes of a petitioner's claim of an *Eddings* violation by the trial court. *See McKinney v. Ryan*, No. CV 03-774-PHX-DGC, 2009 WL 2432738, at *19 (D. Ariz. Aug. 10, 2009) (finding petitioner's claim that the trial court failed to "properly consider" his mitigating evidence was exhausted by the Arizona Supreme Court's independent review of his death sentence); *see also Djerf v. Schriro*, No. CV-02-0358-PHX-JAT, 2008 WL 4446535, at *23 (D. Ariz. Sept. 30, 2008) ("While the Arizona Supreme Court's independent review does not encompass any and all alleged constitutional error at sentencing, the Court finds that it did encompass Petitioner's claim that the trial court violated the Eighth and Fourteenth Amendments by failing to consider all proffered mitigating evidence."). The Court assumes, therefore, that the claim is exhausted, but, as explained below, finds the Supreme Court's decision in *McKinney* has no impact on the

Court's finding that Detrich's claim that the trial court imposed a causal connection requirement is meritless.

In considering Detrich's argument that the Arizona courts imposed an unconstitutional nexus test on his mitigating evidence, the Court looks to Ninth Circuit cases applying *McKinney*. In *Greenway v. Ryan*, 866 F.3d 1094 (9th Cir. 2017), the Ninth Circuit explained that "We said in *McKinney* that the Arizona courts had 'consistently' applied the causal-nexus test. . . . We did not say, however, that Arizona had always applied it." *Id.* at 1095 (citation omitted).

In *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), the Ninth Circuit offered additional guidance to be considered in determining whether a trial court applied a causal nexus test, including whether the trial court "state[d] a factual conclusion that any of [the petitioner's] proffered mitigation failed to affect his conduct." *Id.* at 840.

At Detrich's sentencing, the court stated that it had "considered each of the mitigating circumstances offered by the Defendant and proved to exist," and found that "they are not sufficiently substantial to outweigh the aggravating circumstances of having committed this offense in an especially cruel, heinous or depraved manner." (RT 2/8/95 at 19.) Specifically, the court found that Detrich had proven the (G)(1) mitigating circumstance. (*Id.* at 8.) *See* A.R.S. § 13-751(G)(1)). The court further found that Detrich had proven as a non-statutory mitigating factor that he came from "an abusive background, including both physical and mental abuse." (*Id.* at 9.) In addition, the court found that Detrich felt "some remorse for the killing" and took that into account as a non-statutory mitigating factor. (*Id.* at 10.) The court considered Charlton's less severe sentence and the fact that Detrich had a ten-year-old child and determined that they were not relevant non-statutory mitigating factors. (*Id.*) The court also found Detrich's lack of a prior violent conviction was a relevant, non-statutory mitigating circumstance. (*Id.*) Finally, the court considered Detrich's "longstanding history of alcohol and substance abuse," and found that history to be a non-statutory mitigating factor. (*Id.* at 15.) Significantly, the court never stated that it had considered whether the mitigating circumstances caused or explained the

1    murder or otherwise stated that the proffered mitigation failed to affect his conduct. *See*

2    *Apelt*, 878 F.3d at 840. The holding in *McKinney* has no impact on this Court's finding that

3    the trial court did not impose a causal connection requirement. The sentencing court did

4    not commit *Eddings* error.

5                    **2.  Arizona Supreme Court**

6                    This Court previously ruled that it was precluded from considering the causal nexus

7    error committed by the Arizona Supreme Court because "this part of the claim is

8    technically exhausted but procedurally defaulted." (Doc. 93 at 22.) The Court found this

9    portion of the claim was procedurally defaulted because Detrich did not raise the claim on

10   a motion for reconsideration on direct appeal or in the petition for review on post-

11   conviction review. (*Id.* at 21–23.) The Court found no cause or prejudice to excuse the

12   default, noting "Petitioner did not allege in his PCR petition or petition for review that his

13   appellate counsel was ineffective for failing to raise" the claim. (*Id.* at 22.)  The Court did

14   not rule on the merits of that claim. *Id.*

15                   Detrich does not deny that he failed to present an *Eddings* claim with respect to the

16   Arizona Supreme Court's decision. (Doc. 456 at 25–26.) Rather, Detrich argues that the

17   Arizona Supreme Court's independent review exhausted the *Eddings* claim. (*Id.* at 25.)

18                   As the Court held in addressing this claim in Petitioner's Amended Petition, the

19   independent review by the Arizona Supreme Court does not "provide the court notice of,

20   or an opportunity to correct, the alleged error." (Doc. 93 at 21.) Detrich failed to raise the

21   claim in a motion for reconsideration of the direct appeal decision or in a petition for review

22   from the denial of his PCR petition. (*See id.*) Thus, the Court found the claim technically

23   exhausted, but procedurally defaulted. (*See id.* at 22.) The Court also found that Detrich

24   failed to establish cause to overcome the default or demonstrate a fundamental miscarriage

25   of justice will occur if the claim is not considered on the merits. (*See id.* at 22–23.) The

26   Court dismissed the claim as procedurally barred. (*Id.* at 23.)

27                   Detrich asserts that the Court must reconsider its procedural ruling in light of

28   *McKinney*. In *McKinney*, Detrich claims, the Arizona Supreme Court's independent review

of the death sentence exhausted the petitioner's causal nexus claim in that court. (Doc. 456 at 25) (citing *McKinney*, 813 F.3d at 819–20.) The Court disagrees.

As Respondents correctly note, the Ninth Circuit in *McKinney* did not address whether the *Eddings* claim with respect to the Arizona Supreme Court's decision was exhausted. The district court had determined that the *Eddings* claim with respect to the *trial court's* decision was exhausted by the Arizona Supreme Court's independent review. *McKinney v. Ryan*, 2009 WL 2432738, at *19 (D. Ariz. Aug. 10, 2009). The district court analyzed the claim by considering whether it was clear from the record "that the trial court and the Arizona Supreme Court, in its independent review of the sentence considered the mitigation evidence presented by Petitioner's witnesses." (*Id.* at *22.) The Ninth Circuit did not mention the district court's procedural decision or otherwise discuss whether McKinney's claims were exhausted. Detrich's assertion that *McKinney* established that an *Eddings* claim with respect to a decision of the Arizona Supreme Court is exhausted by the Arizona Supreme Court's independent review is contradicted by both the district court and the Ninth Circuit's decisions.

Thus, as this Court has already determined, the claim that the Arizona Supreme Court applied a causal nexus requirement to Detrich's mitigating evidence is procedurally defaulted, and Detrich has not established cause or prejudice to excuse the default.

Regardless, the claim is without merit. As discussed above, *Apelt* provides this Court with guidance in determining whether a court violated *Eddings* by applying a causal nexus test in upholding a death sentence. *Apelt*, 878 F.3d at 840. These "critical factors" include whether the Arizona Supreme Court "state[d] a factual conclusion that any of [the petitioner's] proffered mitigation would have influenced him not to commit the crime"; and whether the Arizona Supreme Court cited either *State v. Ross*, 180 Ariz. 598, 886 P.2d 1354 (1994), or *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989), in reviewing the mitigating evidence.[23] *Apelt*, 878 F.3d at 840 (citing *Ramirez v. Ryan*, 937 F.3d 1230, 1250

---

[23] In *McKinney*, the Ninth Circuit considered citations by the Arizona Supreme Court to *Ross* and *Wallace*, where the Arizona Supreme Court articulated and applied its causal-nexus test, as evidence that the Arizona Supreme Court applied the improper test in

1    (9th Cir. 2019).

2        Detrich presented evidence at sentencing that he suffered abuse as a child. (RT
3    2/6/95 at 35–37) The trial court found that Detrich had proven as a non-statutory mitigating
4    factor that he came from "an abusive background, including both physical and mental
5    abuse." (RT 2/8/95 at 9.) Significantly, the Arizona Supreme Court never stated that it had
6    considered whether the mitigating circumstances caused or explained the murder or
7    otherwise mentioned a causal nexus requirement, nor did it cite any case that set forth a
8    causal nexus test. *See Detrich II*, 188 Ariz. at 67–69, 932 P.2d at 1338–1340.

9        On appeal, Detrich argued that the trial court gave inadequate weight to several
10   mitigating factors, including Detrich's abusive background. (Doc. 456-1 at 61.) The
11   Arizona Supreme Court noted the mitigating factors found by the trial court, including
12   "Defendant comes from an abusive background, including both physical and mental abuse"
13   and independently reviewed and reweighed the aggravating and mitigating circumstances.
14   *Detrich II*, 188 Ariz. at 67, 932 P.2d at 1338. Without specifically addressing Detrich's
15   abusive background, the court concluded that "when balanced against the circumstances
16   constituting the sole aggravating factor, the mitigating evidence is insufficient to warrant
17   leniency." *Id.* at 69, 932 P.2d at 1340. Although the Arizona Supreme Court did not address
18   each mitigating factor, neither did it mention a causal nexus requirement or cite any case
19   that set forth a causal nexus test. *See id.* State courts "need not exhaustively analyze each
20   mitigating factor 'as long as a reviewing federal court can discern from the record that the
21   state court did indeed consider all mitigating evidence offered by the defendant.'"
22   *Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) (quoting *Clark v. Ricketts*, 958
23   F.2d 851, 858 (9th Cir. 1991)). Neither did the Arizona Supreme Court "expressly exclude
24   any mitigation evidence or claim on the ground that it lacked causal relationship to the
25   commission of the crime." *See Greenway*, 866 F.3d at 1097.

26       In contrast, as noted in *Greenway*, the state court opinions cited in *McKinney* as
27   representative of causal nexus error describe mitigating evidence in terms of whether the

28   _____

     the case under review. *See McKinney*, 813 F.3d at 802–03, 815–16, 820–21.

1  defendant's condition caused him to lose control of his behavior at the time of the crime,

2  had an effect or impact on the defendant's behavior that was beyond the defendant's

3  control, caused a loss of impulse control or explain what caused him to kill, was linked to

4  his criminal behavior or had any effect on the crimes, or was explicitly *causally* linked or

5  connected to the criminal conduct. *Greenway*, 866 F.3d at 1097–98. The Arizona Supreme

6  Court's opinion contains no similar language indicating the court applied an impermissible

7  causal-nexus test.

8      Neither the Arizona Supreme Court nor the trial court applied an impermissible

9  causal-nexus test to exclude mitigating evidence. Both considered all of Detrich's evidence

10  offered in mitigation and found it insufficient to outweigh the serious aggravating factor.

11  Accordingly, there was no violation of clearly established federal law. Because the state

12  courts did not commit *Eddings* error, this Court need not consider whether any error

13  resulted in prejudice.

14  **IV.    CONCLUSION**

15      For the reasons stated above, the default of Claims A(1), A(4), A(8), A(10) and the

16  unexhausted portion of A(5) is not excused under *Martinez*. The claims remain defaulted

17  and barred from federal review.

18      The Court finds that the state courts did not violate *Eddings* by subjecting Detrich's

19  mitigating evidence to an unconstitutional causal nexus test.

20

21  **V.    CERTIFICATE OF APPEALABILITY**

22      Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

23  cannot take an appeal unless a certificate of appealability has been issued by an appropriate

24  judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

25  district judge must either issue or deny a certificate of appealability when it enters a final

26  order adverse to the applicant. If a certificate is issued, the court must state the specific

27  issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

28      Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner

"has made a substantial showing of the denial of a constitutional right."  This showing can

be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court' s procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim A, Detrich's claim of ineffective assistance of trial counsel claim at the guilt phase of trial. *See Browning v. Baker*, 875 F.3d 444, 471 (finding district court errs by separating a petitioner's arguments into particular instances of counsel's conduct for purposes of issuing a COA); *see also Montiel v. Chappell*, NO. 15-99000, 2022 WL 3132416, *1 (9th Cir. August 5, 2022) (same).

Accordingly,

**IT IS ORDERED denying** Claims A(1), A(4), A(8), A(10) and the unexhausted portion of Claim A(5) as procedurally defaulted and barred from federal review.

**IT IS FURTHER ORDERED granting** Detrich's request to expand the record. The record is expanded to include Exhibits 1 through 78. (*See* Docs 403-1–5; 411-2; 439-1).

**IT IS FURTHER ORDERED denying** all other requests for discovery, evidentiary development, or an evidentiary hearing.

**IT IS FURTHER ORDERED granting** a Certificate of Appealability as to Claim A.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment accordingly.

///

///

///

1         **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

2    this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

3    85007-3329.

4         Dated this 16th day of August, 2022.

Honorable David C. Bury
United States District Judge